# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| INTERNATIONALE KAPITALANLAGEGESELLSCHAFT mbH,<br><br>                    Plaintiff,<br><br>v.<br><br>TEVA PHARMACEUTICAL INDUSTRIES LTD.; EREZ VIGODMAN; EYAL DESHEH; SIGURDUR OLAFSSON; KÅRE SCHULTZ; MICHAEL MCCLELLAN; and YITZHAK PETERBURG,<br><br>                    Defendants. | Civil Action No. _____<br><br><br>**COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW AND THE ISRAEL SECURITIES LAW**<br><br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

## TABLE OF CONTENTS

**Page**

I.  SUMMARY OF THE ACTION ................................................................................. 1

II.  JURISDICTION AND VENUE ............................................................................ 12

III.  PARTIES .......................................................................................................... 12

    A.  PLAINTIFF ................................................................................................ 12

    B.  DEFENDANTS ........................................................................................... 13

IV.  FACTUAL ALLEGATIONS .............................................................................. 15

    A.  A BRIEF OVERVIEW OF THE U.S. GENERIC DRUG MARKET ........................ 15

    B.  BY 2013, TEVA WAS PERFORMING POORLY AND FACING A
       COLLAPSING ADS PRICE .......................................................................... 18

    C.  BY 2014, DEFENDANTS WERE FULLY AWARE THAT PRICE HIKES FOR
       GENERIC DRUGS COULD NOT BE MAINTAINED FOR AN EXTENDED PERIOD ....... 21

    D.  VIGODMAN BECOMES CEO AND TEVA ANNOUNCES ITS STRATEGY
       TO USE ITS STOCK AS CURRENCY FOR A MAJOR ACQUISITION ..................... 25

    E.  TEVA SUBSTANTIALLY INCREASES PRICES ON A MULTITUDE OF DRUGS
       TO PROP UP ITS DECLINING REVENUES AND INCREASE ITS SHARE PRICE ................. 26

        1.  Teva Unilaterally Increased Prices on Dozens of Drugs .................................. 26

        2.  Teva Increased Prices in Parallel with Other Manufacturers for a Number of Drugs ...... 28

        3.  Teva Actively Colluded with Other Generic Drug Manufacturers to Fix Prices ............. 29

        4.  Teva Reaps Billions of Dollars of Increased Revenues and Profits
           As a Result of the Price Increases ................................................................. 36

    F.  TEVA MISLEADS INVESTORS REGARDING THE BASIS FOR
       ITS IMPROVED FINANCIAL PERFORMANCE .................................................. 37

    G.  GENERIC DRUG PRICE INCREASES BOOST TEVA'S ADS PRICE ..................... 39

    H.  DEFENDANTS LAY PLANS FOR A MAJOR ACQUISITION—INFLATING
       THE ADS PRICE TO USE AS "CURRENCY" ................................................... 40

    I.  TEVA ANNOUNCES A $40 BILLION ACQUISITION OF ACTAVIS FUELED
       BY ITS INFLATED SHARE PRICE, AND A PROPOSED BOND OFFERING ............ 41

        1.  Teva Issues $3.375 Billion in ADS and $3.375 Billion in
           Preferred Shares While the ADS Trade at an Inflated Price .............................. 41

        2.  Defendants Rush the Notes Offering, Concealing the Fact that Teva
           Had Been Served Subpoenas by the DOJ and the Connecticut Attorney General .......... 42

    J.  THE FRAUD UNRAVELS, CAUSING THE PRICES OF TEVA SECURITIES TO FALL ........... 43

        1.  Days After the Close of the Actavis Transaction, Teva Belatedly
           Announces It Is the Subject of Government Antitrust Investigations ...................... 43

        2.  The Market Is Surprised By Dismal Results for the Third Quarter of
           2016 and the Firing of Olafsson .................................................................... 45

3.   The Truth Emerges Related to Russia, Ukraine, and Mexico ............................................. 45

4.   Teva's Profits from Its Price Increase Plan Further Dry Up, and Vigodman and Desheh Are Forced Out of the Company ..................................... 46

5.   Teva Lowers Guidance, Cuts Dividends, and Takes a $6.1 Billion Charge Against Earnings ............................................................ 47

V.    DEFENDANTS' MATERIAL MISREPRESENTATIONS AND OMISSIONS ........................ 49

A.   FEBRUARY 6, 2014 ............................................................................ 50

B.   FEBRUARY 10, 2014 .......................................................................... 51

C.   MAY 1, 2014 ................................................................................... 53

D.   JULY 31, 2014 ................................................................................. 54

E.   OCTOBER 30, 2014 .......................................................................... 55

F.   DECEMBER 11, 2014 ........................................................................ 56

G.   FEBRUARY 5 AND FEBRUARY 9, 2015 ................................................ 57

H.   APRIL 30, 2015 ............................................................................... 60

I.   JUNE 10, 2015 ................................................................................. 62

J.   JULY 27, 2015 ................................................................................. 63

K.   JULY 30, 2015 ................................................................................. 63

L.   OCTOBER 29, 2015 .......................................................................... 64

M.   NOVEMBER 19, 2015 ....................................................................... 66

N.   JANUARY 11, 2016 .......................................................................... 67

O.   FEBRUARY 11, 2016 ........................................................................ 68

P.   MARCH 8, 2016 ............................................................................... 73

Q.   MAY 9, 2016 ................................................................................... 74

R.   MAY 10, 2016 ................................................................................. 77

S.   JUNE 3 AND 8, 2016 ........................................................................ 78

T.   JULY 13 AND JULY 19, 2016 ............................................................ 80

U.   AUGUST 4, 2016 ............................................................................. 81

V.   SEPTEMBER 7 AND 9, 2016 .............................................................. 84

W.   NOVEMBER 15, 2016 ...................................................................... 87

X.   JANUARY 6, 2017 ........................................................................... 89

Y.   FEBRUARY 15, 2017 ........................................................................ 90

Z.   FALSE AND MISLEADING DENIALS OF TEVA'S PARTICIPATION IN COLLUSIVE CONDUCT ...................................... 92

AA.   FALSE AND MISLEADING STATEMENTS REGARDING ACTAVIS ACQUISITION ........ 94

VI.   ADDITIONAL ALLEGATIONS OF SCIENTER ......................................................... 99

A. THE INDIVIDUAL DEFENDANTS KNEW OF AND CONTROLLED TEVA'S GENERICS PRICING................................................................ 99

B. THE INDIVIDUAL DEFENDANTS WERE MOTIVATED TO USE TEVA'S ADS AS "CURRENCY" FOR A "TRANSFORMATIONAL" ACQUISITION. ..................................... 102

C. THE INDIVIDUAL DEFENDANTS SPOKE REPEATEDLY ABOUT TEVA'S PRICING OF GENERIC DRUGS. ........................................................ 103

D. THE INDIVIDUAL DEFENDANTS, AND ANALYSTS, WERE KEENLY FOCUSED ON TEVA'S GENERICS BUSINESS.................................................. 105

E. THE MAGNITUDE, IMPORTANCE, AND DURATION OF THE FRAUD. .......................... 106

F. TEVA'S TURN-AROUND NARRATIVE RELIED ON EXTRAORDINARY PRICE INCREASES............................................................................ 108

G. THE FRAUD CONCERNS THE CORE OF TEVA'S OPERATIONS. .................................. 109

H. THE COLLUSIVE NATURE OF THE CONCEALED PRICE INCREASES SUPPORTS SCIENTER. ............................................................................ 110

I. GOVERNMENT EVIDENCE SUPPORTS AN INFERENCE OF SCIENTER. .......................... 113

J. THE INDIVIDUAL DEFENDANTS' HIGH-LEVEL POSITIONS, ACCESS TO INFORMATION, AND CONTROL OF TEVA'S PUBLIC STATEMENTS. ...................... 116

K. THE SHORT PERIOD OF TIME BETWEEN THE FALSE STATEMENTS AND THE CORRECTIVE DISCLOSURES SUPPORTS SCIENTER. .................................... 119

L. THE INDIVIDUAL DEFENDANTS WERE PERSONALLY MOTIVATED BY COMPENSATION. ................................................................................ 120

   1. 2014 Compensation ........................................................................ 121

   2. 2015 Compensation ........................................................................ 122

M. CONTEMPORANEOUS RED FLAGS INDICATED THAT DEFENDANTS' STATEMENTS WERE FALSE OR MISLEADING. ........................................... 123

N. THE ABRUPT DEPARTURES OF TOP EXECUTIVES. ...................................... 126

O. CORPORATE SCIENTER ............................................................................ 127

VII. LOSS CAUSATION............................................................................ 128

A. AUGUST 4-5, 2016 ........................................................................ 130

B. NOVEMBER 3, 2016, DECEMBER 13-16, 2016 .......................................... 131

C. NOVEMBER 15, 2016........................................................................ 133

D. DECEMBER 5-6, 2016 ........................................................................ 135

E. JANUARY 6, 2017 ........................................................................ 136

F. FEBRUARY 6-7, 2017 ........................................................................ 137

G. AUGUST 3-7, 2017 ........................................................................ 138

H. NOVEMBER 2, 2017........................................................................ 140

I. FEBRUARY 8, 2018........................................................................ 140

      J.  DECEMBER 7-10, 2018 ........................................................................ 141

      K.  MAY 10-13, 2019 .............................................................................. 142

VIII.    PLAINTIFF IS ENTITLED TO A PRESUMPTION OF RELIANCE ..................................... 143

IX.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION
DOCTRINE DO NOT APPLY ................................................................................. 144

X.    CLAIMS FOR RELIEF ........................................................................................... 145

COUNT I
For Violation of Section 10(b) of The Exchange Act and Rule 10b-5
in Connection with Plaintiff's Domestic Acquisitions of Teva ADS
and Preferred Shares (Against All Defendants).................................................... 145

COUNT II For Violation of Section 20(a) of The Exchange Act
in Connection with Plaintiff's Domestic Acquisitions of Teva ADS
and Preferred Shares (Against The Individual Defendants) ............................... 146

COUNT III For Violation of The Israel Securities Law, 1968 in Connection with
Plaintiff's Acquisitions of Teva Ordinary Shares
(Against All Defendants) .................................................................................. 147

XI.    JURY DEMAND ................................................................................................... 149

XII.    PRAYER FOR RELIEF .......................................................................................... 149

Plaintiff Internationale Kapitalanlagegesellschaft mbH ("Plaintiff") asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and claims under the Israel Securities Law, 1968 (the "Israel Securities Law") against Teva Pharmaceutical Industries Ltd. ("Teva" or the "Company") and certain of Teva's current and former employees and officers.  Plaintiff seeks to recover damages for losses Plaintiff has suffered in connection with its acquisition of Teva Securities (defined herein) during the period February 6, 2014 to May 10, 2019, inclusive (the "Relevant Period") at prices that were artificially inflated as a result of the violations of the securities laws alleged herein.

Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiff's counsel.  This investigation included, among other things, a review of the following: Teva's filings with the U.S. Securities and Exchange Commission (the "SEC"); transcripts of Teva's public conference calls; press releases issued by Teva; analyst reports regarding Teva; civil complaints alleging that Teva and its subsidiaries violated federal and state antitrust and unfair competition laws; other documents concerning criminal investigations and proceedings into collusion between generic drug manufacturers; generic drug pricing data from a nationally-recognized source, and the second amended consolidated class action complaint filed on December 13, 2019 (the "Second Amended Class Complaint") in *Ontario Teachers' Pension Plan Board v. Teva Pharmaceutical Industries Ltd.*, No. 3:17-cv-00558 (SRU) (D. Conn.) (the "Class Action").  Plaintiff believes that discovery will yield substantial additional evidentiary support for the allegations set forth herein.

## I.   SUMMARY OF THE ACTION

1.     This action arises from a long series of material misstatements and omissions made by Teva about its U.S. generic drugs segment, including its financial performance and

projections; the source and sustainability of the Company's revenues, profits and growth; the Company's vulnerability to price erosion; its collusion with supposed competitors to manipulate the generic drug market; and its acquisition of Allergan Generics (also known as "Actavis"). Defendants[1] repeatedly and explicitly denied that Teva's remarkable turn-around beginning in 2013 was based on a strategy of systematically raising generic drug prices across a large swath of Teva's generic drug portfolio (the "Price-Hike Strategy"). During the Relevant Period, often in response to *direct* questions from analysts about the pricing of Teva's generic drugs, Defendants falsely and consistently attributed Teva's quarter-after-quarter financial growth to fundamental business strategies—in particular, cost cutting and strong product management. Defendants' misstatements and omissions misled the market and resulted in the artificial inflation of the price of Teva's securities.

2.     Before the market learned the truth, Teva publicly issued billions of dollars of American Depositary Receipt shares ("ADS"), preferred shares ("Preferred Shares"), and six series of notes (the "Notes") to fund its strategic acquisition of Actavis, while concealing the existence of the Price-Hike Strategy and the fact that the Company was facing multiple government investigations. As Defendants' fraud began to be exposed, *three* of Teva's top executives abruptly left the Company: Sigurdur Olafsson, the President and Chief Executive Officer ("CEO") of Teva's Global Generic Medicines Group, was fired on December 5, 2016; Erez Vigodman, the Company's President and CEO, was terminated on February 6, 2017; and Eyal Desheh, Teva's Chief Financial Officer, left on June 30, 2017. When the market learned the truth concealed by Defendants, investors suffered enormous losses resulting from precipitous declines in the price of Teva securities.

---

[1]    Defendants are Teva, Erez Vigodman, Eyal Desheh, Sigurdur Olafsson, Kåre Schultz, Michael McClellan, and Yitzhak Peterburg.

3.      Teva is the largest generic drug manufacturer and one of the fifteen largest pharmaceutical companies in the world.  Prior to the Relevant Period, however, Teva was facing multiple challenges.  Its top-selling generic drug (budesonide, also known as Pulmicort) was suffering from new competition, its top revenue driver (Copaxone, a branded drug) was facing imminent competition from a generic entrant, and the Company's stock price was flat.  Defendants, under pressure to improve the Company's fortune, turned to fraud.

4.      Teva initiated the Price-Hike Strategy in 2013, rolling out a first batch of price increases in July and August of that year.  All told, Teva imposed price increases on at least fifty-five generic drugs—with multiple increases for many of these drugs—during the Relevant Period, including some increases of 500-1000%.  Teva's senior officers considered and approved each increase, and then carefully tracked the resulting profits generated on a daily, weekly, and quarterly basis. During the Relevant Period, the financial impact of the strategy was staggering, generating billions of dollars of additional revenue and profit attributable solely to the price increases.  Defendants issued financial reports and made public statements about the Company's financial performance while denying that the basis of that performance was the Price-Hike Strategy.

5.      Defendants concealed this information because even though it was legal for Teva to raise the prices of its generic drugs, the Price-Hike Strategy was inherently risky and unsustainable.  The pricing of pharmaceutical drugs, in particular generic pharmaceuticals, is an issue of intense public debate and scrutiny, and any appearance of price gouging could elicit public outrage, Congressional scrutiny, law enforcement investigations, and even civil and criminal liability.  Moreover, generic drugs of the same formulation and dosage are essentially interchangeable, and wholesale purchasers of generics routinely set pricing through competitive

Request for Proposal ("RFP") bidding. Thus, when Teva raised prices, any manufacturer in the generic drug market could underbid Teva and wipe out Teva's market share. Had Teva disclosed the truth of its business strategy, the market would have valued the Company very differently than a company driven by fundamental growth and cost cutting, as Defendants falsely claimed Teva was.

6.      There was an enormous additional risk: Teva's Price-Hike Strategy depended on price-fixing collusion within the generic drug industry. Beginning in mid-2013, Teva began to collude with its supposed competitors to increase generic drug prices, thereby decreasing competition and artificially inflating revenues. Teva agreed to fix the prices of, or allocate the market for, at least 25 generic drugs, and it systematically raised prices across its generic drug portfolio, often in tandem with other generics companies. Defendants thus had to conceal that the Price-Hike Strategy was the primary contributor to Teva's massive boost in revenues and profits. Their secret was a ticking time bomb.

7.      The Price-Hike Strategy fueled Teva's turn-around. During the third quarter of 2013, the Company's U.S. generics revenues increased more than $1 billion, with a 6% increase year-over-year. The generics segment was the most profitable part of Teva's business that year, boasting 14% revenue growth and 50% gross margins. The Company's stock price rose 32% during the first quarter of 2014, posting its biggest quarterly rally since 2005.

8.      For a period, Defendants very effectively concealed that the Price-Hike Strategy was driving Teva's rapid growth, which they invariably attributed to other, legitimate sources. Neither Teva nor any of its peers disclosed to the investing public any information concerning individual drug prices, changes in price, or revenues per drug, let alone profits. Thus, Wall Street analysts, though intimately familiar with Teva's business and disclosures, had no way of

determining that Teva was profiting from systematic price increases, except, of course, by asking Defendants themselves.

9.     Analysts repeatedly and directly asked whether Teva's profits and performance were connected to price increases.  The Individual Defendants[2] explicitly denied any such connection, however, representing that Teva's revenues and profits arose from sound business strategies and were not the product of generic drug price increases, that Teva was not participating in any collusion, and, therefore, that the Company was not vulnerable to, and had not experienced, substantial price erosion.

10.     A substantial factual record demonstrates that Teva colluded to manipulate the prices of at least two dozen drugs.  These drugs' prices moved in near-perfect unison between companies, and the price increases were exponential.  Moreover, there is a pattern of abrupt spikes in Teva's prices, in tandem with those of competitors, following industry conferences attended by Teva and those competitors.

11.     There is no non-collusive explanation for Teva's sudden, synchronized price increases.  There were no supply shortages or sudden increases in demand for these drugs during the Relevant Period, and no major competitor left the market.  Moreover, the market was susceptible to collusion because: (1) production of these drugs was dominated by only a few companies; (2) demand was inelastic; (3) generic drugs are commodity-like prices, for which the only distinguishing factor was purchasers was price; (4) there were no viable substitutes; (5) there were high barriers to new market entrants; and (6) information sharing and price discovery were common.  Moreover, if the price increases resulted from temporary supply shortages, cost increases, or other benign explanations, subsequent price decreases would be expected, but these

---

[2]   The Individual Defendants are Erez Vigodman, Eyal Desheh, Sigurdur Olafsson, Kåre Schultz, Michael McClellan, and Yitzhak Peterburg.

did not occur.  In addition, Teva's extraordinary price increases would have been against its economic self-interest in the absence of collusion with its competitors.

12.     In light of this, Defendants denied that Teva's success was driven by price increases, stating, for example:

- "[A]ll the improvement you see in our . . . margins is **not driven by price**. It is driven by quantities and by mix and by efficiency measures. **Not by price, [in] 2014, 2015, and that's a very important message**." (Defendant Vigodman, Oct. 29, 2015 earnings call).

- "So how did we" achieve $1 billion in increased profit margin?" **"Not by pricing** but by portfolio mix, new products, and efficiency measures." (Defendant Olafsson, Feb. 11, 2016 earnings call).

- "Now there's a lot of **noise around pricing issues**. . . .  Our exposure to all these things is very minimal . . . .  **Teva was not associated with any of that**." (Defendant Desheh, Nov. 19, 2015 investor conference).

13.     Defendants falsely claimed that any price increases were rare and made only in connection with abnormalities in the market, but this was untrue.  Contrary to Defendants' false statements, moreover, the Price-Hike Strategy drove the Company's success, yielding hundreds of millions of dollars in additional revenue and profit quarter-over-quarter through the second quarter of 2015 ("2Q15"[3]).

14.     Defendants had a particular motive for this conduct.  Their goal was to inflate Teva's share price in order to make a large acquisition that the Company otherwise could not afford.  In January 2014, Defendant Desheh predicted that within twelve to twenty-four months Teva's "stock price will go up and we'll be able to use our share as a currency . . . to fund transactions" that could transform Teva into an even larger, more dominant force in generics. Defendant Vigodman, who took Teva's helm as CEO in February 2014 (at the start of the Relevant Period), also reportedly wanted Teva to make a significant strategic acquisition.

---

[3]     The Complaint at times refers to quarterly and annual accounting periods in this manner. Thus, 2Q15 refers to the second quarter of 2015, and FY15 refers to the fiscal year ending 2015.

15.     As Desheh predicted, within eighteen months, as Teva reported increasing profits resulting from the Price-Hike Strategy, the price of Teva's ADS shot up.  Teva's share price hit an all-time high of $72 on July 27, 2015, the very day Teva announced it was acquiring Actavis for $40 billion.  Teva did not have the cash to pay for Actavis outright; the price tag equaled roughly twenty years of Teva's recent average profits. As Defendants intended all along, they used Teva's ADS as "currency" to raise $27 billion from investors to fund the deal.   The acquisition would take nearly a year to close, in part because of the need for regulatory approval from the Federal Trade Commission ("FTC").

16.     By mid-2015, however, generic drug pricing had come under intense scrutiny from law enforcement, and Congress was calling for legislation to regulate pricing. Analysts asked about the implications for Teva, but CFO Desheh deflected: "[T]here's a lot of *noise around pricing* issues. Some of it's coming from politicians. . . .  *Our exposure to all these things is very minimal*."

17.     In December 2015, at the height of this scrutiny and Defendants' repeated denials of pricing issues at Teva, the Company issued another $3.375 billion of ADS and, simultaneously, an equivalent value of preferred shares, for a total of nearly $7 billion (the "ADS/Preferred Offering").  The offering materials for the ADS/Preferred Offering concealed the actual source of Teva's apparent turn-around—the unsustainable Price-Hike Strategy.

18.     As 2016 began, other pharmaceutical companies reported disappointing earnings attributed to increased pressure to reduce prices.  This pricing pressure was a byproduct of heightened government scrutiny and public outcry.  When asked whether Teva faced the same risks, Defendant Olafsson falsely claimed that Teva was not exposed.  At an analyst call on May 9, 2016, he stated: "Teva has not seen any fundamental change or worsening in the pricing

environment." Vigodman claimed "[w]hat we see is a 4% to 5% erosion [in pricing] . . . . That's not something which is different from what we said during 2015."  In fact, that very pricing pressure was eviscerating the profits and revenues of Teva's generics segment.

19.     On July 12, 2016, the Connecticut Attorney General served Teva with a subpoena concerning its pricing for generic drugs.  The receipt of this subpoena ended Teva's ability to continue the Price-Hike Strategy, and Teva did not make any price hikes after this point.

20.     With investigators closing in, Teva desperately sought to close the Actavis deal before the market learned the truth about the Price-Hike Strategy and Teva's resulting vulnerability to price erosion.  Teva had previously announced in May that it would issue $20 billion of debt in the fall of 2016 to fund its acquisition of Actavis.  On July 13, 2016, however— *one day* after receiving the Connecticut Attorney General's subpoena—Defendants announced that this offering of six series of notes (the "Notes Offering") would be launched later that same day, and began filing paperwork with the SEC related to the Notes Offering.  Despite dozens of pages disclosing other investigations and legal matters, these filings said *nothing* about the Connecticut Attorney General's subpoena, nor about a similar subpoena served the prior month by the U.S. Department of Justice (the "DOJ").

21.     After raising billions from investors in the Notes Offering, Teva closed the Actavis deal on August 2, 2016.  Just *two days later*, Teva reported disappointing earnings and disclosed the subpoenas from the Connecticut Attorney General and the DOJ, which Teva admitted it received on June 21, 2016.  Though the truth was beginning to surface, Defendants continued to deny that price increases ever occurred.  For example, in a September 9, 2016 analyst call, Defendant Olafsson stated that "people that say that . . . there's a big generic price inflation, are simply wrong."

22.     Reality overtook Defendants shortly thereafter. On September 12, 2016, the U.S. Government Accountability Office ("GAO") publicly released a report detailing hundreds of unexplained "extraordinary price increases" (defined as a particular drug's price increasing more than 100% within a twelve-month period), including numerous increases of *more than 1,000%*. Teva owned the rights to at least 40% of the drugs the GAO identified as having exhibited an extraordinary price increase between 2013 and 2015.

23.     On November 3, 2016, *Bloomberg* reported that Teva was a target of investigations and looming charges from the DOJ and a group of State Attorneys General. Nevertheless, Defendants continue to falsely deny that Teva's financial performance was fueled by the Price-Hike Strategy and was susceptible to price erosion.  On November 15, 2016, Vigodman told investors that "we are not aware of any fact that would give rise to exposure to Teva with respect to the investigation" by the DOJ into price collusion in the generics industry. During the same call, in response to an analyst's question regarding accelerated price decreases during the third quarter of 2016—the result of government scrutiny spelling doom for the Price-Hike Strategy—Olafsson denied that the price decreases resulted from increased competition or the "tam[ing]" of previous increases, falsely explaining that the price erosion was an anomaly arising from Teva's FTC-mandated divestiture of certain products relating to the Actavis acquisition.  Investors continued to rely on Defendants' false reassurances that Teva was not vulnerable to price erosion, even as the Price-Hike Strategy crumbled.

24.     Olafsson was fired less than three weeks later.  The following week, on December 14, 2016, the DOJ unsealed charges against the CEO and President of Teva's competitor Heritage Pharmaceuticals Inc.—Jeffrey Glazer and Jason Malek, respectively—for colluding with other generic pharmaceutical manufacturers to allocate customers, rig bids, and fix prices.

The charges concerned two drugs that Teva also sold.  Glazer and Malek later pleaded guilty to criminal changes, admitting that they conspired with Teva.  Their co-conspirators were identified as including "executives at the highest levels of" other generic drug manufacturers.

25.     On December 15, 2016, the Attorneys General of twenty states, led by the Connecticut Attorney General, sued Teva for violations of the Sherman Antitrust Act (the "Sherman Act").  The action alleged that Teva allocated customers and market share and agreed with other manufacturers collectively to raise prices of generic drugs, including Glyburide, a drug for which Teva dominated the market from 2012 to 2017.  Eventually, the action included claims by the Attorneys General of *forty-seven* U.S. States, the District of Columbia, and Puerto Rico (together, the "State AGs").  The Connecticut Attorney General described the fraud as "on an almost unimaginable scale."

26.     Defendant Vigodman was terminated in February 2017, though no replacement had been identified.  Then, in April 2017, Teva announced that Defendant Desheh was leaving the Company.  On August 3, 2017, on the first investor call after these terminations, Teva announced that it was required to take a *$6.1 billion* write-down of its entire generics business because its fundamental value had been "permanently impaired."

27.     Without the Price-Hike Strategy, Teva's ability to service its more than $30 billion in debt was endangered, and credit-rating agencies downgraded the Company's debt to just above "junk."  And after thirty years of maintaining or increasing its dividend, Teva's new Board of Directors and management of Teva were forced to cut the dividend by 75%.

28.     In May 2019, the State AGs filed an expanded complaint alleging that Teva significantly raised prices on approximately 112 generic drugs and fixed prices and/or allocated markets for at least 107 drugs.  That expanded complaint sets forth extensive evidence of Teva's

collusive conduct.  This Complaint identifies, on information and belief, the Teva employee who the State AGs allege was central in the price-fixing conduct.  This employee, however, was not in a position to agree to or approve any pricing changes.  Rather, Maureen Cavanaugh ("Cavanaugh")[4] and Defendant Griffin approved the price increases alleged herein.

29.    Teva was a fundamentally weaker company than investors were led to believe. As criminal charges, guilty pleas, and government allegations and investigations mounted in the second half of 2016, the market began to learn the truth, and Teva was forced to abandon the Price-Hike Strategy it continued to deny ever existed.  As the concealed truth was revealed, the share price plummeted more than 66%, causing Plaintiff to incur massive losses.

30.    Plaintiff's claims arise from five interrelated categories of misstatements and omissions.

a.    First, Defendants explicitly attributed Teva's financial performance to legitimate and benign business strategies, including cost cutting and product selection.  Having addressed the basis of Teva's revenues, Defendants were required to disclose the reality that Teva's performance was driven by the Price-Hike Strategy.  Moreover, Defendants failed to disclose, as required by Item 303 of SEC Regulation S-K and Item 5 of Form 20-F, that the Price-Hike Strategy was impacting Teva's profits, both as those profits dramatically increased and later as they evaporated.

b.    Second, Defendants falsely denied that Teva had engaged in price increases or received material benefit therefrom.  Rather, Defendants claimed that Teva raised price on only a few generic drugs when a market shortage occurred.

---

[4]    During the Relevant Period, Cavanaugh served as Teva USA's SVP and Chief Operating Officer, North America Generics.

c.      <u>Third</u>, Defendants falsely claimed that Teva was immune to pricing pressures, though in reality it was unable to sustain the undisclosed Price-Hike Strategy.

d.      <u>Fourth</u>, Defendants repeatedly stated that Teva was excelling in a highly competitive environment. That was far from the truth, as Teva was able to adopt and pursue the Price-Hike Strategy only because of a lack of competition resulting from its collusion with supposed competitors.

f.      <u>Fifth</u>, Defendants failed to disclose and actively concealed the negative impact of the Actavis acquisition and integration of the acquired business on Teva's financial results and business prospects.

g.      <u>Sixth</u>, since August 4, 2017, Teva repeatedly—and falsely—denied any involvement in collusive misconduct, further misleading investors during the Relevant Period.

## II.   JURISDICTION AND VENUE

31.     This Court has jurisdiction over the subject matter of Counts I and II pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over Count III pursuant to 28 U.S.C. § 1367.

32.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391.

33.     In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telecommunications, and the facilities of the New York Stock Exchange ("NYSE").

## III.  PARTIES

### A.   PLAINTIFF

34.     Plaintiff is a German fund management company with over €200 billion of assets under management, including assets for institutional investors and mutual funds.  Plaintiff

functions as a "Master KAG" under German investment company law and is acting on behalf of and in the sole interest of its (non-legal entity) investment funds based on its fiduciary duties to its clients.  It is the only corporate entity with standing to assert the claims asserted herein, as the funds administered and managed by INKA are registered funds under German law but without legal personality.

35.     During the Relevant Period, Plaintiff purchased (1) Teva ADS and Preferred Shares on a United States exchange and/or in transactions whereby Plaintiff incurred irrevocable liability for the purchases within the United States and/or title to the purchased securities passed within the United States and (2) Teva ordinary shares.  These purchases were made at prices that were artificially inflated by the violations of the Exchange Act and Israel Securities Law described herein, and Plaintiff suffered damages thereby as a result of those violations

**B.   DEFENDANTS**

36.     Defendant Teva, the world's largest generic drug manufacturer, is incorporated in Israel with its executive offices at 5 Basel Street, P.O. Box 3190, Petach Tikva, 4951033, Israel. Teva engages in interstate commerce within this District and regularly does business in Connecticut.  Teva's wholly-owned subsidiary Teva Pharmaceuticals USA, Inc. ("Teva USA") has its principal offices at 1090 Horsham Road, North Wales, Pennsylvania, 19454.  Teva ADS, each of which represents one ordinary share of Teva, trade on the NYSE under the symbol "TEVA."  Teva ordinary shares trade on the Tel Aviv Stock Exchange ("TASE") under the symbol "TEVA."  Teva's Preferred Shares trade in the U.S.

37.     Defendant Erez Vigodman ("Vigodman") served as Teva's President and CEO from February 11, 2014, to February 6, 2017, and as a Teva Director from June 22, 2009, to February 6, 2017.  Vigodman signed and certified certain of Teva's alleged false and misleading reports on Forms 20-F and Forms 6-K filed with the SEC during the Relevant Period, as well as

the shelf registration statement on Form F-3 that Teva filed with the SEC on November 30, 2015 in connection with the ADS/Preferred Offering (the "ADS/Preferred Registration Statement") and the post-effective amendment thereto that Teva filed on July 13, 2016 in connection with the Notes Offering (the "Notes Registration Statement").  Vigodman also made false and misleading statements on numerous conference calls with investors and analysts, as alleged specifically herein.  During his tenure at Teva, Vigodman possessed the power and authority to, and in fact did approve and control the contents of the Company's SEC filings alleged herein to be false and misleading.

38.    Defendant Eyal Desheh ("Desheh") served as Teva's CFO from July 2008 to June 30, 2017, except from October 30, 2013 to February 11, 2014, a period during which he served as Teva's Interim CEO and Interim President.  Desheh signed and certified certain of Teva's false and misleading reports on Forms 20-F and 6-K filed with the SEC during the Relevant Period, as well as the ADS/Preferred Registration Statement and the Notes Registration Statement filed with the SEC.  Desheh also made false and misleading statements on numerous conference calls with investors and analysts, as alleged specifically herein.

39.    Defendant Sigurdur "Siggi" Olafsson ("Olafsson") served as President and CEO of Teva's Global Generic Medicines Group from July 1, 2014 to December 5, 2016.  Olafsson made false and misleading statements on numerous conference calls with investors and analysts, as alleged herein.  During his tenure at Teva, Olafsson possessed the power and authority, and in fact did approve and control the contents of the Company's SEC filings alleged herein to be false and misleading.

40.    Defendant Kåre Schultz ("Schultz") has served as Teva's President and Chief Executive Officer, and as a member of the Board of Directors, since November 1, 2017.

41.     Defendant Michael McClellan ("McClellan") served as Executive Vice President and Chief Financial Officer of Teva from November 2017 until November 8, 2019. Prior to serving in that role, McClellan served as Teva's Interim Group CFO from July 2017 to November 2017 and Senior Vice President and CFO, Global Specialty Medicines from 2015 to November 2017.

42.     Defendant Yitzhak Peterburg ("Peterburg") served as Teva's Interim President and CEO from February 6, 2017 to October 31, 2017. He also served as a Teva Director from June 2009 to July 2010, and from 2012 until December 12, 2017, and as Chairman of Teva's Board of Directors from January 1, 2015 to February 6, 2017.

43.     Defendants Vigodman, Desheh, Olafsson, Schultz, McClellan, and Peterburg are referred to herein collectively as the "Individual Defendants."  Teva and the Individual Defendants are referred to herein as the "Defendants."

## IV.   FACTUAL ALLEGATIONS

### A.  A BRIEF OVERVIEW OF THE U.S. GENERIC DRUG MARKET

44.     In 2015, an estimated $84 billion of generic pharmaceutical drugs were sold in the United States, with generics accounting for approximately 88% of all prescriptions written in the United States.  Teva controlled as much as 16% of the U.S. market as of year-end 2016.

45.     Under U.S. law, newly discovered drugs receive patent protection.  But once this protection expires, other companies may obtain government approval to manufacture and market "generic" drugs to compete.  According to the U.S. Food and Drug Administration's ("FDA") glossary, a generic drug shall be "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."  Once the FDA approves a generic as "therapeutically equivalent" to a brand name drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."  Thus, "[d]rug

products classified as therapeutically equivalent [to a branded drug] can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed product."

46.     The regulatory filings necessary to market generic drugs are typically made before the applicable patent expires so that generics manufacturers can maximize the amount of time they can sell the drug.   Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), manufacturers that create a new drug must obtain FDA approval to sell the product by filing a New Drug Application ("NDA").   21 U.S.C. §§ 301-392.   An NDA must include specific data concerning the safety and effectiveness of the drug, as well as information on applicable patents. 21 U.S.C. § 355(a), (b).

47.     The Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act") simplified the regulatory hurdles for prospective generics manufacturers by allowing a manufacturer seeking approval to sell a generic version of a brand-name drug to file an Abbreviated New Drug Application ("ANDA"), a much simpler filing than an NDA. Once the FDA determines that a drug company's application contains sufficient scientific evidence establishing the bioequivalence of the product to a previously-approved branded drug, an applicant may manufacture, market, and sell the generic drug product.

48.     Because each generic must be identical, the only real means for manufacturers to compete is by price.   As reported in an audit report by the U.S. Government Accountability Office (the "GAO") titled "Generic Drugs Under Medicare," dated in August 2016 and publicly released on September 12, 2016 (the "August 2016 GAO Report") concerning generic drug

prices, each of the five manufacturers interviewed by the GAO—including Teva—"reported that competition is the primary driver of generic drug prices."[5]

49.     Ordinarily, and consistent with established economic principles and common sense, once the first lower-priced generic enters the market, the brand-name drug rapidly loses sales, and sales continue to decrease.  As new generic competitors enter the market, the price of the drug typically continues to decrease.  In a normally functioning market for a generic drug, the market participants compete to maintain market share, and if one manufacturer raises prices, the others will lower prices and steal its customers.

50.     By 2012, resource problems at the FDA had become a significant limitation on the processing and approval of ANDAs for generic drugs.  In 2012, the FDA faced a backlog of over 2,800 unexamined ANDAs, and the average waiting period for an ANDA approval had increased to 31 months.

51.     In addition, the global market for generic pharmaceutical manufacturers has undergone substantial consolidation since at least 2005, which fueled the growth of a handful of large manufacturers, like Teva, who together dominate many of the generic drug markets.  Teva gained the status as the world's largest manufacturer of generic drugs, leading the U.S. generic market in total prescriptions and new prescriptions, through a series of acquisitions.  For example, Teva acquired Ivax Corp. for $7.4 billion in 2006, Barr Laboratories for $7.4 billion in 2008, Ratiopharm—Germany's second largest generic drug producer—for $5 billion in 2010, and Actavis for $40 billion in 2016.

52.     Teva's competitors also went on acquisition sprees.  By mid-2015, a handful of players controlled 50% of the market: Teva (13%), Mylan (11%), Actavis (8%), the Sandoz

---

[5]     U.S. Gov't Accountability Off., GAO16-706, *Generic Drugs Under Medicare Part D* 11-12, 16 (Aug. 2016).

division of Novartis AG ("Sandoz") (8%), Sun Pharmaceutical Industries, Inc. ("Sun") (4%), Endo International plc ("Endo") (3%), and Par Pharmaceutical ("Par") (3%).   In 2016, the consolidation continued with Endo's acquisition of Par.

53.     The backlog of unapproved drugs, which limited generic competition, combined with consolidation of generic drug companies, created a window in which those companies had the ability to increase prices.  For example, the August 2016 GAO Report found that more than 300 of the 1,441 established generic drugs examined by the study had one or more instances of "extraordinary price increases"—*i.e.*, "periods of prices at least doubling" between the first quarter of 2010 and the first quarter of 2015.  In 2014 alone, more than 100 generic drugs experienced these extraordinary price increases.  For 48 of these 100 drugs, the price increases were 500% or higher.

### B. BY 2013, TEVA WAS PERFORMING POORLY AND FACING A COLLAPSING ADS PRICE

54.     Heading into 2013, Teva faced a number of significant issues.  <u>First</u>, by 2012, Teva's ADS price had fallen into the $30s from a high of over $60 in 2010.

55.     <u>Second</u>, in 2012, Teva received subpoenas from the SEC relating to a Foreign Corrupt Practices Act ("FCPA") investigation into Teva's bribery scheme to generate sales and gain market share of generic drugs in Russia, Ukraine and Mexico (*SEC v. Teva Pharm. Indus.*, No. 1:16-cv-25298 (KMM) (S.D. Fla. Dec. 22, 2016) (ECF No. 1 (Complaint) at ¶ 2)).  The SEC also alleged that Teva deliberately falsified its accounting.  Teva's generics revenues from "Rest of World" markets ("ROW") (including those subject to the FCPA investigation) fell approximately $280 million in 2013 and continued to fall thereafter.  Ultimately, Teva paid a $519 million fine and entered into a deferred prosecution agreement.   The investigation obstructed the revenue pipelines from those countries.

56.     <u>Third</u>, Teva's U.S. generics business reported dramatically lower revenues, year over year.  Then-CEO Jeremy M. Levin ("Levin"), Teva's CEO from May 9, 2012 to October 30, 2014, acknowledged in August 2013 that the U.S. generics business had been "slowing fundamentally" for years.   In fact, Teva was the worst performing generic drug company compared to its peers, despite being the largest.   As a Deutsche Bank analyst concluded in a May 3, 2013 report, Teva's overall generics business had "significantly underperformed."

57.     <u>Fourth</u>, Teva's generics segment's profitability was dominated by one drug— budesonide, also known as generic Pulmicort—which was at heighted risk of losing exclusivity in light of a generic entrant from Actavis.  Excluding profits from generic Pulmicort, Teva's generics segment was close to break-even.

58.     <u>Fifth</u>, Teva would soon lose its patent protection on Copaxone, which was far and away its most important drug, accounting for as much as 40% of Teva's operating profits at that time.  Due to this impending loss of exclusivity, Teva knew it could face generic competition to Copaxone as early as mid-2014.

59.     Teva's business has two reporting segments, specialty medicines (*i.e.*, branded drugs) and generic medicines.  During the Relevant Period, Teva's generics segment contributed approximately half of the Company's revenues.  Teva's U.S. generics business is the most important part of its generics segment, producing approximately half of Teva's overall generics revenues.

60.     In 2013, Levin announced a strategy focusing on Teva's specialty medicines segment.  Abruptly, however, Levin was fired on October 30, 2013, after just 18 months as CEO, and was immediately replaced in an interim capacity by Defendant Desheh.  On an investor call on that date, both Desheh and Chairman Phillip Frost were enthusiastic about Teva's prospects.

Desheh informed the market that Teva "ha[d] decided to accelerate" its purported cost reduction plan and promised "to create a much better, efficient generic machine," while Frost told analysts that his friends were buying "hundreds of millions of dollars" of Teva stock.

61.     In reality, just months earlier, recognizing that the backlog in ANDA approvals at the FDA discussed above had, at least temporarily, restricted competition for some generic drugs, Teva had undertaken a risky gambit to improve its results—substantial price increases for certain of its drugs.  In July and August 2013, Teva increased prices on a number of drugs, namely: Oxybutynin Chloride Tablets; Nadolol Tablets; Fluconazole Tablets; Methotrexate Sodium Tablets; Cimetidine Tablets; Prazosin Capsules; Ranitidine HCL Tablets; Enalapril Maleate Tablets; Doxazosin Mesylate Tablets; Etodolac Tablets; Pravastatin Sodium Tablets; Ketoprofen Capsules; Etodolac SR Tablets; Tolmetin Sodium-Capsules; Clemastine Fumarate; Diltiazem HCL Tablets; Ketorolac Trometh Tablets; and Diclofenac Potassium Tablets.[6]

62.     As this decision had not yielded adequate results by October 2013, however, CEO Levin lost his job.

63.     By the beginning of 2014, Desheh's optimism became more strident as he announced Teva's motivation to make a major acquisition, predicting that within 12 to 24 months Teva's "stock price will go up and we'll be able to use our share as a currency . . . to fund transactions."  As Defendant Vigodman took the helm as new CEO in February 2014, analysts reported that he also supported engaging in a significant acquisition.  With the stock price below $40, however, Teva's CFO concluded that "[i]t's just too expensive.  There's no deal in the world that will justify using our stocks."

---

[6]     The specific timing and price increases for these drugs are set forth in the charts in Sections IV.E and in Appendix A hereto.

### C.  BY 2014, DEFENDANTS WERE FULLY AWARE THAT PRICE HIKES FOR GENERIC DRUGS COULD NOT BE MAINTAINED FOR AN EXTENDED PERIOD

64.    Recognizing the enormous backlog the FDA was experiencing in its ANDA approval process, and the attendant negative impacts on competition in the provision of generic drugs, Congress enacted the Generic Drug User Fee Amendments ("GDUFA") to provide the FDA with a supplemental revenue source to spur the approval process.  GDUFA went into effect in October of 2012, and instituted user fees on ANDA submissions and other facility fees to generate $1.5 billion over the life of the five-year program.  The goal of GDUFA was to eliminate the ANDA backlog and reduce the average review time to ten months or less.  The expectation was that, once the fees flowed into the system and new FDA reviewers were hired and trained, backlogs would decrease and competition would increase, severely curtailing generic drug makers' ability to increase prices.  Thus, by late 2012 or early 2013, generic manufacturers knew that within the next one to two years, ANDA approvals would be on the rise and any ability they had to raise prices would be severely curtailed.

65.    With the additional funds provided by GDUFA came an FDA commitment to reach a variety of goals, including accelerating the review process and eliminating the mounting backlog of ANDA.  One such commitment the FDA took was to act on 90% of all backlogged ANDA by the end of fiscal year ("FY") 2017.  In a keynote address at the Generic Pharmaceutical Association annual meeting in the spring of early 2015, the Director of the FDA's Office of Generic Drugs, Kathleen Uhl, M.D., pledged accelerated action.  The FDA delivered on Director Uhl's promise, hiring nearly 1,200 new employees in 2015—more than the preceding two years combined.

66.     As the graph below depicts[7], the number of full approvals and tentative approvals of generic drugs began to reach record heights in or around April 2015:

**Chart 7. Approvals and Tentative Approvals**



67.     On November 9, 2015, InsiderHealthPolicy reported in an article entitled, *FDA, Pressed to Clear Generic Drug Backlog, Says It Is Ahead of Schedule*, that the FDA had taken action on **82% of the backlog** "as a rising chorus of voices, including Democratic presidential candidate Hillary Clinton, press the agency to clear the backlog to help counter rising pharmaceutical prices."   All told, in 2015, more than 700 generic drugs were approved or tentatively approved by the FDA—**the highest figure in the FDA's history**.

68.     In addition to the increase in generic competition that would result from the adoption of GDUFA and subsequent increase in the FDA's ANDA review capabilities, Teva had

---

7       Implementation of the Generic Drug User Fee Amendments of 2012 (GDUFA), Testimony of Janet Woodcock, M.D., Director, Center for Drug Evaluation and Research, U.S. Food and Drug Administration, Before the Committee on Oversight and Government Reform, U.S. House of Representatives, Feb. 4, 2016, at 7.

other reasons to believe that its ability to increase prices would be a short-term phenomenon that would not extend beyond 2015 or 2016—at the latest.

69.     As a result of the initial price increases by Teva and others in 2013, in January 2014, the National Community Pharmacists Association ("NCPA") wrote to the U.S. Senate Health Education Labor and Pensions ("HELP") Committee and the U.S. House Energy and Commerce Committee regarding generic pharmaceutical pricing.  The letter stated that "many of our members across the U.S. . . . have seen huge upswings in generic drug prices that are hurting patients and pharmacies ability to operate."  It further noted that "77% of pharmacists reported 26 or more instances over the past six months of a large upswing in a generic drug's acquisition price."  It asked that the Senate "schedule an oversight hearing to examine what factors may have led to these unmanageable spikes in generic drugs."

70.     On July 8, 2014, *The New York Times* addressed pricing issues with generic drugs in an article titled, "Rapid Price Increases for Some Generic Drugs Catch Users by Surprise," highlighting a nearly 100% price increase for digoxin, a longtime generic drug that Teva did not produce.  The article stated:

> Though generic medicines are far cheaper to bring to market than brand-name drugs because they involve little research and development, they also are priced lower because generics typically face intense competition. But Dr. Aaron Kesselheim, a professor of health economics at the Harvard School of Public Health, noted, "Studies show it is not until you have four or five generics in the market that the prices really are down."

71.     As a result of this article, the Connecticut Attorney General began an investigation on pricing issues with a focus on digoxin.  Other Attorneys General quickly followed suit.

72.     On October 2, 2014, U.S. Senator Bernie Sanders and U.S. Representative Elijah E. Cummings sent letters to Teva and thirteen other generic drug companies asking for detailed

information on various generic drug price hikes.  The letter stated:  "We are conducting an investigation into the recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening illnesses."  It specifically noted that

> We are writing to your company to request information about the escalating prices it has been charging for two drugs: Divalproex Sodium ER, which is used to prevent migraines and treat certain types of seizures, and Pravastatin Sodium, which is used to treat high cholesterol. According to data provided by the Healthcare Supply Chain Association (HSCA), the average prices charged for these drugs have increased by as much as 736 percent for Divalproex Sodium and 573 percent for Pravastatin Sodium from October 2013 to April 2014.

Teva never responded to this letter.

73.     On November 10, 2014, The Wall Street Journal reported that the DOJ was investigating generic drug manufacturers for violations of the antitrust laws.  Later that month, the DOJ convened a grand jury in the Eastern District of Pennsylvania, pursuant to which subpoenas were issued to Teva and at least ten other generic drug manufacturers.

74.     On November 20, 2014, the Senate Subcommittee on Primary Health and Aging held a hearing entitled "Why Are Some Generic Drugs Skyrocketing In Price?"  In his opening remarks, Senator Sanders noted that

> According to Medicare and Medicaid data, between July 2013 and July 2014, half of all generic drugs went up in price. During this same time period, over 1,200 generic drugs, nearly 10 percent of all generic drugs, more than doubled in price. More than doubled in price. In fact, these drugs went up in price by an average of 448 percent. Dozens of drugs went up by 500, 600, 1,000 percent.

75.     Other Senators noted the need to reduce the FDA backlog in ANDA approvals to spur generic competition—a process that was then ongoing.

76.     As a result of the adoption of GDUFA in 2012, and the intense scrutiny by Congress, regulators and the press in generic drug pricing (spurred largely by drug price increases in 2013 and 2014), Teva knew that its ability to obtain additional revenues by raising prices was a short term phenomenon that would not persist for more than a relatively short (*i.e.*,

1-2 year) period of time.  Investors were also aware that the flood of new generics to the market would lead to increased competition and lower prices.  Teva therefore knew that acknowledging price increases could alert investors that any success the Company was experiencing would be short term.

### D. VIGODMAN BECOMES CEO AND TEVA ANNOUNCES ITS STRATEGY TO USE ITS STOCK AS CURRENCY FOR A MAJOR ACQUISITION

77.    In January 2014, Teva announced the appointment of Vigodman as its President and CEO, effective February 11, 2014.  From the time Vigodman was hired, it became clear that Teva's plan was to solve its long-term issues through a major acquisition by using its stock to facilitate a deal.  This strategy was related to Teva's planning for the end of its patent for Copaxone in 2017.  Copaxone is used to treat multiple sclerosis and was a huge success for Teva, providing as much as 40% of Teva's operating profit in some years.  "Teva's management anticipated the patent and pricing issues well in advance, and decided that the company should buy its way out of the problem through major acquisitions."[8]

78.    Thus, at a January 14, 2014 J.P. Morgan Healthcare Conference, Defendant Desheh explained that Teva was in a position to make "more than a small acquisition or in-licensing transaction."  He specifically noted that this "major commitment" was supported by the recent recruitment of Vigodman who would "emphasize (potentially large) acquisitions more readily than his predecessor," ideally using Teva's ADS as "currency."

79.    On March 4, 2014, at a Cowen Health Care Conference, Desheh noted that, with "the stock price under $40, … we can't use [Teva ADS as] currency" for the large acquisition he had touted two months earlier.

---

[8]    David Segal and Isabel Kershner, "'Nobody Thought It Would Come To This': Drug Maker Teva Faces A Crisis," *N.Y. Times* (Dec. 27, 2017), at B1.

### E.   TEVA SUBSTANTIALLY INCREASES PRICES ON A MULTITUDE OF DRUGS TO PROP UP ITS DECLINING REVENUES AND INCREASE ITS SHARE PRICE

80.     With the arrival of Vigodman, Teva intensified its undisclosed plan to increase the prices it charged for an array of its generic drug offerings.  Including the multiple drugs where it had raised prices in 2013, beginning in April 2014 and extending through July 2015, Teva raised prices on additional drugs and, in total, raised prices on at least 55 drugs.  These undisclosed price increases fit into one of three categories:  (1) 28 drugs where Teva was the only (or only major manufacturer) increasing the price of the generic drug; (2) 24 drugs where Teva's price increase occurred in parallel with increases by other manufacturers; and (3) three drugs where governmental investigations have indicated there may have been active collusion between Teva and other manufacturers.  In total, the price increases swelled Teva's revenue by billions of dollars.

### 1.   Teva Unilaterally Increased Prices on Dozens of Drugs

81.     Beginning in 2013 and extending through early 2016, Teva recognized that the FDA's ANDA backlog had bestowed it with significant market power with respect to a number of drugs.  In response, Teva unilaterally increased prices on at least **28 generic drugs** by significant amounts.  The drugs and the dates and amounts of increases are set forth below:

| Generic Drug | Period of Increase[9] | Percentage Increase[10] | Increased Revenue[11] |
|---|---|---|---|
| Anagrelide HCL | 3/14-12/15 | 243% | $17,134,558 |
| Cimetidine | 6/13-6/18 | 869% | $12,797,442 |
| Ciprofloxacin HCL | 12/14-1/17 | 1111% | $102,373,807 |
| Clemastin Fum | 7/13-12/16 | 223% | $3,410,833 |
| Clotrimazole | 8/14-12/17 | 500% | $3,193,627 |
| Cromolyn Sodium | 7/14-6/18 | 392% | $6,029,503 |
| Cyrpoheptadine HCL | 3/14-11/17 | 110% | $7,460,259 |
| Diclofenac | 1/13-8/15 | 310% | $21,783,410 |
| Dicloxacillin Sodium | 3/14-8/17 | 98% | $13,326,041 |
| Diltiazem HCL | 7/13-1/16 | 205% | $38,020,901 |
| Etodolac SR | 7/13-1/14 | 200% | $49,403,608 |
| Fluoxetine HCL | 1/15-6/18 | 769% | $29,043,960 |
| Flutamide | 11/15-7/16 | 55% | $88,170 |
| Fosinipril Sodium | 2/15-9/15 | 60% | $3,928,025 |
| Griseofulvin | 2/15-3/16 | 276% | $16,148,357 |
| Hydroxyzine Pam | 3/14-1/18 | 173% | $11,019,351 |
| Ketoprofen | 7/13-5/18 | 746% | $6,131,456 |
| Ketorolac Trometh | 7/13-5/16 | 409% | $36,732,068 |
| Loperamide HCL | 8/14-2/16 | 119% | $15,651,417 |
| Megestrol Ace | 2/15-6/15 | 35% | $762,856 |
| Methotrexate Sodium | 6/13-1/15 | 579% | $138,314,084 |

[9]  A nationally recognized database was used to calculate prices per unit. The data reflect prices at wholesale, but do not reflect off-invoice discounts and rebates. The data show sales prices reflecting the inventory in any given month. Even though price increases may be set at a particular point in time, because the data tracks actual market pricing, these prices increases can take time to work through the system as older stocks with lower prices are sold and replaced by newer stocks with higher prices. The period of increase is calculated with respect to the beginning of the price increase and the month of the peak price after the price increase.

[10]  This represents the percentage increase for the most commonly prescribed dosage level for the period in the prior column. All dosages and relevant periods are set forth in Appendix A hereto.

[11]  To determine increased revenue, the month prior to the price increase was identified. Then it was assumed that this "but-for" price would have continued from that point onward had the price increase not occurred. The increased revenue is the difference between the actual monthly prices and the pre-increase price, multiplied by total quantity. Increased revenue is only calculated for months where the actual price is greater than the pre-increase price. This calculation is performed separately for each formulation of a given product.

| | | | |
|---|---|---|---|
| Methyldopa | 1/15-2/17 | 216% | $645,886 |
| Mexiletine HCL | 8/14-4/17 | 124% | $23,345,258 |
| Nefazodone HCL | 8/14-11/16 | 120% | $23,479,496 |
| Nortriptyline HCL | 1/15-9/16 | 158% | $20,967,422 |
| Prazosin HCL | 11/12-11/15 | 243% | $43,272,877 |
| Ranitidine HCL | 6/13-1/17 | 611% | $41,038,333 |
| Tolmetin Sodium | 7/13-6/17 | 265% | $2,652,049 |

82.    In total, comparing the year prior to the price increase to the year after the increase, Teva's revenues for these drugs increased by a total of $688.1 million.

**2.  Teva Increased Prices in Parallel with Other Manufacturers for a Number of Drugs**

83.    Beginning in 2013 and extending through early 2016, Teva, acting in response to or in parallel with other manufacturers, increased prices on at least **24 generic drugs**.  The drugs and the dates and amounts of increases are set forth below:

| Generic Drug | Period of Increase | Percentage Increase[12] | Increased Revenue | Average Increase of Competitors[13] |
|---|---|---|---|---|
| Baclofen | 3/14-2/15 | 306% | $143,490,678 | 716% |
| Bumetanide | 3/14-7/16 | 652% | $86,977,165 | 258% |
| Cabidopa-Levodopa | 6/16-12/16 | 51% | $94,699 | 79% |
| Carpamazepine | 8/14-12/16 | 909% | $81,660,368 | 792% |
| Cephalexin | 3/14-7/14 | 171% | $52,800,891 | 320% |
| Danazol | 1/15-3/16 | 169% | $3,588,552 | 76% |
| Dipyridamole | 6/15-12/17 | 413% | $1,486,507 | 245% |
| Divalproex Sodium | 3/13-6/18 | 444% | $8,765,463 | 166% |
| Doxazosin Mesy | 7/13-10/15 | 666% | $45,742,141 | 908% |

---

[12]  This represents the percentage increase for the most commonly prescribe dosage level for the period in the prior column.  All dosages and relevant periods are set forth in Appendix A hereto.

[13]  Competitor price increases are included here if the data showed a price increase generally within a month or two of Teva's price increase for the same drug and formulation.  The data in this chart represent the average percentage increase for all competitors that increased the price on at least one dosage of the drug.  All competitors, dosages and relevant periods are set forth in Appendix A hereto.

| Generic Drug | Period of Increase | Percentage Increase[12] | Increased Revenue | Average Increase of Competitors[13] |
|---|---|---|---|---|
| Enalapril | 6/13-12/16 | 1728% | $55,084,975 | 1222% |
| Estazolam | 3/14-6/18 | 132% | $20,790,429 | 277% |
| Estradiol | 7/12-1/16 | 198% | 61,704,439 | 273% |
| Etotolac | 3/13-12/15 | 501% | $49,403,608 | 333% |
| Fluconazole | 5/13-8/13 | 487% | $98,589,022 | 643% |
| Fluocinonide | 5/14-12/14 | 182% | $110,899,192 | 358% |
| Glimepiride | 1/15-8/15 | 199% | $19,091,825 | 214% |
| Ketoconazole | 3/14-9/16 | 590% | $54,025,729 | 945% |
| Meperdine HCL | 7/14-5/16 | 439% | $9,463,723 | 389% |
| Nadolol | 6/13-10/16 | 1143% | $70,875,535 | 131% |
| Oxybutynin CL | 5/13-1/16 | 869% | $97,355,732 | 535% |
| Penicillin V Potassium | 10/16-3/17 | 440% | $27,574,780 | 412% |
| Pravastatin Sod | 7/13-11/13 | 437% | $373,633,425 | 394% |
| Propranolol HCL | 5/13-5/14 | 298% | $256,345,498 | 900% |
| Trazodone HCL | 6/15-2/16 | 112% | $100,168,909 | 130% |

84.     In total, comparing the year prior to the price increase to the year after the increase, Teva's revenues for these drugs increased by a total of $1.83 billion.

### 3.  Teva Actively Colluded with Other Generic Drug Manufacturers to Fix Prices

85.     With respect to three drugs as to which Teva made significant price increases—Nystatin, Theophylline ER, and Glipizide-Metformin—there is direct evidence that the price increases were the result of collusion with other manufacturers.  Teva increased prices for and revenues from these drugs as follows:

| Generic Drug | Period of Increase | Percentage Increase[14] | Increased Revenue |
|---|---|---|---|
| Glipizide Metform | 2/13-2/16 | 142% | $14,683,227 |
| Nystatin | 3/14-11/15 | 52% | $4,334,575 |

---

[14]  This represents the percentage increase for the most commonly prescribe dosage level for the period in the prior column. All dosages and relevant periods are set forth in Appendix A hereto.

| Theophylline | 3/14-7/14 | 172% | $25,624,945 |

86.     **Direct Evidence of Price-Fixing: Nystatin and Theophylline ER.**  Nystatin is a medication used to fight fungal infections.  The generic Nystatin sold by Teva is AB-rated to the brand name drug Mycostatin®.  During the Relevant Period, Teva's two main competitors for Nystatin were Heritage Pharmaceuticals Inc. ("Heritage") and Sun Pharmaceuticals (through its division Mutual Pharmaceuticals ("Mutual")).

87.     Theophylline ER is a medication used to treat asthma and airway narrowing associated with long-term asthma or other lung problems, such as chronic bronchitis and emphysema.  The generic Theophylline ER sold by Teva is AB-rated to the brand name drug Theodur®. Theophylline ER is an extended release medication, which means that it is released into the body throughout the day.  During the Relevant Period, Teva's primary competitor for Theophylline ER was Heritage.

88.     As evidenced by facts and documents detailed in the State AGs' Consolidated Amended Complaint against Teva and others dated June 18, 2018 (the "State AGs' CAC"), Teva, Heritage and Mutual exchanged numerous e-mails and text messages regarding the prices of generic Nystatin and Theophylline ER during the Relevant Period.   Many of these communications were, on information and belief, between Nisha Patel ("Patel"), Teva's former Director of Strategic Customer Marketing from April 2013 to August 2014 and its Director of National Accounts from September 2014 to December 2016, and Jason Malek ("Malek"), the former President of Heritage who pled guilty to Sherman Act antitrust violations for price-fixing in January 2017.[15]  For example:

---

[15]   Based on publicly available social media sites, Patel's tenure at Teva aligns with the tenure of Malek's contact at Teva.

a)  In July 2013, Patel had a series of phone calls with Malek.  The three calls spanned 43 minutes, including an initial call on July 7 that lasted for 21 minutes.

b)  On July 30, 2013 Patel and Malek spoke twice, with the second of those two calls lasting more than twelve minutes.  In between these two calls, another Heritage representative spoke with a Mutual representative for nearly eleven minutes.

c)  After these calls, Nystatin was identified on an internal Teva document listing "potential" price increases, notwithstanding that Teva management had declined to raise prices a month earlier.  Patel then left for maternity leave in August 2013 until the end of 2013.

d)  On February 5, 2014, Patel and Malek spoke for more than one hour.  Two days later, on February 7, Nystatin was again identified on an internal Teva document listing drugs for potential price increases.  Patel and Malek had several additional calls in February and March 2014.

e)  On April 4, 2014, Teva increased the weighted average cost ("WAC") price for Nystatin and Theophylline ER.

f)  On April 15, 2014, Patel and Malek spoke for 17 minutes and discussed price increases for Nystatin, Theophylline, and several other generic drugs.

g)  On June 23, 2014, Heritage employees internally discussed strategies to implement its own price increases of Nystatin, which it had slated for a 95% increase, and Theophylline ER, which it has slated for a 150% increase.  In her notes about the call, a Heritage representative indicated that Heritage had

to increase its WAC pricing for Nystatin, because Teva had.  On June 25, 2014, the Heritage representative exchanged text messages with her contact at Sun/Mutual to let her know the details of Heritage's anticipated price increase for Nystatin.

h)  On June 25, 2014, Malek also spoke with Patel for nearly fourteen minutes, during which Malek reported that Heritage would increase its prices for Theophylline shortly.

i)  On June 30, 2014, Patel emailed her colleagues, acknowledging the agreement with Heritage.

j)  By July 9, 2014, Heritage had increased Nystatin prices for at least fourteen of its customers nationwide, and by at least August of 2014, Sun began increasing its price for Nystatin as well.  In addition to leading the price increases for Nystatin, Teva also refused to bid or challenge Heritage's price increases when requested by Heritage customers.  Indeed, on July 8, 2014, a large retail customer emailed a Teva representative requesting a quote for Nystatin, but Teva refused to bid or challenge the Heritage price increase for this customer.

k)  Also by July 9, 2014, Heritage had increased prices for Theophylline ER for at least twenty different customers nationwide, much as Teva had done three months earlier.

89.    The agreements between Teva and these other drug companies to increase prices for Theophylline and Nystatin were part of a scheme to manipulate prices for these drugs.

90.     **Direct Evidence of Price-Fixing: Glipizide-Metformin.**  Glipizide-Metformin is a medicine indicated for the treatment of high blood sugar levels caused by Type-2 diabetes. The generic Glipizide-Metformin manufactured by Teva is AB-rated to the brand name drug Metaglip®.  Prior to and during the Relevant Period, Teva's only two competitors for Glipizide-Metformin were Heritage and Mylan.  In 2016, Zydus entered the market with less than 2% market share.

91.     Beginning in April 2014, representatives from Teva, Heritage, Zydus, Mylan, Aurobindo, and/or Citron participated in numerous phone calls, and exchanged numerous emails and text messages regarding the prices of generic Glipizide-Metformin.

92.     On April 15, 2014, Heritage's Malek spoke with Patel for more than seventeen minutes, during which they discussed Heritage's intention to raise the price of Glipizide-Metformin and other drugs, and Teva agreed that if Heritage raised the price of these drugs, Teva would follow with its own price increase or, at least, would not challenge Heritage's price increases by seeking to underbid Heritage and take its accounts.  Malek and Patel spoke several more times over the next several months, during which Malek and his contact confirmed the agreement to raise Glipizide-Metformin, prices, and Malek updated Patel on the progress of Heritage's price increases.

93.     By May 9, 2014, a Teva representative had spoken with a Mylan representative multiple times regarding Glipizide-Metformin, including one call that lasted more than seven minutes, and the two continued to stay in close contact throughout the rest of 2014.

94.     **Other Indicia of Price Collusion.**  In addition to the direct evidence of price collusion between Teva and its rival drug maker in the form of inter-company communications, there are other indicia of collusion.  For example, there was no reasonable justification for the

price hikes discussed above.  While a supply shortage can explain an abrupt rise in prices, here— notwithstanding drug manufacturers' obligation to report shortages to the FDA—no such shortages were reported during the Relevant Period. In addition, there was no significant increase in the demand for these drugs or in the drugs' production costs that would explain the enormous price increase.  In addition, price increases of this magnitude would have been contrary to Teva's and each of the co-conspirators' economic interest absent the price-fixing scheme.  Without the certainty that all of the co-conspirators would raise and maintain the prices for the relevant drugs, each co-conspirator risked getting undercut by the others, leading to a loss of market share and a loss of revenue.  This risk was alleviated by the co-conspirators' agreement to raise and maintain their prices for the relevant drugs.

95.    In addition, Teva and the Individual Defendants had a palpable motive to fix prices with Teva's competitors which derives from the nature of the U.S. generic drug market itself.  As discussed above, because federal law requires each generic pharmaceutical to be readily substitutable for another generic of the same brand drug, competition will cause prices to fall until they near generic drug makers' marginal production costs.  This stabilization of prices in turn caused Teva's profits and revenues to level off, thus giving Teva and its co-conspirators a common motive to conspire to raise prices.

96.    With the backdrop of this common motive in mind, the markets for Nystatin, Theophylline ER, and Glipizide-Metformin were all susceptible to anti-competitive conduct for the following economic reasons:

a) The market for each of the three drugs referenced above was **highly concentrated** and controlled by a handful of companies.  A more concentrated market is more susceptible to anti-competitive behavior, due in part to the relative ease with which co-conspirators can monitor each other's pricing behavior to ensure adherence to the price-fixing agreement.  Moreover, in a

highly concentrated market, there is a lower probability that each company has different production costs, which facilitates the maintenance of a price-fixing scheme.

b)  **Barriers to entry** into a market can delay, diminish or even prevent the attraction and arrival of new market participants, which is the usual mechanism for checking the market power—*i.e.*, the ability to set prices above market costs—of existing participants.  Entry barriers include things like: trade secrets, patents, licenses, capital outlays required to start a new business, pricing elasticity, and difficulties buyers may have in changing suppliers. If there is no significant threat that new firms will enter a market, a single firm with a dominant market share—or a combination of firms with a significant percentage of the market—is able to engage in anticompetitive conduct, such as restricting output and raising prices to the detriment of consumers.  Barriers to entry in the markets for generic drugs include, among other things, high manufacturing costs and regulatory and intellectual property requirements. For example, the requirement that companies file an ANDA and receive FDA approval can delay entry into the market by an average of thirty-six months.

c)  The presence of alternative products that can easily be substituted for a given product serves to undermine anti-competitive behavior.  Conversely, the **absence of available substitutes** increases the susceptibility of a market to anticompetitive behavior because consumers have no alternative but to purchase the product, notwithstanding any price increases. In the context of prescription drugs, a pharmacist presented with a prescription for a given drug can only substitute another drug if that drug has an "AB" rating. Only generic and brand-name versions of a drug are AB-rated to one another.  Therefore, a pharmacist can only fill a prescription for a given drug with the brand-name version or one of the AB-rated generic versions and cannot substitute another drug.

d)  A standardized, commodity-like product with a **high degree of interchangeability** between the goods of the participants in an anti-competitive conspiracy also increases the susceptibility of a given market to anti-competitive

conduct. By their very nature, all generic versions of a given drug are interchangeable, as every generic version of a drug must be bioequivalent to the original, brand-name drug.

97.     In addition to the economic characteristics of these markets which indicate a susceptibility to anti-competitive conduct, representatives from Teva and its co-conspirators had substantial opportunities to meet, socialize and engage in collusive conduct.  Teva and its co-conspirators routinely attended conferences, meetings, and trade shows sponsored by various pharmaceutical trade associations, interacted with each other and discussed their respective businesses and customers, and to discuss, devise, and implement the price-fixing schemes set forth herein.  Social events and other recreational activities—including golf outings, lunches, cocktail parties, and dinners—were also organized in conjunction with the trade association events and provided further opportunities for these representatives to meet outside of the traditional business setting and engage in the collusive activities alleged herein.  Teva even reserved a "strategic exchange" bungalow at the 2013 and 2014 annual meetings of the National Association of Chain Drug Stores ("NACDS") which NACDS marketed as an "opportunit[y] to meet and discuss strategic issues with key trading partners."  Such bungalows provided Teva and its competitors with a secluded place to conduct business privately.  A list of these industry events and the attendees from Teva and others in the generics industry, including Teva's co-conspirators, is attached as Appendix B hereto.

### 4.  Teva Reaps Billions of Dollars of Increased Revenues and Profits As a Result of the Price Increases

98.     As a result of the price increases described above, between 2014 and 2016, the total additional revenues obtained from these price increases was **$2.5 billion**.  Further, because price increases impose minimal additional costs on Teva, these revenue increases were, effectively, increases in Teva's profitability resulting from the price increase strategy.

99.     On an annual basis, the increased revenues began to impact Teva's bottom line beginning in 2013, peaked in 2015, and by 2017, had substantially declined as increased price competition negatively impacted Teva's ability to successfully implement its price increase strategy.   The additional revenues earned by Teva from its price increase strategy for 2013 through November 2014 are set forth in the chart below:

| Total Additional Revenues Earned From Price Increases | |
|---|---|
| 2013 | $222,115,831 |
| 2014 | $656,024,837 |
| 2015 | $747,045,795 |
| 2016 | $541,772,741 |
| 2017 | $273,812,033 |
| 2018 | $74,887,541 |
| Total | $2,515,686,778 |

### F.   TEVA MISLEADS INVESTORS REGARDING THE BASIS FOR ITS IMPROVED FINANCIAL PERFORMANCE

100.     In connection with its price increase strategy, Teva sought at all costs to avoid any suggestion that price increases were the cause of its seemingly miraculous turnaround. Accordingly, at the beginning of the Relevant Period, Teva attributed its increase in revenues for the end of 2014 to higher sales volumes and launches of new generic drugs.  Nothing was said about the multiple drug price increases from the summer of 2013.

101.     In May 2014, touting its first quarter results, Teva again relied upon "new product launches" and a changed composition of revenues to explain its increased profitability.

102.    On October 30, 2014, during the third quarter earnings call, Teva was specifically asked about the impact of price increases, but Defendant Olafsson deflected, suggesting that there were no significant increases since "the base business itself is slowly eroding . . . ."

103.    During a conference call in December 2014, Defendant Olafsson was asked a question that was based upon an assumption that wholesalers of generic drugs were experiencing "extraordinary price increases."   Defendant Olafsson rejected the premise of the question, stating: "let me correct. I have to disagree that they have experienced tremendous price increase[s]."

104.    Throughout 2015 and early 2016, Vigodman, Desheh and Olafsson flatly denied that Teva's improved performance was the result of price increases:

- October 29, 2015 (Vigodman):  "[A]ll the improvements you see in our margins is ***not driven by price***.  It is driven by quantities, and by mix, and by efficiency measures, not by price, 2014, 2015.  And that's a very important message."

- November 19, 2015 (Desheh):  "There is a lot of noise around pricing issues. Some of it is coming from politicians [who are] driving agenda[s] . . . . Our exposure to all these things is very minimal . . . . I believe there are many examples for competitive environment, real competition, like we see in the generic market in the United States . . . . ***Teva was not associated with any of that***."

- February 11, 2016 (Olafsson):  "So how did we do this [increase our profit margin by $1 billion over 24 months]?  ***Not by pricing but by portfolio mix, new products, and efficiency measures***."

105.    All of the above statements were false because by July 2015, Teva had raised prices on more than sixty-one drugs, including many by more than 250%.

106.    In addition, Teva made statements about its strategy in various markets including Russia, including statements in its 2014 20-F that Teva's "key ROW markets" included Russia, which "is characterized by rapid growth and relatively high sales of branded generics and OTC products," and that Teva's "ROW strategy is to be selective as to where we do business, focusing

on the countries and segments where we can achieve a significant position.  Over time and with the right opportunities, we intend to expand our presence in markets such as Russia, China, Brazil, and India."  Teva's 2014 20-F further stated that Russia "is primarily a branded generic market" where "we market a diverse portfolio of products.  We are currently one of the largest pharmaceutical companies in Russia, playing a role in the commercial, retail, hospital and state funded segments.  The Russian government seeks to encourage the use of generic products in order to reduce the cost of pharmaceuticals and increase patient access, which is influencing our portfolio strategy.  The government is further seeking to encourage local pharmaceutical production by providing incentives, and we have recently established a manufacturing facility in Yaroslavl, Russia."  Teva made substantially similar statements in its 2015 20-F.

107.    The 2014 20-F further stated that Teva's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2014, and concluded that its internal controls were effective, and that Defendants Vigodman and Desheh evaluated the effectiveness of the Company's disclosure controls and procedures as of December 31, 2014, and concluded that its disclosure controls and procedures were effective. Teva made substantially similar statements in its 2015 20-F.

### G.  GENERIC DRUG PRICE INCREASES BOOST TEVA'S ADS PRICE

108.    In 2014, despite the storm clouds raised by press stories, government investigations and the increasing pace of the FDA's ANDA approval process, Teva's price increases fueled a turn-around success story for Teva's U.S. generics business, which reported approximately a $250 million (or 6%) increase in revenues over the prior year.  Teva's ADS price soared as a result, jumping more than 50% from around $37 in late October 2013, to approximately $56 by the end of 2014.  These astonishing year-over-year increases in U.S.

generics revenues were accomplished in the face of twenty-three million fewer prescriptions than in 2013.

109.    The price increases also led to a banner year in 2015 for Teva's U.S. generics division, which spearheaded the Company's growth story, fueling an unprecedented increase in the price of Teva ADS.  Teva reported the 2015 gross profit from its overall generic medicines segment as $4.5 billion, an increase of $246 million, or 6%, compared to $4.3 billion in 2014, and a profit (with expenses removed) of $2.7 billion in 2015, compared to $2.2 billion in 2014, or a difference of almost 24%.  Most of these glowing results stemmed from Teva's U.S. generics division, which reported revenues of $4.8 billion, an increase of $375 million, or 8%, over 2014, which itself had been a flagship year for U.S. generics.  Teva's inflated ADS price rocketed from approximately $55 at the beginning of the year to more than $70 by late July 2015.

### H.  DEFENDANTS LAY PLANS FOR A MAJOR ACQUISITION—INFLATING THE ADS PRICE TO USE AS "CURRENCY"

110.    Undeterred by the public outcry regarding the price increases and the government investigations into generic price-fixing, as well as Teva's knowledge that price increases could not be maintained over the long-term as generic competition increased, Defendants continued to pursue plans—contemplated from the time Vigodman was hired as CEO in January 2014—to engage in large acquisitions to position the Company for the end of its Copaxone patent rights.

111.    On April 21, 2015, with the ADS shares trading at the artificially inflated price of approximately $66 per share, Defendants announced an offer to acquire all of the outstanding shares of Mylan in a transaction valued at $82.00 per Mylan share, with the consideration to be comprised of approximately 50% cash and 50% stock.  The acquisition fell through; yet Defendants continued to pursue other acquisition options, all the while continuing to

misrepresent and omit material facts regarding the Teva's ongoing price-fixing conspiracy and source of its financial success.

## I.  TEVA ANNOUNCES A $40 BILLION ACQUISITION OF ACTAVIS FUELED BY ITS INFLATED SHARE PRICE, AND A PROPOSED BOND OFFERING

112.   Fueled by Defendants' misleading statements, Teva's ADS price reached a new all-time high of $72 on July 27, 2015.  On that day, Teva announced it had entered into a definitive agreement with Allergan plc ("Allergan") to acquire Allergan's worldwide generic pharmaceuticals business, Actavis, for $40.5 billion in cash and equity.

113.   As would later be revealed during a call with investors on October 29, 2015, Defendants planned to raise approximately $6.75 billion from a secondary public offering of ADS and an initial public offering of Preferred Shares, and approximately $27 billion from a debt issuance and term loans, to finance the acquisition.

114.   On the same day, Teva issued its 3Q15 results, which were ahead of the street's expectations, and again raised its full year guidance.  As summarized by the analysts at UBS in their October 29, 2015 report, "Our takeaway: Another good quarter."

### 1.  Teva Issues $3.375 Billion in ADS and $3.375 Billion in Preferred Shares While the ADS Trade at an Inflated Price

115.   On December 8, 2015, Teva closed the ADS/Preferred Offering, which consisted of a secondary offering of ADS and Teva's initial offering of Preferred Shares (which were 7.00% mandatory convertible preferred shares).  Teva issued 54 million ADS at $62.50 per ADS in the secondary offering, raising approximately $3.375 billion from investors.  These ADS were offered publicly pursuant to the ADS/Preferred Registration Statement and certain prospectus materials.  Teva also issued 3,375,000 Preferred Shares at $1,000.00 per share, raising another $3.375 billion from investors.  Each Preferred Share was to be converted into a number of ADS equal to the conversion rate set forth in the Preferred Prospectus, between 13.3333 and 16.0000.

116.    On January 6, 2016, Teva sold an additional 5.4 million ADS and an additional

337,500 Preferred Shares pursuant to the exercise of an overallotment option held by the

underwriters of the ADS/Preferred Offering.   In total, Teva generated net proceeds from the

ADS/Preferred Offering of approximately $7.24 billion.

### 2.    Defendants Rush the Notes Offering, Concealing the Fact that Teva Had Been Served Subpoenas by the DOJ and the Connecticut Attorney General

117.    On July 13, 2016, Vigodman announced that Teva would accelerate the timing of

the bond offering related to the Actavis deal, despite the fact that it "lacked full visibility into the

Actavis Generics number."  According to Vigodman:

> [W]e are closely monitoring the corporate bond markets and given the various
> attractive terms currently prevailing there, we are considering accelerating our
> planned debt offering.  With this in mind, and despite the fact that we will not yet
> have full visibility into the Actavis Generics number, and in particular, certain
> pipeline information, we have decided to provide you today with our best
> estimate of the financial outlook for Teva in 2016 to 2019, following the close of
> the deal.

118.    This was surprising because just a few weeks earlier, on a May 9, 2016

conference call, Desheh had told investors that the offering would not happen until *after* the

Actavis deal closed.

119.    On July 21, 2016, Teva consummated, through a special purpose finance

subsidiary, the Notes Offering of an aggregate of $15 billion of debt securities comprised of the

Notes, specifically (i) $1,500,000,000 of 1.400% Senior Notes due 2018; (ii) $2,000,000,000 of

1.700% Senior Notes due 2019; (iii) $3,000,000,000 of 2.200% Senior Notes due 2021;

(iv) $3,000,000,000 of 2.800% Senior Notes due 2023; (v) $3,500,000,000 of 3.150% Senior

Notes due 2026; and (vi) $2,000,000,000 of 4.100% Senior Notes due 2046.

120.    In connection with the Notes Offering, Teva filed registration and prospectus materials, yet omitted any mention of the subpoena served by the Connecticut Attorney General on July 12, 2016, nor of the subpoena from the DOJ received on June 21, 2016.

121.    As of July 31, 2016, Teva had raised $20.3 billion from the Notes Offering to complete the Actavis acquisition.  The Actavis deal closed on August 2, 2016.  In the related August 2, 2016 press release, Vigodman falsely declared that the "acquisition of Actavis Generics comes at a time when Teva is stronger than ever—in both our generics and specialty businesses."

122.    In sum, of the $33.4 billion owed Allergan beyond the transfer of Teva stock (priced as of July 2015), $5 billion was funded by Teva borrowing from its loan facility, and $8.1 billion from cash on hand that was previously raised in the ADS/Preferred Offering, including from its December 2015 equity offerings and borrowings under its syndicated revolving credit. The remaining $20.3 billion came from the proceeds of the Notes Offering.  If Defendants had been unable to secure financing for that debt, according to the terms of the deal's structure, Teva's agreement with Allergan would have required Teva to pay

Allergan $2.5 billion.

### J.    THE FRAUD UNRAVELS, CAUSING THE PRICES OF TEVA SECURITIES TO FALL

#### 1.    Days After the Close of the Actavis Transaction, Teva Belatedly Announces It Is the Subject of Government Antitrust Investigations

123.    On August 4, 2016, just two days after the Actavis transaction closed, Teva reported 2Q16 financial results that reflected a $434 million decline in revenues in its U.S. generics segment compared to 2Q15.  The end of Teva's ability to maintain growth through price increases was due to the massive increase in competition as the result of the FDA's vastly

accelerated pace of ANDA approvals, as well as increased scrutiny by, among others, government officials and regulators.

124. Defendants also revealed for the first time that Teva was the subject of *two* investigations, by the DOJ and State AGs, respectively, into generic drug price collusion. In fact, the DOJ had served Teva with a subpoena on June 21, 2016, and the Connecticut Attorney General served a subpoena (as part of the State AGs' investigation) on July 12, 2016—just *one day* before Teva announced and opened the $20 billion Notes Offering, although Defendants did not disclose either subpoena until the Notes Offering, and the Actavis acquisition, closed. Teva's sudden decision to accelerate the Notes Offering now appeared to have an explanation. Upon this news, the price of Teva's securities fell.

125. Despite the revelation of government inquiries and the continued unraveling of Teva's ability to maintain elevated drug prices, Defendants doubled down, expressly denying the impact of price hikes and reaffirming their inflated outlook for 2016.

126. Defendants' denials were deeply undermined when, on September 12, 2016, the GAO Report was publicly released. This report, based upon a review of Medicare data, concluded that generic drug manufacturers, including Teva, had made hundreds of unexplained "extraordinary price increases"—defined as a particular drug's price increasing over 100% within a 12-month period—including numerous price increases of more than 1,000%. Teva owned the rights to at least ***40%*** of the drugs identified in the GAO Report as having exhibited an extraordinary price increase between 2013 and 2015.

127. Further, after *Bloomberg* and other media outlets reported, between November 3 and November 10, 2016, that U.S. prosecutors could seek criminal charges related to their price-fixing investigation by year-end, resulting in sizable liabilities for Teva and other generic drug

manufacturers, Teva flatly denied any wrongdoing, stating, "Teva is not aware of any facts that would give rise to an exposure to the company with respect to these subpoenas."

128.   This denial was false.   Only a month later, the State AGs filed a complaint alleging direct evidence that Teva had engaged in a conspiracy to fix the prices of numerous generic drugs.

### 2.   The Market Is Surprised By Dismal Results for the Third Quarter of 2016 and the Firing of Olafsson

129.   On November 15, 2016, Teva reported third quarter 2016 revenues below consensus expectations, which Defendant Olafsson stated were a result of pricing pressures in Teva's U.S. generics business.   This news was a shock and a disappointment in light Defendants' bullish comments on Teva's generics business and statements concerning price trends.   On this news, the price of Teva's securities dropped.

130.   Less than three weeks later, on December 5, 2016, amid Teva's deteriorating financial condition, the Company unexpectedly announced the "retirement" of Olafsson, the 48-year-old head of generics.   His replacement, Dipankar Bhattacharjee, took over effective immediately.   In reality, Olafsson did not "retire."   He was fired.   The price of Teva's securities dropped again in response.

### 3.   The Truth Emerges Related to Russia, Ukraine, and Mexico

131.   On December 22, 2016, the DOJ issued a press release entitled "Teva Pharmaceutical Industries Ltd. Agrees to Pay More Than $283 Million to Resolve Foreign Corrupt Practices Act Charges." This press release stated the payment was a criminal penalty connection with the bribery of government officials in Russia, Ukraine, and Mexico, and explained that Teva had entered a deferred prosecution agreement in connection with a criminal information filed the same day in the Southern District of Florida. Further, the press release

explained that Teva LLC (Russia) had entered a plea agreement with the DOJ, pleading guilty to conspiracy to violate the FCPA in connection with its bribery of a Russian official. The plea agreement included the admission that Teva LLC (Russia) did not timely and voluntarily self-disclose the FCPA violations to the DOJ. The DOJ's December 22, 2016, press release, the criminal information, and Teva LLC (Russia)'s plea agreement are each incorporated herein in their entirety. Those documents detailed Teva's bribery of government officials in Russia, Ukraine, and Mexico.

### 4. Teva's Profits from Its Price Increase Plan Further Dry Up, and Vigodman and Desheh Are Forced Out of the Company

132. On January 6, 2017, Teva reduced its 2017 guidance, far below market expectations, which Vigodman attributed "to not being able to realize new launches in . . . Teva['s] legacy business," rather than to pricing pressure as generic competition increased. With this report of reduced revenues, the price of Teva securities declined precipitously.

133. Shortly thereafter, on February 6, 2017, Teva announced the termination of Vigodman, effective immediately and without a permanent replacement. The press release noted that Vigodman's service on Teva's Board had also ended. As with Olafsson, investors questioned the timing and abruptness of Vigodman's departure, especially given that no replacement was named, or, apparently, was even under consideration at the time. For example, J.P. Morgan, in a report dated February 6, 2017, titled "CEO Transition Adds Further Uncertainty to Story," wrote that "we view today's update as a disappointment, with arguably the two most important executives at Teva stepping down (Erez [Vigodman] and Siggi Olafsson, CEO of generics) within the last several months at a time of significant fundamental challenges."

134. On April 25, 2017, numerous media reports surfaced that Desheh would be pushed out as CFO at Teva. These reports were confirmed the next day when, in an April 26,

2017 6-K, Teva announced that Desheh would be stepping down as CFO in "the coming months" so that he could move on to "the next phase of [his] career."

### 5.   Teva Lowers Guidance, Cuts Dividends, and Takes a $6.1 Billion Charge Against Earnings

135.   On June 8, 2017, in an apparent attempt to regain lost credibility, Teva announced that four new directors were joining its Board.  By June 21, 2017, Desheh's departure from Teva was complete.  Two months later, with Defendants Desheh, Vigodman and Olafsson finally gone and new board members in place, Teva revised guidance down again, reduced its dividend, and took a $6.1 billion charge.  Management admitted that these actions were triggered largely by the same pricing and competitive market pressures that the Company—and especially former executives Vigodman, Olafsson and Desheh—had previously denied would have any impact on Teva.

136.   On August 3, 2017, Teva announced lower-than-expected 2Q17 results, including a net EPS loss for the quarter of $5.94, reduced guidance, and a $6.1 billion goodwill impairment charge.  As Dr. Yitzhak Peterburg, Vigodman's temporary replacement, revealed during the earnings call that day, the EPS loss was primarily the result of the $6.1 billion impairment charge, which was taken to reduce goodwill associated with Teva's U.S. generics business.  Fitch downgraded Teva's Issuer Default Rating to BBB- as a result, with a "negative outlook," reasoning that "[p]ricing pressure in the U.S. will weigh on operations in the near term, requiring the company to reduce debt both through FCF generation and asset divestitures."  As reported by TheStreet that day, "Teva Shares Are Getting Obliterated Again After Vicious Investment Bank Downgrades."

137.   Teva's August 3, 2017 disclosure was the direct result of Defendants' fraud. Defendants had concealed from investors that Teva had generated revenues from price increases

47

that could not be maintained for long.  As that revenue source diminished, and competition seeped back into the generic drugs market, revenue substantially declined, necessitating the massive write-down.

138.    Further, as the multiple government investigations and State AG lawsuits intensified, Teva repeatedly made false and misleading statements and/or failed to disclose material adverse facts regarding Teva's anticompetitive practices and involvement in the collusive scheme. For example, on August 3, 2017, Teva described the various antitrust matters it faced, including the Connecticut AG and DOJ subpoenas and the December 2016 State AG lawsuit referenced above, and fraudulently stated that "Teva denies having engaged in any conduct that would give rise to liability with respect to the above-mentioned subpoenas and civil suits."

139.    The truth about Teva's collusion further emerged with the publication of an article on December 9, 2018 in *The Washington Post*, which quoted statements from Connecticut Assistant AG Joseph Nielsen that the State AG investigation had expanded to at least 16 companies and 300 drugs, and exposed "the largest cartel in the history of the United States." The article also noted Teva's continued denial of engaging in any anticompetitive conduct, and its statement in a court filing that allegations of a price-fixing conspiracy "are entirely conclusory and devoid of any facts."

140.    On May 10, 2019, after the market closed, the State AGs filed a 524-page antitrust complaint revealing previously undisclosed facts regarding Teva's participation in the generic drug price-fixing conspiracy that is independently previously alleged herein. The May 2019 complaint alleges that Teva implemented significant price increases for approximately 112 generic drugs, including extraordinary price hikes of over 1,000%, and details Teva's price-

fixing with regards to at least 86 of those generic drugs (over half of which are independently alleged and in Lead Plaintiff's June 22, 2018 Complaint at Appendix A, attached here), compared to just 7 Teva-related drugs in the State AGs' previously filed action. The action details Teva's role as a "consistent participant" and a central player in the conspiracy. Further, the civil enforcement action names four Teva employees personally as defendants: Cavanaugh, Patel, Kevin Green (Teva's former Director of National Accounts), and David Rekenthaler (Teva's former Vice President, Sales U.S. Generics).

## V.    DEFENDANTS' MATERIAL MISREPRESENTATIONS AND OMISSIONS

141.    During the Relevant Period, Defendants made a series of materially false or misleading statements and omissions of material fact.  These statements can be summarized as follows:

*First*, Defendants made materially false and misleading statements and omissions regarding the reasons for the Company's success in the generic drug market (including improved revenues, growth, profitability, costs, and margins). Specifically, Defendants falsely attributed the year-over-year ("YOY") changes in Teva's generic segment profit and U.S. generic revenues to sources other than Teva's price increases.  Once Defendants spoke on these subjects, they had a duty to fully and accurately disclose the true source of Teva's revenues and profits.

*Second*, Defendants flatly and falsely denied that Teva had engaged in price increases or received material benefit from price increases.  Instead, Defendants falsely claimed that Teva only raised prices on a select few generic drugs due to market shortages.

*Third*, Defendants falsely stated that the Company was immune to pricing pressures when, in fact, it was unable to sustain its undisclosed strategy of taking substantial price increases.

*Fourth*, Defendants falsely represented the level of competition that the Company faced in the generic drug market.  In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short term price increases depended in large part on a *lack* of competition.

*Fifth*, Defendants falsely denied that Teva had participated in collusive conduct, while in reality Teva was the central actor in an industry-wide scheme to fix

prices and allocated customers, and four Teva executives were so extensively involved in the unlawful conspiracy that they were named personally as defendants in the State AGs' May 2019 complaint.

*Sixth*, Defendants failed to disclose and actively concealed the negative impact resulting from the acquisition and integration of Actavis on Teva's financial results and business prospects.

142. Further, Defendants violated Item 303 of SEC Regulation S-K and Item 5 of Form 20-F by failing to disclose the true reasons and factors contributing to the increases and decreases in the Company's revenues, *i.e.*, the Company's undisclosed strategy and implementation of massive price increases for generic drugs. These increases were unsustainable given, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market.

### A. FEBRUARY 6, 2014

143. On February 6, 2014, in a press release filed with the SEC on Form 6-K, Teva reported the Company's 4Q13 and FY 2013 financial results. In the same press release, Teva disclosed 4Q13 U.S. Generic Medicine "revenues of $1.2 billion, an increase of 14% compared to the fourth quarter of 2012." The press release reported that:

> The increase resulted mainly from the exclusive launches of niacin ER, the generic version of Niaspan®, and temozolomide, the generic version of Temodar®, in the third quarter of 2013, and launches of duloxetine, the generic version of Cymbalta®, and tobramycin, the generic version of Tobi®, in the fourth quarter of 2013, as well as higher sales of budesonide inhalation, the generic version of Pulmicort®.

144. The statements set forth in the paragraph above were materially false and misleading and/or omitted material facts because they had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to

take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, during FY13 Teva generated more than $222 million through price increases alone.  This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market.  Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### B. FEBRUARY 10, 2014

145.    On February 10, 2014, Teva filed its 2013 Annual Report with the SEC on Form 20-F, which was signed by Defendant Desheh. The 2013 20-F disclosed a YOY decline in generic profit of $400 million, or 20%, "primarily" attributed to "lower revenues and lower gross profit, which were partially offset by a reduction in selling and marketing expenses," and "by sales of higher profitability products in the United States."

146.    The statements set forth in the paragraph above were materially false and misleading and/or omitted material facts because they had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results in the generic drug market were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, during FY13 Teva generated more than $222 million through price increases alone. Without this inflated revenue, Teva would have experienced a YOY decline in generic profit of $622 million, or 55% more than what it reported.  This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect

of introducing new competitors in the market.  Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

147.    The Company's February 10, 2014 Form 20-F also described the "intense competition" Teva faced in the U.S. generic market and its "competitive pricing strategy," and again touted its "competitive advantages" in a "[c]ompetitive [l]andscape":

> In the United States, we are subject to intense competition in the generic drug market from other domestic and foreign generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs.  Price competition from additional generic versions of the same product typically results in margin pressures.  We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality and cost-effective production, our customer service and the breadth of our product line. We believe we have a focused and competitive pricing strategy.

148.    In the same Form 20-F, Teva discussed the primary factors driving growth in the Company's Generic Medicines segment, and reported "intense competition in the generic market":

> Sales of generic pharmaceuticals have benefitted from increasing awareness and acceptance on the part of healthcare insurers and institutions, consumers, physicians and pharmacists globally. . . .  These conditions also result in intense competition in the generic market, with generic companies competing for advantage based on pricing, time to market, reputation, customer service and breadth of product line.

149.    The statements set forth in the two paragraphs above were materially false and misleading and/or omitted material facts because Teva was not facing "intense competition" or operating in a competitive environment. Nor was Teva working to combat the purported effects of competition, which resulted in "margin pressures," through a "competitive pricing strategy." In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short term price increases depended in large part on a *lack* of competition. In fact, during the Relevant

Period, Teva increased the prices of multiple drugs, many of which were done in tandem with its purported competitors. *See* Section IV.E.

### C. MAY 1, 2014

150.    On May 1, 2014, Teva filed a press release on a Form 6-K with the SEC, signed by Defendant Desheh, reporting the Company's 1Q14 financial results. The Q1 2014 6-K disclosed a YOY increase in generic profit of $117 million, or 31%, which was "primarily" due to "higher revenues, higher gross profit and a reduction in selling and marketing expenses," with higher gross profit attributed to "the change in the composition of revenues in the United States and Europe, mainly products launched during the first quarter of 2014 and in the United States in the second half of 2013."

151.    That same day, Teva held its 1Q14 earnings conference call, in which Defendants Vigodman and Desheh participated.  During that call, Desheh stated:

> In generics, we experienced significant growth in the Unites States market, with 17% year-over-year growth, to a total of $1 billion with a number of new product launches.

> * * *

> The profitability of our major business segment was driven by global generic, with 31% improvement resulting from the strong performance in the US market and higher profitability in Europe. . . .  31% improvement in the profit of the global generic business, driven by the performance of the US market, improved the total generic share to 30% of total profit.

152.    The statements set forth in the two paragraphs above were materially false and misleading and/or omitted material facts. Defendants' statements touting the purported success of their generics business had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact,

during FY13 Teva generated more than $222 million through price increases alone and in FY14, generated more than $656 million from price increases, much of which had been realized by May 2014.  This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market.  Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### D.  JULY 31, 2014

153.    On July 31, 2014, Teva filed its 2Q14 Form 6-K with the SEC, which was signed by Desheh.  The 2Q14 Form 6-K reported that YOY increase in generic segment profit of $156 million, or 41%, "primarily" attributed to:

> [A] significant reduction in selling and marketing expenses, higher revenues and higher gross profit, [which was attributed to] . . . . higher revenues in the United States, specifically of products launched during the first half of 2014 and in the second half of 2013, and higher revenues in Canada as well as … the change in the composition of revenues in Europe.

154.    On July 31, 2014, Teva held its 2Q14 earnings conference call, on which Vigodman, Desheh, and Olafsson participated.  During the call, Desheh stated:

> [T]he improvement of operating profit and profitability was driven by strong results of our global generic business, with profit improvement of 41% compared to last year.  Launch of generic Xeloda in March and generic Lovaza this quarter in the US market . . . led to the better results.

155.    The statements set forth in the two paragraphs above were materially false and misleading and/or omitted material facts. Defendants' statements touting the purported success of their generics business had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved

revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with.  In fact, during FY13 Teva generated more than $222 million through price increases alone and in FY14, generated more than $656 million from price increases, much of which had been realized by July 2014.  This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market.  Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### E.  OCTOBER 30, 2014

156.    On October 30, 2014, in a press release filed with the SEC on Form 6-K and signed by Desheh, Teva reported its 3Q14 financial results. The Q3 2014 6-K disclosed a YOY increase in generic profit of $160 million, or 40%, "primarily" from:

> [H]igher gross profit and a significant reduction in selling and marketing expenses, [with higher gross profit attributed to] . . . lower expenses related to production, higher revenues from our API business as well as higher gross profit due to the change in the composition of revenues.

157.    On October 30, 2014, Teva held its 3Q14 earnings conference call, on which Vigodman, Desheh, and Olafsson participated.  During the call, Olafsson stated:

> I think overall, we have a good revenue off the new launches this year. [Capasida] the generic Lovaza omega 3 [and] Entecavir. Entecavir was a new launch for us in the quarter. I think all these three products have been very significant contributors to the year.

(First alteration in original.)

158.    On the same call, a UBS Securities analyst asked whether price increases in "some of [Teva's] base business" impacted Teva's 3Q14 financial results. Olafsson responded:

"there's never a price increase on the base business as whole. Like any other business, if there's a pricing opportunity that comes in the market, we look for that.  But the base business itself has been eroding overall because of the consolidation of the customers."

159.    The statements set forth in the three paragraphs above were materially false and misleading and/or omitted material facts. Defendants' statements touting the purported success of their generics business had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, during FY13 Teva generated more than $222 million through price increases alone and in FY14, generated more than $656 million from price increases, much of which had been realized by October 2014.  This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market.  Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### F.  December 11, 2014

160.    On December 11, 2014, Vigodman, Desheh, and Olafsson participated in the Company's 2015 Business Outlook Meeting conference call.  During the call, a Morgan Stanley analyst asked "with respect to Generic inventory in the channel, both for Teva and for other generic manufacturers, I'm assuming that wholesalers have been seeing extraordinary price increases in recent years and has been buying inventory ahead of tremendous price increases." Defendant Olafsson "disagree[ed]" stating:

So first let me correct. I have to disagree that they have experienced tremendous price increase. I think, overall, the pricing in the US of generics has been flat to a slight down. There has been a lot of press about price increases on individual molecules and this has been a hot political issue selecting a few products.

161.    The statements set forth in the paragraph above were materially false and misleading and/or omitted material facts. Defendants' statements that "overall, the pricing in the U.S. of generics has been flat to a slight down" had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, during FY 13 and FY14 Teva generated more than $878 million through price increases alone. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market.  Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### G.  FEBRUARY 5 AND FEBRUARY 9, 2015

162.    On February 5, 2015, Teva filed a press release with the SEC on Form 6-K, signed by Defendant Desheh, reporting the Company's 4Q14 and FY2014 financial results. The Q4 2014 Press Release disclosed a YOY increase in generic profit of $47 million, or 9%, attributed "primarily" to "lower S&M expenses and lower R&D expenses."

163.     On February 9, 2015, Teva filed its 2014 Annual Report with the SEC on Form 20-F, signed by Desheh.  The 2014 20-F disclosed a YOY increase in generic profit of $480 million, or 29%, attributed "mainly" to:

> lower S&M expenses and higher gross profit . . . . [which was] mainly a result of higher revenues in the United States, specifically of products launched during 2014 and in the second half of 2013, and higher revenues in Canada, which led to higher gross profits, as well as higher gross profit from API sales to third parties.

164.     The Company's 2014 20-F also reported that FY2014 U.S. Generic Medicine revenues "amounted to $4.4 billion, up 6% compared to $4.2 billion in 2013," explaining that:

> The increase resulted mainly from the 2014 exclusive launch of capecitabine (the generic equivalent of Xeloda®), the launch of omega-3-acid ethyl esters (the generic equivalent of Lovaza®) for which we were first to market, and the launch of raloxifene (the generic equivalent of Evista®), as well as products that were sold in 2014 that were not sold in 2013.  These increases were partially offset by lower sales of the generic versions of Adderall IR (amphetamine salts IR), Pulmicort (budesonide inhalation) and Niaspan® (niacin ER).

165.     The table below reflects Teva's improved profits as reported in 2014:

| 2014 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Reported YOY Change in Generics Profit | $117 | $156 | $160 | $47 | $480 |

166.     The statements set forth in the four paragraphs above were materially false and misleading and/or omitted material facts. Defendants' statements touting the purported success of their generics business had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, during FY14 Teva generated more than $656 million through price increases alone, representing a YOY increase in inflated revenues of more than $434 million, or nearly all of the reported

YOY change in generics profit.  This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market.  Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

167.    The Company's February 9, 2015 Form 20-F also described the "intense competition" Teva faced in the U.S. generic drug market and its "competitive pricing strategy," and again touted its "competitive advantages":

> In the United States, we are subject to intense competition in the generic drug market from domestic and international generic drug manufacturers, brand- name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs.  Price competition from additional generic versions of the same product typically results in margin pressures.  We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio.  We believe we have a focused and competitive pricing strategy.

168.    In the 2014 Form 20-F, Teva also described the "intense competition in the generics market," and the primary factors driving growth in its Generic Medicines segment:

> Sales of generic medicines have benefitted from increasing awareness and acceptance on the part of healthcare insurers and institutions, consumers, physicians and pharmacists globally. . . .  These conditions also result in intense competition in the generic market, with generic companies competing for advantage based on pricing, time to market, reputation, customer service and breadth of product line.  We believe that these factors, together with an aging population, an increase in global spending on healthcare, economic pressure on governments to provide less expensive healthcare solutions, legislative and regulatory reforms and a shift of decision-making power to payors, will lead to continued expansion in the global generic market, as well as increased competition in this market.

169.    In the same Form 20-F, the Company also described the following Risk Factor:

59

> Our generic drugs face intense competition.  Prices of generic drugs typically
> decline, often dramatically, especially as additional generic pharmaceutical
> companies (including low-cost generic producers based in China and India)
> receive approvals and enter the market for a given product and competition
> intensifies.  Consequently, our ability to sustain our sales and profitability on any
> given product over time is affected by the number of new companies selling such
> product and the timing of their approvals.

170.    The statements set forth in the three paragraphs above were materially false and

misleading and/or omitted material facts because Teva was not facing "intense competition" or

operating in a competitive environment. Nor was Teva working to combat the purported effects

of competition, which resulted in "margin pressures," through a "competitive pricing strategy."

In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short term

price increases depended in large part on a *lack* of competition.  In fact, during the Relevant

Period, Teva increased the prices of multiple drugs, many of which were done in tandem with its

purported competitors. *See* Section IV.E.

### H. APRIL 30, 2015

171.    On April 30, 2015, Teva filed its 1Q15 Form 6-K with the SEC, also signed by

Defendant Desheh. The Company's 1Q15 Form 6-K reported a YOY increase in generic profit

of $296 million, or 59%, attributed "primarily" to:

> Higher gross profit and lower selling and marketing expenses as well as lower
> research and development expenses . . . . [with] higher gross profit . . . mainly a
> result of the launch of esomeprazole in the United States during the quarter and
> improved profitability of our European business.

172.    On April 30, 2015, Teva held its 1Q15 earnings conference call, on which

Vigodman, Desheh, and Olafsson participated.  During the call, a Bank of America Merrill

Lynch analyst asked "how much more potential exists to increase generic segment margins

purely from organic gains in operational efficiency?"  In response, Olafsson stated:

> I think there is room for more, but it takes a little longer time.  What plays into
> the operating profit in generics are probably three or four things.

First of all, we have a significant improvement in our cost of goods.  I think the operation team in Teva has done an outstanding job in lowering the cost of goods, improving the quality of the supply.

And really, it's my business that has benefited from that because a big portion of our volume comes straight to the generic business.  And really, we will continue that over time. . . .

I think the next thing is the portfolio offering. I think the more we have of exclusive complex generics on offering, we have a higher margin on these products. It's simple. So when we have more of the launches, it will drive up the margin.

The third thing is the cost infrastructure.  I think we have done a very good job in the cost infrastructure.  You can see that from our gross margin versus our operating profit. . . .

[O]bviously, the big jumps of 1,000 basis points we have taken over the last 24 months, you wouldn't see that skill of improvement in the generics. . . .

When you look at the top line growth, you see that already in first quarter we have improved our top line growth.  That mainly comes from our new launches but also our emphasis on the branded generic markets.

173.    The statements set forth in the two paragraphs above were materially false and misleading and/or omitted material facts. Defendants' statements touting the purported success of their generics business, including the "three or four things" that play into Teva's operating profit, had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, from FY13 through FY14 Teva generated more than $878 million through price increases alone, and in FY15 generated an additional $747 million through price increases, much of which had been realized by April 2015.  This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of

introducing new competitors in the market.  Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### I.   JUNE 10, 2015

174.   During a June 10, 2015 Goldman Sachs conference, Vigodman spoke of "the profound change in the generic business" since 2014, stating:

> These are "things [that] are not confined to numbers, but maybe [numbers tell the story]: 16.7% operating profit in 2013; 21.9% operating profit 2014," and attributing this success solely to "[t]he execution of the cost reduction program[:] $600 million net savings 2014; $500 million 2015," and a "[f]ull transformation of our operational network," claiming that "[w]e closed or divested 11 plants during the last 12 months, we centralized procurement.… So everything that was done during 2014 was based on organic moves only."

175.   The statements set forth in the paragraph above were materially false and misleading and/or omitted material facts. Vigodman's statements touting the purported success of their generics business, including the "cost reduction program" and "full transformation of our operational network," had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, from FY13 through FY14, Teva generated more than $878 million through price increases alone, and in FY15 generated an additional $747 million through price increases, much of which had been realized by June 2015.  This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market.  Having put into play the issue of the source of

Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### J.    JULY 27, 2015

176.    On July 27, 2015, Teva held a call to discuss the Company's Actavis acquisition. On that call, a BMO Capital analyst asked Olafsson and Vigodman about the competitive landscape in the generic market.  In response, Olafsson stated, "the U.S. generic market is very competitive. . . .  [There's] a fierce competition on most of the portfolio, if not all of the portfolio."  Vigodman added, "we promise to do everything in our power to take the Company to be able to continue the improvement that we have been witnessing here.  We believe in competition, and we'll do what is needed in order to win all the markets we operate."

177.    The statements set forth in the paragraph above were materially false and misleading and/or omitted material facts because Teva was not facing "fierce competition" or operating in a competitive environment. Nor was "the U.S. generic market [] very competitive." In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short term price increases depended in large part on a *lack* of competition.  In fact, during the Relevant Period, Teva increased the prices of multiple drugs, many of which were done in tandem with its purported competitors. *See* Section IV.E.

### K.  JULY 30, 2015

178.    On July 30, 2015, Teva filed its 2Q15 Form 6-K, which was signed by Defendant Desheh.  Teva's 2Q15 6-K reported a YOY increase in generic profit of $193 million, or 36%, attributed "primarily" to "higher gross profit as well as lower selling and marketing expenses," while claiming that higher gross profit was "mainly a result of higher gross profit in the United States, due to the launches of aripiprazole in the second quarter of 2015 and of esomeprazole during the first quarter of 2015, and lower production expenses."

179.    The statements set forth in the paragraph above were materially false and misleading and/or omitted material facts. Defendants' statements touting the purported success of their generics business had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, from FY13 through FY14 Teva generated more than $878 million through price increases alone, and in FY15 generated an additional $747 million through price increases, much of which had been realized by July 2015.  This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market.  Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### L.  OCTOBER 29, 2015

180.    On October 29, 2015, Teva filed its 3Q15 Form 6-K with the SEC, signed by Desheh.  In the 3Q15 Form 6-K, Teva reported YOY increase in generic profit of $20 million, or 4%, attributed "primarily" to "lower selling and marketing expenses, partially offset by lower gross profit," which in turn was partially offset "by higher gross profit of our API business."

181.    On October 29, 2015, Vigodman, Desheh, and Olafsson participated in the Company's 3Q15 earnings conference call. During the call, Vigodman denied that any of Teva's margin improvements were attributable to price increases:

> We are very responsible . . . in everything that pertains to prices on the generic side and on the specialty side.  And I would even put it another way, ***all the improvements you see in our – in margins is not driven by price. It is driven by quantities and by***

*mix and by efficiency measures.   Not by price, 2014, 2015.   And that's a very important message*.

182.    In light of recent legislative proposals that would penalize generic manufacturers for raising prices above the rate of inflation, an analyst asked for management's thoughts on "the potential limit to generic drug price increases." Olafsson minimized the extent and effect of Teva's practice of increasing prices and implied that Teva was not dependent on such profit:

> In terms of the proposed legislation on pricing control on generics, first of all, we don't really know what it's going to be. But let me give you examples. So Teva has the largest portfolio on the U.S. market. We are offering approximately 275 products. And we have told you that overall on our whole portfolio, we have a decline in price. *The talk about the inflation in generics when you have a big portfolio is really not there*. 95% of our portfolio is declining due to the consolidation of the customers I talked about. There might be 5% of the portfolio that is either flat or increasing in pricing due to some abnormalities in the market.

183.    The statements set forth in the three paragraphs above were materially false and misleading and/or omitted material facts. Defendants' statements had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, from FY13 through FY14, Teva generated more than $878 million through price increases alone, and in FY15 generated an additional $747 million through price increases, much of which had been realized by October 2015.   This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market.  Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

184.    On the same October 29, 2015 call, Olafsson was asked if he could "follow up . . . on what your pricing trends are here in the US for the generic business."  Olafsson responded:

> So on the pricing, I think pricing is obviously based on the competition. We have talked about that the overall pricing trend is down.  What will change that obviously, there is different things.  I think the consolidation of the customers affect pricing.  I think the backlog, when the FDA releases the backlog of 3,000 NDA affect pricing.

185.    The statements set forth in the paragraph above were materially false and misleading and/or omitted material facts because Teva's pricing was not "obviously based on the competition" and the Company was not operating in a competitive environment. In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short term price increases depended in large part on a *lack* of competition.  In fact, during the Relevant Period, Teva increased the prices of multiple drugs, many of which were done in tandem with its purported competitors. *See* Section IV.E.

**M.**        **NOVEMBER 19, 2015**

186.    On November 19, 2015, during a Global Healthcare Conference call hosted by Jefferies LLC, in response to a question asking Desheh to "give us your 20,000 foot view on pricing" and asked "[i]s it an issue . . . where do you go on price," he stated:

> There is a lot of noise around pricing issues. Some of it's coming from politicians who are driving agenda, which is very, very legitimate.
>
> ***Our exposure to all these things is very minimal. . . .***
>
> Generic prices? There are no – I believe that there are many examples for competitive environment, real competition, like we see in the generic market in the United States. . . .
>
> So it's a highly competitive environment with players coming from all over the world, with a very fierce price competition.  The price of generic went down 50% over the past 10 years. . . .
>
> ***And Teva was not associated with any of that.*** So we're playing a competitive game.  We're playing it fairly.  We, of course, play by the book and by the rule.

*And we believe that our exposure to any initiative on price reduction in the United States is as small as anybody can have. . . .*

But we also saw that there is a floor to this. And the floor is a common economic and business model. And wherever prices have come down to a level that it doesn't make sense, companies like us just pull out. We refuse to participate in tenders that generate no profit, and we just pull out. You pull out, prices go up because there is less supply over the demand. And we are, in short, playing in a very competitive market.

187.     The statements set forth in the paragraph above were materially false and misleading and/or omitted material facts because Teva was not facing "fierce price competition" or operating in a "highly competitive environment." In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short term price increases depended in large part on a *lack* of competition. In fact, during the Relevant Period, Teva increased the prices of multiple drugs, many of which were done in tandem with its purported competitors. *See* Section IV.E.

188.     Similarly, Desheh's statements set forth in ¶ 186 above—including the statements that Teva's "exposure to all these things is very minimal," "we believe that our exposure to any initiative on price reduction in the United States is as a small as anybody can have," and "Teva was not associated with any of that"—were false and misleading because Teva was highly dependent on its strategy to implement massive short term price hikes. In fact, from FY13 through FY15 Teva generated more than $1.6 billion through price increases alone. Thus, any political initiative, such as permitting Medicare to negotiate drug prices, could lead to drastic price decreases.

### N.        JANUARY 11, 2016

189.     At a January 11, 2016 J.P. Morgan Conference, a J.P. Morgan analyst asked Olafsson, "McKesson this morning announced some maybe challenging pricing on the generics side or an expectation of that going forward. Could you just comment a little bit on how you see

generic pricing as we look out not just this year but in the future and how Teva is able to navigate the current environment?" In answer to this question, Olafsson responded:

> The generic pricing – we need to keep in mind there's a lot of talk about inflations in generic pricing. But what we see is there's – overall on our total portfolio of 270 products, there is a slight decrease in pricing. It's low single digit, but year on year we see a low single-digit decrease because *on 95% of our portfolio, we experience price decline. And then on 5%, we might be flat or a slight increase*. So, overall, we see that in the business. There's a lot of headlines of examples of big price increases in generics. But when you are a company of the size of Teva and you have the portfolio that we have today – as I said, 270 products for the whole of the portfolio – there is a decline.

190.   The statements set forth in the paragraph above were materially false and misleading and/or omitted material facts. Olafsson's statement that "on 95% of our portfolio, we experience price decline" had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, from FY13 through FY15 Teva generated more than $1.6 billion through price increases alone. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market.  Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### O.      FEBRUARY 11, 2016

191.   On February 11, 2016, Teva filed with the SEC a press release reporting the Company's fourth quarter 2015 ("Q4 2015") and full year 2015 ("FY 2015") financial results ("Q4 2015 Press Release"). The Q4 2015 Press Release disclosed a YOY increase in generic

profit of $7 million, or 1%, attributed "primarily" to: "[T]he reduction in S&M expenses, partially *offset*" by, in part, "lower sales of budesonide (Pulmicort®) in the United States."

192.    Also on February 11, 2016, Teva filed its Annual Report with the SEC on Form 20-F, signed by Desheh.  Vigodman and Desheh also signed the consolidated balance sheet.  The 2015 Form 20-F a YOY increase in generic profit of $500 million, or 24%, attributed "primarily" to "lower S&M expenses and higher gross profit," which was "mainly a result of higher revenues from new products launched in the United States during 2015, lower other production expenses and higher gross profit from API sales to third parties."

193.    The table below reflects Teva's improved profits as reported in 2015:

| 2015 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Reported YOY Change in Generics Profit | $296 | $193 | $20 | $7 | $516 |

194.    On February 11, 2016, Vigodman, Desheh, and Olafsson participated in Teva's 4Q15 and FY2015 earnings call.  On the same call, Olafsson stated:

> 2015 was a very good year for Teva Generics. Thanks to our strong performance of the base business and good new products launches, we delivered great results in the US and in major markets globally. We continued improving the operating profit of the generic business, coming from $1.68 billion operating profit in 2013, or 17% of revenue, to $2.68 billion operating profit in 2015, or 28% of revenue. This is $1 billion improvement in operating profit over 24 months period.
>
> So how did we do this? Not by pricing but by portfolio mix, new products, and efficiency measures.

195.    During the February 11, 2016 earnings conference call, Olafsson made the following statements regarding pricing in the generic segment:

> Briefly, on pricing. As I've previously stated, we and the generic industry overall don't see price inflation of generics as it sometimes is portrayed in the media. On the contrary, for 2015, we saw mid-single-digit price decline for the overall business.
>
> In the U.S., our largest market, we saw approximately 4% price erosion. . . .

Looking forward, the conjunction of price erosion with the mix changes, focus on cost structure, and the new product launches, we continue to drive our business growth, both top line and bottom line.  We expect to see the same in 2016. Nothing today points to a significant change in the generic pricing environment.

196.    On the same call, a Guggenheim Securities, LLC analyst asked Olafsson about pricing pressures discussed by Teva's competitors during the quarter.  In response, Olafsson denied that there was any pricing pressure:

As I mentioned in the beginning, we didn't see anything change in fourth quarter. We saw approximately 4% pricing pressure or price decline in the US business over 2015 flat over the year. Some of our competitors have seen more pressure.  I think overall, it might have to do with some dosage form differences.  But also I think we have been right in adjusting the business.

197.    The Investor Slides presented during the February 11, 2016 earnings conference call contained the following statements attributed to Olafsson:  "Do not see the inflationary pricing discussed in the media[.]  Also do not see the sharp drop in prices other competitors have seen recently[.]  Mid-single digit increases in 2015[.]  Expect 2016 to maintain the current trend."

198.    The statements set forth in seven paragraphs above were materially false and misleading and/or omitted material facts. Defendants' statements (i) touting the purported success of their generics business and (ii) denying any knowledge of price inflation, had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, from FY13 through FY15 Teva generated more than $1.6 billion through price increases alone. Moreover, during FY15 Teva generated more than $747 million through price increases alone, representing a YOY increase in inflated revenues of more than $91 million, or nearly 20% of the reported

YOY change in generics profit.  This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market.  Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

199.    In the 2015 20-F filed on February 11, 2016, Teva described the "intense competition" the Company faced in the U.S. generic market and its "competitive pricing strategy," as well as its "competitive advantages":

> In the United States, we are subject to intense competition in the generic drug market from domestic and international generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs.  Price competition from additional generic versions of the same product typically results in margin pressures.  We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio.  We believe we have a focused and competitive pricing strategy.

200.    The 2015 Form 20-F also described the "intense competition in the generic market" and the primary factors driving growth in Teva's Generic Medicines segment:

> Sales of generic medicines have benefitted from increasing awareness and acceptance on the part of healthcare insurers and institutions, consumers, physicians and pharmacists globally. . . .  These conditions also result in intense competition in the generic market, with generic companies competing for advantage based on pricing, time to market, reputation, customer service and breadth of product line.  We believe that these factors, together with an aging population, an increase in global spending on healthcare, economic pressure on governments to provide less expensive healthcare solutions, legislative and regulatory reforms and a shift of decision-making power to payors, will lead to continued expansion in the global generic market, as well as increased competition in this market.

201.    The same Form 20-F also described the following Risk Factor:

Our generic drugs face intense competition.  Prices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies (including low-cost generic producers based in China and India) receive approvals and enter the market for a given product and competition intensifies.  Consequently, our ability to sustain our sales and profitability on any given product over time is affected by the number of new companies selling such product and the timing of their approvals.

202.    During the February 11, 2016 earnings conference call, a Susquehanna Financial Group analyst also asked Olafsson about the Company's relationships with customers and what impact the Actavis deal was having on pricing.  Olafsson responded:

We will pride ourselves of the service level of the high quality of the product. But at the end of the day, there is a fierce competition in the market.  Over 200 generic companies, and really there is no bundling or anything like that, that can go on in the market.  So overall, same as without the deal.  But we see the opportunity going forward based on the huge pipeline that we have.

203.    During the same call, Olafsson also stated that the U.S. generics business had been "stable over the year" and "[t]here is a lot of competition in the US, there is no question about it.  As you well know, there are over 200 generic competitors in the market and the competition is fierce."  Olafsson claimed Teva's competitive advantage was having "the largest [drug] pipeline" and "an extremely good supply chain."

204.    The statements set forth in the five paragraphs above were materially false and misleading and/or omitted material facts because Teva was not facing "intense competition," "a lot of competition in the US," or operating in a competitive environment. Nor was Teva working to combat the purported effects of competition, which resulted in "margin pressures," through a "competitive pricing strategy."   In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short term price increases depended in large part on a *lack* of competition.  In fact, during the Relevant Period, Teva increased the prices of multiple drugs, many of which were done in tandem with its purported competitors. *See* Section IV.E.

P.        MARCH 8, 2016

205.    On March 8, 2016, during a Cowen & Company Healthcare Conference call, Olafsson stated:

> So we came out in our fourth quarter results, and told the market that we had seen approximately 4% price decline in the US market in 2015. . . .
>
> I think **overall the pricing hasn't changed that much**.  There was a lot of talk about inflation in generic pricing.  But we never saw that.  That was an individual molecule basis, they used example of products that really were not generic products, even though they were off-patent, and in an environment where there was an inflation never really happened in the generic business.  And there has been a decline there. . . .
>
> So as of today, I came out with 4% [price erosion] in 2015.  As of today, I don't see any big changes in the pricing environment.  It's relatively stable. 4% is worse than maybe two years ago.  But it's similar to what we saw in 2014. But overall, these are the three things that affect the price.  And there's nothing on the horizon that should affect the pricing as of today.

206.    During the same conference, Olafsson also discussed Teva's profitability in its generic segment:

> In terms of growing the profitability, from 2013 to 2015, we grew the operating profit of the generic business from 17% in 2013, and we exited for the full year of 2015 we were at 28.1%.  So it's about 1,100 basis points we improved the profitability on approximately $10 billion in revenue.  So it was a significant improvement over a 24-month period.  Part of that was due to the improvement in our cost of goods sold, very important in consolidation of plants and looking for the money there.  But also part of it was due to portfolio selection and the cost infrastructure.

207.    The statements set forth in the two paragraphs above were materially false and misleading and/or omitted material facts.  Olafsson's statements had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market, including improved revenues, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. In fact, from FY13 through FY15 Teva generated more than

$1.6 billion through price increases alone. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### Q.     MAY 9, 2016

208.    On May 9, 2016, Teva filed its 1Q16 Form 6-K with the SEC, which was signed by Desheh. Vigodman and Desheh both signed the consolidated balance sheet in the 1Q16 Form 6-K. In the 1Q16 Form 6-K, Teva reported a YOY decline in generic profit of $215 million, or 27%, attributed "primarily" to "lower gross profit, as well as higher R&D expenses," while lower gross profit was "mainly a result of lower sales of high gross profit products in the United States, higher production expenses and lower gross profit in our European markets."

209.    On May 9, 2016, Vigodman, Desheh, and Olafsson participated in Teva's 1Q16 earnings conference call. During the call, Olafsson explained away the decline in generic profit margin by blaming it on issues other than pricing: "[w]hen compared to first quarter 2015, the operating profit declined by 360 basis points, fully explained by the exclusive launch of generic Nexium, esomeprazole, in the first quarter 201[5]. Excluding the exclusivity period of esomeprazole in first quarter, the profit margin of the generic segment was 24.4%."

210.    During the call, Olafsson also discussed pricing on the May 9, 2016 earnings call:

The global generic drug market has no shortage of manufacturers supplying vital medicines to patients in the US and around the world. . . .  As you know, in February, during the fourth-quarter reporting season, several industry participants referenced a tougher pricing environment than what they have experienced in previous years, as a reason for the softness in their respective generic businesses.

Now, we fast-forward to April and May, to a new reporting season, and we find the number of companies citing a tougher pricing environment or price deflation seems to have grown at an almost incredible rate.  The referencing of generic drug price deflation has not been limited to the manufacturers, but is also being cited by those on the purchasing and distribution side, leaving many to wonder about what is the real opportunity in generics.

As always, I will do my best to provide you with as much color as possible on what Teva is experiencing, in regards to pricing and volume; and more importantly, where we are headed.  Throughout the ongoing debate this year about the level of generic price erosion in the United States, Teva has been very consistent and clear with investors.  Teva has not seen any fundamental change or worsening in the pricing environment – something we have been consistent about telling investors all year.  Teva experienced approximately 4% price erosion in the United States last year, and our guidance for this year is that it will remain the same.  In fact, Allergan, and Mylan, two other companies with broad and diversified portfolios and high quality products, have also reported similar trends.  From where I sit today, there is nothing that changes my mind about that.  Nothing has happened in the last two quarters that has changed the pricing environment.  What this boils down to is each individual company's business model. . . .

211.    During the same call, Olafsson stated:

[W]hy is Teva different?  Why is our performance better than most generic companies?  Why are other companies continuing to say, there is pricing pressure greater than what we at Teva are seeing?

I see three reasons: first, the companies with older portfolio seemed to complain much more loudly.  What I mean by that is, that if you look carefully at some companies with older portfolios, they will tell you that the pricing environment is worsening.  But this is not an environment.  This is purely a reflection of their portfolios, some of which are concentrated in one, or very few, therapeutic classes that are experiencing normal competition.  This takes me to the second factor, new product launches.  When companies don't have new product launches, and the business is declining, they tend to talk about the market more than anything else.  This is not a reflection of the environment, but rather again, a reflection on a company's portfolio.

The third factor is companies that are trying to grow their market share.  Some companies are aggressive in going after market share for a variety of reasons, including to utilize excess capacity with relatively cheap volume. But in order to do that, you'll have to drive down price.  Buying new market share in price will cost you on the bottom line.  We, on the other hand, are seeing our volumes go down, deliberately, net-net approximately 1% a year, because we think that is better for our business, and we would rather reduce capacity, than fill it with less profitable products.  So if you look at this slide, you'll see that over the past few

years, we discontinued 70 products.  At the same time, we introduced 68 new ones in the US.

212.    During the May 9, 2016 earnings call, Olafsson also offered the supposed reasons why Teva's generics division had achieved success over several years, and thus was differently positioned compared to its competitors who were reporting increased pricing pressure:

> We have taken a significant step to transform our generic business, solidify our foundation, increase our profitability, and to better position us to generate sustainable long-term growth. These many steps have included portfolio optimization, strengthening our capabilities in R&D, and manufacturing of complex products, regaining a leading position in submission on first-to-files, enhancing our go-to-market, and sales force effectiveness capabilities, and much, much more. These are the very capabilities that companies must possess in order to thrive at the global level. We have created a unique and differentiated platform, positioned to extract significant value in the global growing generic space.

213.    The Investor Slides that the Company presented during the May 9, 2016 earnings conference call contained the following statement, attributed to Olafsson:  "What has changed in the US pricing environment since Q4 2015?  The short answer is . . . nothing.  We still expect 4% price erosion on our portfolio."  The Investor Slides also contained the statement:  "There is no change in the pricing environment [.]  It all comes down to each company's business model . . . Why is Teva generics performance better than most Gx companies? Portfolio optimization …. [and] [n]ew product[]."

214.    The statements set forth in the six paragraphs above were materially false and misleading and/or omitted material facts. Defendants' statements had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results, including the YOY decline in generic profits, were driven primarily by the unsustainability of Teva's undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the

pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. In fact, by this time, the risk from Defendants' undisclosed strategy had begun to materialize. While Teva generated more than $541 million through price increases during FY16, that figure represented a decline of more than $200 million, or nearly 30%, from FY15.  Much of this decline would have been known to Teva by May 2016.  Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the source of its revenue.

### R.        MAY 10, 2016

215.    On May 10, 2016, on a Bank of America Merrill Lynch Healthcare Conference call, Olafsson discussed the Company's 1Q16 financial results and the pricing environment in the generics market:

> I mentioned on that call, and want to reemphasize here, there's nothing I have seen which shows a worsening pricing environment.  We saw a price erosion in the US last year of approximately 4%.  We guided the market that we would see the same pricing of approximately deflation of 4% in 2016.  And where I sit today, there is no change to that.

> I know many of the competitors in the generic space, and in the specialty space, are talking about a lot of pricing pressure, but it shouldn't be.  There is nothing that has happened over the last two quarters which has changed fundamental the market.  And I feel that we are blaming the environment on individual company's business model more than anything else because as long as you have the right portfolio, you have had the right investment in R&D, you really have a strong opportunity.

216.    During the call, Olafsson also stated:

> You have to keep in mind that in the US generic space there's approximately 230 competitors.  Two hundred and thirty generic companies in the US that are offering products.  So the competition is heavy.  So if you show that you grow 3%, let's say 3% volume year-on-year, that will cost you on pricing.

> There's no question about it.  So that's why I'm highlighting that in Teva world, we assume approximately 1% decline in the volume to maintain the pricing.  So

it's not that we are the only good house in the neighborhood, and I don't think this is a bad neighborhood, I think it's a good neighborhood. It's unique. To maintain your business you need to think about the future. And I think that's at the end of the day what differentiates us.

217.   The statements set forth in the paragraph above were materially false and misleading and/or omitted material facts. Olafsson's statement that nothing had changed in the pricing environment in which Teva operated had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. In fact, by this time, the risk from Defendants' undisclosed strategy had begun to materialize. While Teva generated more than $541 million through price increases during FY16, that figure represented a decline of more than $200 million, or nearly 30%, from FY15. Much of this decline would have been known to Teva by May 2016. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

## S.   JUNE 3 AND 8, 2016

218.   On June 3, 2016, during a Sanford C. Bernstein Strategic Decisions Conference call, Vigodman made the following statement regarding pricing:

[W]e are very consistent. Our message was conveyed, and we will continue to convey. What we see is a 4% to 5% erosion. That's what we see. That's not something which is different from what we said during 2015. By the way, we continue saying it in 2016. I think our results in Q1 demonstrated that. And with basically our operating profits towards one of the (inaudible) in our history on kind of a naked basis, so generic business in the US without launches. So, in this

respect, we are very continuing with our messages, and that's what we continue seeing.

219.    During a June 8, 2016 Goldman Sachs Healthcare Conference call, Olafsson again discussed pricing:

> When we signed that [Actavis] deal in July, we talked about 4% price erosion in the US generic business.  And we are still talking about the same number, what we see in the base business.  And we can talk about that later, how we look at it versus others.  But really the fundamental -- so what has changed in the market is that currently the multiples for generic companies, Mylan and us, has been dragged down, I think, due to other companies in the market partly, due to Valeant, due to Endo, due to comments that were made in Perrigo and Mallinckrodt about the generic business, which has affected the whole industry.

220.    The statements set forth in the two paragraphs above were materially false and misleading and/or omitted material facts. Defendants' statements that nothing had changed in the pricing environment in which Teva operated had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with.  This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. In fact, by this time, the risk from Defendants' undisclosed strategy had begun to materialize. While Teva generated more than $541 million through price increases during FY16, that figure represented a decline of more than $200 million, or nearly 30%, from FY15.  Much of this decline would have been known to Teva by June 2016.  Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

79

T.        JULY 13 AND JULY 19, 2016

221.    In a July 13, 2016 call to announce the acceleration of Teva's debt offering, including the Notes Offering, to the end of July, a Citigroup analyst asked: "[C]an you comment on the generics pricing assumptions that you have baked into your forecast? Following on that, Siggi, maybe you could just comment on the generics pricing environment, more broadly, that you are currently seeing in the marketplace." In response, Olafsson indicated that Teva had still not seen any change in the pricing environment, and that this stable pricing was baked into the assumptions underlying Teva's guidance and projections:

> Our assumption and what we assume is basically approximately 5% organic growth that we see year on year.…
>
> In terms of generic pricing in the second quarter, we saw no change in the pricing. We saw a stable environment, as we talked about, from first quarter into second quarter. Obviously, in second quarter, as we have highlighted to investors, there was no significant new launches that we saw in Teva, which obviously impacts the overall generic numbers. The pricing has remained stable.…
>
> ***
>
> Our assumption for the rest of the year is basically assuming the same pricing erosion. It is difficult to say; but as I'm sitting here today, with the information I have in hand, we are assuming and now forecasting for the guidance for the remainder of the year same pricing assumption as we have had for the first half of the year.

222.    The statements set forth in the paragraph above were materially false and misleading and/or omitted material facts.  Olafsson's statement that nothing had changed in the pricing environment in which Teva operated had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with.  This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the

pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. In fact, by this time, the risk from Defendants' undisclosed strategy had begun to materialize. While Teva generated more than $541 million through price increases during FY16, that figure represented a decline of more than $200 million, or nearly 30%, from FY15. Much of this decline would have been known to Teva by July 2016. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

223.    On July 13, 2016, Teva filed the Notes Registration Statement, which was signed by Vigodman and Desheh.   On July 19, 2016, Teva filed with the SEC, pursuant to Rule 424(b)(5), its final Notes Prospectus (the "Notes Final Prospectus") and, under Rule 433, two free writing prospectuses, all dated July 18, 2016.   The Notes Registration Statement and the Notes Final Prospectus incorporated by reference the 2015 Form 20-F and the 1Q16 Form 6-k, which contained false and misleading information as described herein.

U.      AUGUST 4, 2016

224.    On August 4, 2016, in a press release filed with the SEC on Form 6-K and signed by Desheh, Teva announced its 2Q16 financial results.  That same day, Teva also filed with the SEC its 2Q16 Form 6-K, signed by Desheh.  Vigodman and Desheh both signed the consolidated balance sheet in the 2Q16 Form 6-K. The Company's 2Q16 6-K reported a YOY decline in generic profit of $115 million, or 16%, attributed "primarily" to "lower gross profit," which in turn was "mainly a result of loss of exclusivity on certain products as well as increased competition on other products in the United States . . . and higher production expenses."

225.    On August 4, 2016, Vigodman, Desheh, and Olafsson participated in Teva's 2Q16 earnings conference call. On the call, Desheh attributed the poor performance of the

Company's generic segment to factors other than its inability to maintain its long undisclosed price increases, stating that "[r]evenues of our US generics business was impacted by competition to our Aripiprazole, Esomeprazole, and Budesonide which were the major drivers of our generic business in the US in the second quarter last year."

226.    On the same call, in response to a question about "pricing stability" in light of Teva's U.S. generic revenues coming in "a little lower than expectations," Olafsson stated:

> I think, first of all, it's the old story in the generic business, and we have talked about it many times. It's the short-term volatility, but a long-term profitability that we are seeing in the generic business.  I think on the US side, clearly the impact we highlighted, the impact of having a competition on Aripiprazole, Esomeprazole, and Budesonide was very, very significant. I think overall, the underlying business did well. . . .
>
> In terms of the pricing, the pricing is stable to the same degree as before. We saw approximately in the US, 4% price erosion in the business, in a way very stable from the first quarter.

227.    Later in the call, Olafsson reiterated that "overall the business itself is fairly stable. As I mentioned in the beginning, we are seeing exactly the 4% price erosion…. 4% price erosion in the US."

228.    On the same call, a J.P. Morgan analyst asked about "price opportunities" on the combined Teva-Actavis generic portfolio.  In response, Olafsson stated:

> On the pricing, as you know, and we know that, the size really doesn't affect the pricing.  And I have a strong feeling when you have over 200 competitors, size has nothing to do about pricing. I think the pricing comes with shortages in the market.  If you have an exclusive product, if there's some kind of dysfunction in the market, there might be a small pricing opportunity that usually comes in and comes out. But overall, the size, and being a combined company doesn't play into that. I feel quite strongly about that.

229.    The statements set forth in the five paragraphs above were materially false and misleading and/or omitted material facts. Defendants' statements (i) citing non-price factors for the decline in generic revenue, and (ii) that nothing had changed in the pricing environment in

which Teva operated had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results, including the YOY decline in generic profits, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. In fact, by this time, the risk from Defendants' undisclosed strategy had begun to materialize. While Teva generated more than $541 million through price increases during FY16, that figure represented a decline of more than $200 million, or nearly 30%, from FY15. Much of this decline would have been known to Teva by August 2016. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues. Moreover, Olafsson's suggestion that pricing decisions were driven by organic market factors—including the statement that "pricing comes with shortages in the market"—was false and misleading in light of the Company's undisclosed practice of implementing massive short term price increases to boost revenue.

230.    During the August 4, 2016 earnings conference call, Olafsson also stated that "competition is fierce" in the U.S. generics market and "[t]here's no question about it."

231.    The statements set forth in the paragraph above were materially false and misleading and/or omitted material facts because Teva was not facing "fierce" competition, or operating in a competitive environment. In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short term price increases depended in large part on a *lack*

of competition.  In fact, during the Relevant Period, Teva increased the prices of multiple drugs, many of which were done in tandem with its purported competitors. *See* Section IV.E.

V.        **SEPTEMBER 7 AND 9, 2016**

232.    On September 7, 2016, during a Wells Fargo Securities Healthcare Conference call, Desheh stated:

> Now, with talking about prices of the base business, product that we've been selling more than two years already, the prices are very stable there.  Might even go up a little bit here and there, depending on demand and supply, and demand and availability of competing products in the market, but you don't see -- there you don't see the erosion.  Where we see erosion is that you know, you have six months exclusivity, you start with the high price, and then obviously more competitors go into the market and the price goes down.  But when we look at the base, there's no -- there's no pressure on prices.

233.    On September 9, 2016, during the Generic Medicines Business Overview call, Olafsson stated:

> ***There is no inflation in the generic pricing*** . . . .
>
> So what is the secret sauce?  It's not very complex.  This has been the same winning formula I have talked about many, many times.  Really to be top three in the market is so important.
>
> ***
>
> I think what I want to highlight is there will always be cycling of the pricing of generics.  I have in my career, 23 years, never seen a real inflation.  I mentioned to some of you before, I have been in the market where price declines was approximately 1% to 2%, probably 2%, and I've been in the market in 2006 and 2007 when the price decline was 7%, 8%.  And then it's everything in between.
>
> So far, what we saw in the end of second quarter was approximately 4% in the US and 5% global.  So, there will be a fluctuation, and obviously, it will affect every generic Company.  But the message I want you to take from this slide is with our business, with the size of our portfolio, with the flexibility of our manufacturing network, with the industry-leading position in the market, we are more shielded towards the prices up and down.

234.     On the same call, Olafsson made the following statement regarding industry talk about price inflation:  "so first of all, we need to differentiate generics from branded pricing. And people that say that the generic—there's a big generic price inflation, are simply wrong."

235.     Also during the September 9, 2016 call, a Goldman Sachs analyst noted there had been speculation that Teva was not raising prices during the approval process for the Actavis deal and asked if the Company expected the "landscape in terms of pricing to change at all, now that the deal is closed."  Olafsson responded:

> So first of all, it doesn't work like we wake up when we are one Company, and we can take price increases. Simply, it doesn't work like that in generics.  **When price increases are taken, there's some kind of abnormality in the business**. There are shortages.

> Remember that there's 208 generic companies out there that are offering product, and an average of every molecule we have, there is more than five competitors. So there's always somebody happy to take a little bit lower price.  **So it's a very competitive business we're in**. I think overall, obviously, we look at each opportunity, but we come back to what Andy said and he will say it better, is we have an opportunity to work with it. We have a broader portfolio now.

236.     During the September 9, 2016 conference call, the Company presented Investor Slides related to pricing pressures in the Generics market.  The slides contain the following statements attributed to Olafsson:

- "Generic Price erosion varies year-to-year" and "Chasing market share will destroy value."

- Listing Teva's advantages as: "Price challenges are product specific – a broad diverse portfolio mitigates risk[;] Strong understanding of the market[;] Offering differentiated products – lower competition, durability[;] Competitive cost position[;] Industry leading pipeline – customers want access to our new products which brings them value."

- "Price erosion is nothing new."

- Listing how Teva is positioned to succeed in the market as:  "Teva operations is a competitive advantage and capable of creating additional value[;] Allows Teva to maximize the value of the best R&D engine in the industry[;] Diverse portfolio and competitive cost structure allows for long-term value creation."

237.    The statements set forth in the five paragraphs above were materially false and misleading and/or omitted material facts. Defendants' statements (i) citing non-price factors for the decline in generic revenue, (ii) that nothing had changed in the pricing environment in which Teva operated, and (iii) denying price inflation in the generic business, had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with.  This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. In fact, by this time, the risk from Defendants' undisclosed strategy had begun to materialize. While Teva generated more than $541 million through price increases during FY16, that figure represented a decline of more than $200 million, or nearly 30%, from FY15. Much of this decline would have been known to Teva by September 2016.  Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.  Moreover, Desheh's and Olafsson's suggestions that pricing decisions were driven by organic market factors—including the statements that "prices are very stable there . . . depending on demand and supply" and "When price increases are taken, there's some kind of abnormality in the business"—were false and misleading in light of the Company's undisclosed practice of implementing massive short term price increases to boost revenue.

238.    These statements set forth in ¶¶ 232-36 above were also materially false and misleading and/or omitted material facts because Teva was not operating in a "very competitive

business."   In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short term price increases depended in large part on a *lack* of competition.   In fact, during the Relevant Period, Teva increased the prices of multiple drugs, many of which were done in tandem with its purported competitors. *See* Section IV.E.

**W.      NOVEMBER 15, 2016**

239.    On November 15, 2016, in a press release filed with the SEC on Form 6-K, and signed by Desheh, Teva reported its 3Q16 financial results.  That same day, Teva filed its 3Q16 Form 6-K with the SEC, signed by Desheh.  Vigodman and Desheh both signed the consolidated balance sheet in the 3Q16 Form 6-K.  The Company's 3Q16 Form 6-K also reported a YOY increase in U.S. generic revenue of $261 million, or 25%, attributed to increased revenues from Actavis. However, after removing Actavis' $538 million in U.S. generic revenues that quarter, Teva's U.S. generic revenues from its legacy business suffered a YOY decline of $277 million, or 27%. In discussing the increased revenues that were due to Actavis, Teva disclosed that those revenues were: "partially offset by loss of revenues following our divestment of certain products in connection with the acquisition, a decline in sales of budesonide . . . due to increased competition and the loss of exclusivity on esomeprazole."

240.    Teva's 3Q16 Form 6-K also contained the following statement regarding the subpoenas the Company had received from the DOJ and the Connecticut Attorney General: "Teva is not aware of any facts that would give rise to an exposure to the Company with respect to these subpoenas."

241.    On November 15, 2016, Vigodman, Desheh, and Olafsson participated in Teva's 3Q16 earnings conference call.  During the call, a Credit Suisse analyst asked:

> [J]ust around your comments you made around generic drug pricing, you mentioned that 7% erosion this quarter, but you said you're confident it will still remain in the mid single-digits going forward.  So can you just maybe provide a

little bit more insight, there's obviously an area that there's a lot of investor focus, just what gives you the confidence that what's going to happen in the coming quarters will be different than what you saw this quarter?

242.    In response, Olafsson stated:

Let me start on the drug pricing, so overall, like previous quarters, there hasn't been any fundamental change in the US drug pricing.  And what we saw in the difference between the 5% or mid single-digit we guided for going into it, versus exiting at 7%, was the impact of the pricing impact on the divested product.

243.    When pressed on his explanation by a J.P. Morgan analyst, Olafsson reiterated: "where I sit here today, experiencing the market, there hasn't again been any fundamental change."

244.    A Wells Fargo analyst also asked Olafsson on the same call if he was saying that "the acceleration in the price decreases . . . this past quarter aren't a result of increased competition . . . and . . . not a result of having to tame previous price increases, or give back some of those?"  In response, Olafsson stated:

No, basically, the main reason, David, was that we had to divest a very good portfolio of products that had limited competition, so we had to divest it.  What our customers did, as they do, is that there is a new player in the market that took over those products, and that became a pricing pressure on roughly about 60 molecules of -- and these were one of our top -- the top molecules we had in our portfolio.  So there was an instability that happened in the market during the month of August, when the new owners were taking market share. . . . It didn't change the structure of the market, or the chemistry of the market, but we saw the impact on the divested molecule significantly more than we saw for on the rest of the portfolio which gave us a 7% versus 5%, which we assumed going into the quarter.

245.    The statements set forth in the five paragraphs above were materially false and misleading and/or omitted material facts. Defendants' statements (i) citing non-price factors for the decline in generic revenue, and (ii) that nothing had changed in the pricing environment in which Teva operated had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results, including the YOY decline in generic profits, were driven

primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with.   This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. In fact, by this time, the risk from Defendants' undisclosed strategy had begun to materialize. While Teva generated more than $541 million through price increases during FY16, that figure represented a decline of more than $200 million, or nearly 30%, from FY15.   Much of this decline would have been known to Teva by November 2016.   Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.   Moreover, Olafsson's suggestions that price decreases were driven by organic market factors—including the explanation that Teva "had to divest a very good portfolio of products that had limited competition"—was false and misleading in light of the Company's undisclosed practice of implementing massive short term price increases to boost revenue, which, by this time, was no longer sustainable.

### X.       JANUARY 6, 2017

246.   During a January 6, 2017 Business Outlook Conference Call, Vigodman announced that Teva would provide 2017 guidance early in January 2017. During the call, Vigodman claimed Teva's past success was not due to price increases, stating:

> Since the start of 2014, one of our greatest priorities has been to increase the profitability of our generics business. In the first three years of this great effort, we have been able to improve significantly the margins of Teva's standalone generics business. This has been accomplished with a strong emphasis on the cost of goods sold, product mix, and the overall cost structure.

247.    The statements set forth in the paragraph above were materially false and misleading and/or omitted material facts. Defendants' statements touting the purported success of their generics business had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results and success in the generic drug market were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. Indeed, from FY13 through FY16 Teva generated more than $2.1 billion through price increases alone. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market.  In fact, by this time, the risk from Defendants' undisclosed strategy had begun to materialize. While Teva generated more than $541 million through price increases during FY16, that figure represented a decline of more than $200 million, or nearly 30%, from FY15. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

### Y.    FEBRUARY 15, 2017

248.    On February 15, 2017, Teva filed its 2016 Annual Report with the SEC on Form 20-F, signed by Desheh.  Desheh signed the consolidated balance sheet.  The Company's 2016 Form 20-F also reported a YOY decline in U.S. generic revenues of $39 million, or 5%. When removing the impact of Actavis' $1.168 billion in U.S. generic revenues, Teva's U.S. generic revenues from its legacy business suffered a YOY decline of $1.4 billion, or 29%. The Form 20-F explained that the decline:

> [R]esulted mainly from the loss of exclusivity on esomeprazole … and aripiprazole …, a decline in the sales of budesonide … due to increased competition, loss of revenues following our divestment of certain products in connection with the Actavis Generics acquisition and the decline in sales of capecitabine.

249.    The statements set forth in the paragraph above were materially false and misleading and/or omitted material facts. Defendants' statements citing non-price factors for the decline in generic revenue had the effect of concealing, and/or failed to disclose, that, in truth, the Company's reported financial results, including the past success and current YOY decline in generic profits, were driven primarily by its undisclosed strategy to take massive price increases, either on its own or in tandem with other manufacturers whom it purportedly competed with. This strategy was inherently unsustainable in light of, among other things, industry, regulatory and governmental scrutiny surrounding the pricing of generic drugs, and the inevitable clearing of the ANDA backlog at the FDA, which would have the effect of introducing new competitors in the market. In fact, by this time, the risk from Defendants' undisclosed strategy had begun to materialize. While Teva generated more than $541 million through price increases during FY16, that figure represented a decline of more than $200 million, or nearly 30%, from FY15. Having put into play the issue of the source of Teva's revenue growth and the subject of competition in the generic drug markets, Defendants had a duty to disclose Teva's price increase strategy and the true source of its revenues.

250.    In the same February 15, 2017 Form 20-F, Teva described the "intense competition" the Company faced in the U.S. generic market and its "strategic" and "competitive advantages":

> In the United States, we are subject to intense competition in the generic drug market from domestic and international generic drug manufacturers, brand- name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs.  Price competition from additional generic versions of the same product

typically results in margin pressures.  We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio.

251.    The Company also described in the Form 20-F the "intense competition in the generic market" and the primary factors driving growth in the Teva's Generic Medicines segment:

Sales of generic medicines have benefitted from increasing awareness and acceptance on the part of healthcare insurers and institutions, consumers, physicians and pharmacists globally.  . . .  These conditions also result in intense competition in the generic market, with generic companies competing for advantage based on pricing, time to market, reputation, customer service and breadth of product line. . . .  We believe that our robust product pipeline, which has been enhanced with the Actavis Generics business, and ability to continuously launch new products are critical to our growth in the face of continuing price erosion expected in the generics market.

252.    Teva's 2016 Form 20-F also described the following Risk Factor:

Our generic drugs face intense competition. Prices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies (including low-cost generic producers based in China and India) receive approvals and enter the market for a given product and competition intensifies.  Consequently, our ability to sustain our sales and profitability on any given product over time is affected by the number of companies selling such product, including new market entrants, and the timing of their approvals.

253.    The statements set forth in the five paragraphs above were materially false and misleading and/or omitted material facts because Teva was not facing "intense competition" or operating in a competitive environment. In truth, Teva's undisclosed and inherently unsustainable strategy to take massive short-term price increases depended in large part on a *lack* of competition.  In fact, during the Relevant Period, Teva increased the prices of multiple drugs, many of which were done in tandem with its purported competitors. *See* Section IV.E.

### Z.    FALSE AND MISLEADING DENIALS OF TEVA'S PARTICIPATION IN COLLUSIVE CONDUCT

254.    Teva repeatedly and falsely denied its participation in collusive conduct.

255.    In Teva's August 3, 2017 Form 6-K filed with the SEC, Teva described the various antitrust matters it faced, including the Connecticut AG and DOJ subpoenas and the December 2016 State AG lawsuit referenced above, and fraudulently stated that "Teva denies having engaged in any conduct that would give rise to liability with respect to the above-mentioned subpoenas and civil suits." Teva made materially identical false and misleading statements in each of its periodic reports filed with the SEC between August 3, 2017, and May 10, 2019, including Teva's Form 6-K filed on November 2, 2017; Teva's Form 10-K for the year ended December 31, 2017, filed on February 12, 2018; Teva's Form 10-Q for the period ended March 31, 2018, filed on May 3, 2018; Teva's Form 10-Q for the period ended June 30, 2018, filed on August 2, 2018; Teva's Form 10-Q for the period ended September 30, 2018, filed on November 1, 2018; and Teva's Form 10-K for the year ended December 31, 2018, filed on February 19, 2019.

256.    Further, on October 31, 2017, in response to media reports issued after the State AGs filed a proposed amendment expanding their first antitrust complaint, a Teva spokeswoman stated to Courthouse News that "Teva denies these allegations and will continue to defend itself vigorously in court." The Company further stated that "[i]n accordance with our values, Teva is committed to complying with all applicable competition laws and regulations. To this end, we have a robust compliance program designed to ensure that our employees are aware of competition laws, regulations and internal policies, and their obligations to abide by them."

257.    Teva issued further denials in a December 19, 2018 statement to *Business Insider*, in which Teva denied the State AGs' allegations and said it "will continue to vigorously defend itself." On January 18, 2019, Teva stated to *Law360*: "Overall, we establish prices to enable patient access, maintain our commitment to innovative and generic medicines and fulfill

obligations to shareholders." Teva added that it is "committed to complying with all applicable laws and regulations and is dedicated to conducting business with integrity and fairness. Litigation surrounding U.S. generic pricing of several companies, including Teva, continues to be the subject of inaccurate media stories." On February 19, 2019, in response to media reports discussing an unredacted version of the first State AG complaint that had recently been made public, Teva stated to *Bloomberg* that it would "vigorously defend itself against these unfounded allegations."

258.    In addition, each of the reports Teva filed with the SEC on Forms 10-Q and 10-K throughout the Class Period contained certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX Certifications") signed by Defendants Schultz and McClellan, stating that the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

259.    These statements were false and misleading because, as alleged specifically and independently herein and at Sections IV.E and VI.H, Teva had in fact engaged in the collusive conduct the State AGs alleged; Teva was not merely a participant, but the central actor in an industry-wide scheme to fix prices and allocate customers; and four Teva executives were so extensively involved in the unlawful conspiracy that they were named personally as defendants in the State AGs' May 2019 complaint.

### AA.    FALSE AND MISLEADING STATEMENTS REGARDING ACTAVIS ACQUISITION

260.    Teva's Q3 2016 6-K asserted that the Actavis acquisition "had a significant impact on our generic medicines segment, expanding our product portfolio, R&D capabilities, product pipeline, and global operational network."

261.    In the press release announcing the Q3 2016 results, Defendant Vigodman stated:

This has been a year of transition for Teva, underscored this quarter by the close of our strategic acquisition of Actavis Generics, which had significant contribution to our results. Actavis will continue to contribute in a meaningful way to the future growth of our generics business through the strengthened R&D capabilities and complementary pipeline and portfolio, and enhance our leadership in an increasingly evolving industry.

262.    During the Nov. 15, 2016, earnings call the same day, Teva made the following false and misleading statements concerning the financial impact of the Actavis acquisition and integration on the Company's business prospects and reported financials:

[Vigodman:] The completion of the Actavis acquisition strengthens and broadens our R&D capabilities, and highly complements our product pipeline, product portfolio, geographical footprint and operational network. It enhances Teva's leadership in an evolving competitive landscape and massive consolidation across our customer base. In addition, our integration plans with the Actavis generics business are on track.

* * *

[Olafsson:] On August 2, we completed the strategic acquisition of Actavis generics. The result is a much stronger, more competitive Teva that is best positioned to thrive in an evolving global generics marketplace.

263.    In response to a question about the Actavis acquisition, Defendant Olafsson stated:

The closing of the Actavis transaction has gone very smoothly since day one with no operational disrupter. While we were disappointed at the delays with antitrust review, the time allows the integration teams at Teva and Actavis Generics to work diligently to plan for integration of the two companies in order to ensure that combined company would be fully operational immediately as on closing of the transaction. As a result, Teva was able to begin capitalizing immediately on the benefits offered by the acquisition of Actavis Generics. This included optimizing our R&D activities, harmonizing our customer contracts and relationships, and realizing economies of scale with our purchase.

264.    On December 5, 2016, Teva filed a report on Form 6-K with the SEC, which included the following false and misleading statements concerning the financial impact of the Actavis acquisition and integration on the Company's business prospects and reported financials:

> Erez Vigodman, Teva's President and [CEO stated:] ... "As we continue to focus on integrating and realizing the value of the Actavis Generics transaction, which is progressing according to plan, Dipankar and his team will focus on generating organic growth through new launches and replenishing the pipe line through our industry-leading R&D, and drive efficiencies across the generics organization . . . ."

> . . . [Dipankar] Bhattacharjee[, Teva's President and CEO, Global Generic Medicines Group stated:] "With the integration of Actavis proceeding on schedule and the complementary U.S. distribution capabilities provided by our recent acquisition of Anda we have a matchless opportunity to add value in the U.S. healthcare system, and in the fast-changing global generics marketplace."

265.    On February 13, 2017, Teva filed with the SEC the Q4 2016 Press Release. In the Feb. 13, 2017 earnings call the same day, Defendants Peterburg and Desheh made the following false and misleading statements concerning the financial impact of the Actavis acquisition and integration on the Company's business prospects and reported financials:

> [Peterburg:] The Company's priorities continue to be extracting all synergies related to the Actavis generic acquisition, successfully launching the key generic and specialty products we have planned for 2017, and generating significant cash flow to rapidly pay down our existing debt to maintain a strong balance sheet.

> We are reiterating our guidance for 2017, including our earnings per share of $4.90 to $5.30. We are very committed to this EPS range, and the management team and I will do what it takes to protect it, including additional cost reduction if necessary

> *        *        *

> [Desheh :] The increase in our operating profit was driven mainly by our generic business, following the closing of the Actavis transaction.

> *        *        *

> Total sales were $93 billion, with significant growth in goodwill and intangible assets, resulting from the progress made on the Actavis acquisition versus price allocation.

266.     On February 15, 2017, Teva filed the 2016 20-F. In the 2016 20-F, Teva made the

following false and misleading statements concerning the financial impact of the Actavis

acquisition and integration on the Company's business prospects and reported financials:

> In August 2016, we completed the Actavis Generics acquisition. Our strong legacy
> generics business, combined with the Actavis Generics business, has a world-
> leading product portfolio, comprehensive R&D capabilities, robust product
> pipeline and an efficient global operational network. The combined generic
> business has a wide-reaching commercial presence, as the market leader in the
> United States and a top three leadership position in over 40 countries, including
> some of our key European markets. The combined business benefits from a
> leading and diverse pipeline of products, which will help us continue executing
> key generic launches and further expand our product pipeline, focusing on both
> large and small opportunities. We expect that a larger number of smaller but more
> durable launches will help offset expected price erosion while diversifying our
> revenue stream.

*     *     *

> Significant highlights of 2016 included:

> - In August 2016, we completed our acquisition of Actavis Generics. The
>   acquisition had a significant impact on our generic medicines segment,
>   expanding our product portfolio and pipeline, R&D capabilities and
>   global operational network

267.     The 2016 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act

of 2002 by Defendants Peterburg and Desheh, stating that the financial information contained in

the 2016 20-F was accurate and disclosed any material changes to the Company's internal

control over financial reporting.

268.     On May 11, 2017, Teva filed a report on Form 6-K with the SEC reporting the

Company's financial and operating results for the quarter ended March 31, 2017 (the "Q1 2017

6-K").

269.    In the Q1 2017 6-K, Teva made the following false and misleading statements concerning the financial impact of the Actavis acquisition and integration on the Company's business prospects and reported financials:

> On August 2, 2016, Teva consummated its acquisition of Allergan plc's ("Allergan") worldwide generic pharmaceuticals business ("Actavis Generics"). At closing, Teva transferred to Allergan consideration of approximately $33.4 billion in cash and approximately 100.3 million Teva shares. The acquisition significantly expanded Teva's generics product portfolio and pipeline, R&D capabilities and global operational network.

270.    In a conference call the same day, Defendants Peterburg and Desheh made the following false and misleading statements concerning the financial impact of the Actavis acquisition and integration on the Company's business prospects and reported financials:

> [Peterburg:] As it relates to our first priority, I'm pleased to report the synergies related to the Actavis Generics acquisition and additional cost reduction, which the company has identified, is now on track to realize cumulative net synergies and cost reduction of approximately $1.5 billion by the end of 2017.
>
> *        *        *
>
> Turning to generics. It has been 2 full quarters since the completion of our acquisition of Actavis Generics. The acquisition has provided us with many benefits, especially much stronger and broader R&D capabilities, which we believe are the engine for any substantial generic business. This is essential in today's world when we are operating across such an evolving competitive landscape and ongoing consolidation across our customer base. We are very confident that the global business we have built will allow Teva to thrive in the long-term future as a leader in the generics industry.
>
> [Desheh:] The increase in our operating profit was driven mainly by our generic business. following the closing of the Actavis transaction.

271.    The statements referenced above were materially false and misleading. Considered as a whole, Defendants' representations misled investors by presenting a materially false and misleading picture of Teva's business, financial results and operations by, in addition to the reasons set forth in Sections IV.E-G and V.AA, failing to disclose and actively concealing the negative impact resulting from the acquisition and integration of Actavis on the Company's financial results and business prospects, which (among other things) exacerbated the risky and

unsustainable nature of the Price-Hike Strategy, which collapsed shortly after the closing of the

Actavis acquisition in August 2016.

## VI.   ADDITIONAL ALLEGATIONS OF SCIENTER

272.   The Individual Defendants each acted with scienter in that each knew or

recklessly disregarded that the statements identified herein were materially false and misleading

and/or omitted material facts.

### A.   THE INDIVIDUAL DEFENDANTS KNEW OF AND CONTROLLED TEVA'S GENERICS PRICING.

273.   Throughout the Relevant Period, the Individual Defendants closely monitored

product-by-product pricing and deliberately chose which products to target for price hikes.

Between 2013 and 2015, when Teva was actively hiking prices and entering into collusive

agreements to drive profits, Teva's generic pricing was one of the first topics the Individual

Defendants addressed in virtually all of the earnings conference calls throughout the Relevant

Period, and the Individual Defendants frequently discussed targeted price increases and margin

enhancement, including as follows:

- On May 1, 2014, Vigodman told investors that "*we have been assessing markets and products*, in order to terminate products and markets, which will not meet a minimum threshold of profitability.  I strongly believe that there is significant strategic and economic value in global generics leadership.  Teva must regain focus on its generic business, with strong emphasis on portfolio selection and management …."

- On July 31, 2014, Olafsson represented to investors that "[w]e have taken the decision that in some of our markets, we look at the portfolio and we take a pricing decision, and see if we stay for this molecule or not."

- On October 30, 2014, Olafsson suggested to investors that "there's never a price increase on the base business as a whole.  Like any other business, if there's a pricing opportunity that comes in the market, *we look for that*….  When there is an opportunity, when there is a shortage in the market, *we obviously look* for pricing like any other business."

- On December 11, 2014, Olafsson told investors that "*[w]e are looking through our portfolio*, what are the most profitable products we have. *We work hand in hand* with the manufacturing and the operation, if we need to cut the portfolio to reduce our cost; but we still want to retain our leadership in the US market."

- On January 13, 2015, Vigodman explained to analysts that opportunity for margin expansion in the generics business involved strong focus on "optimization of products and markets, product selection decisions."

- On March 12, 2015, Desheh told analysts that to drive "the absolute profit" and not just the profit margins, price increases must be managed correctly, stating that "*[w]e see price increases, we manage it right*.  You have to manage [it] correctly, it can bounce back very, very easily."

274.    After the government scrutiny on generic drug price increases heightened, the

Individual Defendants addressed the issues directly with investors and falsely denied the price

hikes and collusive activities:

- On November 29, 2015, Desheh reviewed Teva's potential exposure from past conduct and represented to investors that "our exposure to all these things is very minimal."  He further emphasized that Teva played the competitive game "by the book and by the rule."

- On January 11, 2016, Olafsson discussed his generics portfolio and conveyed that "on 5%, we might be flat or a slight increase" and the remaining 95% experienced a "slight decrease in pricing."

- On February 11, 2016, in answering an analyst's question about contracting with large customers in the United States, Olafsson stated that "you are really fighting on a molecule by molecule basis.  If there is a lowering of the prices, you either have to walk away from the business and that's that."  In addition, "[w]e basically launched the product.  We compete on pricing."

- On February 11, 2016, while touting Teva's $1 billion improvement in operating profit over a 24-month period, Olafsson offered "how did we do this?  Not by pricing."  Further, speaking on behalf of the industry, he stated "we and the generic industry overall don't see price inflation of generics as it sometimes is portrayed in the media."

- On May 9, 2016, Olafsson suggested that Teva did not buy market share, but instead, "[w]e … are seeing our volumes go down, deliberately."  Furthermore "we also walk away when the competition is too fierce on a product."

- On June 8, 2016, Olafsson stated that, "about two years ago when they started the price increases[,] [t]here was a lot of shortages in the market.  This is when the

FDA went very strongly and had the import bans and things like that, which led to shortages, which meant that the overall business was doing much better."

- On September 9, 2016, Olafsson indicated that "pricing and pharmaceuticals are always a hot topic in an election year" and, with 208 generic companies, "an average of every molecule we have, there is more than five competitors. So there's always somebody happy to take a little bit lower price. So it's a very competitive business we're in. I think overall, obviously, we look at each opportunity . . . we have an opportunity to work with it." In turn, Andy Boyer, Head of North America Generics affirmed that "if . . . there's been a change in marketplace dynamics due to supply chain or someone leaving the market, we will evaluate that and price our products accordingly."

- On December 14, 2017, CEO Kåre Schultz, Teva's new CEO, stated that "[i]n order to secure that we have a long term sustainable portfolio, we are reviewing each and every product worldwide, and we will make pricing adjustments to the extent that this is necessary."

275.    This self-proclaimed personal involvement by the Individual Defendants supports a strong inference that they possessed knowledge of the true state of affairs of the business, and thus had knowledge that their representations were misleading, or were reckless in not knowing.

276.    In the absence of collusion, moreover, Teva's generic drug price hikes during 2013 to 2015 would have been against its self-interest and unsustainable. The rational response to the massive price increases would be for "someone happy to take a little bit lower price" and Teva would either fight "on a molecule by molecule basis" or "walk away from the business and that's that." In a commoditized business with multiple competitors, price increases would indeed "be a small pricing opportunity that usually comes in and comes out" as companies could only gain market share by competing on price. Yet, as explained herein, Teva and its co-conspirators substantially *maintained* market share on the drugs subject to collusion with negligible pricing competition.

277.    Furthermore, contrary to Olafsson's justifications for Teva's price hikes that occurred in 2014, none of the drugs subject to collusive price increases experienced supply shortages in the market around that time. Manufacturers were required by federal law to report

any potential drug shortages to the FDA, and no shortage report existed for any of these drugs around the time of their respective price hikes.

### B.   THE INDIVIDUAL DEFENDANTS WERE MOTIVATED TO USE TEVA'S ADS AS "CURRENCY" FOR A "TRANSFORMATIONAL" ACQUISITION.

278.    The Individual Defendants were motivated to inflate the price of Teva Securities, in particular Teva ADS, in order to complete a "transformational" acquisition. By January 2014, once the Price-Hike Strategy was fully implemented and had generated material profits toward fourth quarter 2013 results, Desheh announced this motivation in setting out that "the stock price will go up and we'll be able to *use our share as a currency* . . . *to fund transactions*." Upon his hiring in February 2014, Vigodman was reported to also favor significant M&A activity.

279.    Unbeknown to investors, Teva was already focused on acquiring Actavis by as early as the middle of 2014.  By the end of 2014, after multiple batches of systematic price hikes, involving numerous drugs, that generated hundreds of millions of dollars of additional profits, Teva's ADS was trading in the mid-$50s. By then, as Vigodman would later acknowledge on July 27, 2015, Defendants had developed a list of acquisition targets, with Actavis at the top. Concealed from investors at this time, Teva had already approached Actavis, but was rejected.

280.    By the end of the first quarter of 2015, the Price-Hike Strategy resulted in another batch of hikes, yielding additional inflated profits and revenues.  Teva's ADS was trading near $63.  Defendants' "willingness" to perform a "'*transformational*' acquisition in the generics space" was well-known to analysts, as was their "urgency to diversify via M&A" as Barclays and Leerink wrote on April 7 and 16, 2015, respectively. On April 21, 2015, Teva attempted to purchase Mylan. Mylan's Board dismissed the offer six days later.

281.    Undeterred, during a June 10, 2015 Goldman Sachs conference, Teva again announced glowing results, with Vigodman emphasizing to investors the "*profound change in*

*the generic business*" and Olafsson noting the improvement of "*$1 billion . . . in 14 months, 16 months*," while concealing that the Price-Hike Strategy undergirded this turn-around. Fueled by profits from the fraud, by July 27, 2015, the price of Teva's ADS reached an all-time high of $72.

282.    That day, Teva announced the $40 billion acquisition of Actavis from Allergan. Vigodman explained that the improvement in generics was a "*precondition*" for accomplishing their motivation for a deal. Indeed, without the inflated securities as a "currency," Teva did not have the cash; the $40 billion price tag was roughly *twenty years* of Teva's average annual income from 2013 to 2015. They raised the cash from Plaintiff and other investors.

283.    By the second quarter 2015, however, the Price-Hike Strategy had peaked. Teva began to experience pricing pressure on its generic drugs, and was increasingly unable to make additional large price increases. The price-hike-related revenue and profit began to deteriorate, even as the Teva needed to raise the capital necessary to pay Actavis's $40 billion price tag. As questions were raised regarding the deteriorating pricing environment and Teva's weakening financials, Defendants flatly denied that Teva was deriving profits from extraordinary price increases, or that Teva was facing pricing pressure. It was not until Teva completed over $27 billion in public offerings by July 28, 2016, and closed the Actavis deal on August 2, 2016, that they disclosed that their generics business was now the subject of government subpoenas. Soon after that, the truth began to leak into the marketplace, and the fraud fell apart.

### C.  THE INDIVIDUAL DEFENDANTS SPOKE REPEATEDLY ABOUT TEVA'S PRICING OF GENERIC DRUGS.

284.    The Individual Defendants repeatedly claimed that they had knowledge of the sources of Teva's generics profitability, particularly knowledge of whether Teva had taken price increases and whether those price increases contributed to the increased profitability of Teva's

generics division. For example, on October 29, 2015, Vigodman claimed awareness that "all the improvement . . . in our . . . margins is not driven by price. It is driven by quantities and by mix and by efficiency measures. Not by price, 2014, 2015." Similarly, on February 11, 2016, Olafsson claimed he knew that the "$1 billion improvement in operating profit over 24 months period," was achieved "[n]ot by pricing but by portfolio mix, new products, and efficiency measures." On November 19, 2015, when asked about industry price increases, Desheh claimed that "Teva was not associated with any of that."

285.    The Individual Defendants also claimed knowledge of when Teva would take price increases, limiting them to instances with shortages. For example, on October 30, 2014 Vigodman claimed he knew that Teva looked for pricing only "when there is a shortage in the market." On August 4, 2016, Olafsson claimed that Teva would increases prices only where there were "shortages in the market," then "there might be a small pricing opportunity."

286.    The Individual Defendants further claimed they were aware of the rate of pricing decline that Teva was experiencing in 2016, and how it compared to prior years. For example, on June 3, 2016, Vigodman asserted he knew that "[w]hat we see is a 4% to 5% erosion.  That's not something which is different from what we said during 2015." Earlier, on May 9, 2016, Olafsson asserted awareness that despite "a tougher pricing environment or price deflation," "Teva has not seen any fundamental change or worsening in the pricing environment. . . .  What this boils down to is each individual company's business model. . . .  Nothing has happened in the last two quarters that has changed the pricing environment." Similarly, on September 7, 2016, Desheh claimed that the pricing environment for Teva's base generic business was "very stable," and that "there's no pressure on prices."

287.    The Individual Defendants also claimed knowledge of whether Teva was competing in a functional and competitive generics market. For example, on July 27, 2015, Olafsson asserted that he knew that "there's fierce competition on most of [Teva's] portfolio, if not all the portfolio." During that same call, Vigodman added, "We believe in competition, and we'll do what is needed in order to win all the markets we operate." On November 19, 2015, Desheh claimed he knew that Teva was "playing a competitive game . . . playing it fairly . . . by the book and by the rule."

288.    This self-proclaimed personal involvement by the Individual Defendants' supports a strong inference that they possessed knowledge of the true state of affairs of the business, and thus had knowledge that their representations were misleading, or were reckless in not knowing.

### D.    THE INDIVIDUAL DEFENDANTS, AND ANALYSTS, WERE KEENLY FOCUSED ON TEVA'S GENERICS BUSINESS.

289.    The fact that the Individual Defendants repeatedly publicized that Teva's generics segment, fueled by its U.S. division, was driving the Company's turnaround during the Relevant Period supports a strong inference of scienter. For example, on May 13, 2015, Desheh described the turn-around in generics as "nothing short of a revolution." On June 10, 2015, Olafsson touted improvement of the "generic business by . . . $1 billion [] in 14 months, 16 months." That same day, Vigodman touted "the profound change in the generic business," citing increased operating profit from 2013 to 2014.

290.    Analysts accordingly focused on Teva's generics businesses, and particularly its U.S. division, as a financial driver for the Company, further supporting a strong inference of scienter. For example, in a February 5, 2015 report, Piper Jaffray noted that "the profitability of the generics business [is] continuing to improve." On April 30, 2015, J.P. Morgan wrote: "Teva

continues to make progress on generics profitability . . . we remain encouraged by the recovery in Teva's generic business." The same day Cowen and Company noted that Teva's "outperformance was a result of better than expected U.S. generic sales."

291.    Similarly, when industry pricing pressure damaged Teva's competitors, analysts peppered the Individual Defendants with questions about pricing pressure over the course of several months, which were met with detailed answers: For example, on February 11, 2016, Guggenheim asked Olafsson about "pricing pressure in the generics business," with Olafsson claiming to know that "on the pricing . . . we didn't see anything change in fourth quarter." On September 7, 2016, Wells Fargo asked whether Teva was "seeing the same generic erosion, pricing erosion that some of the other companies" had, to which Desheh asserted he knew that "the base [generics] business . . . the prices are very stable there." The Individual Defendants' sustained focus on Teva's generics business, and its pricing, supports an inference of scienter.

### E.   THE MAGNITUDE, IMPORTANCE, AND DURATION OF THE FRAUD.

292.    During the Relevant Period, Teva made astronomical increases in the prices of its generic drugs, including multiple price hikes of more than 800%, and some more than 1700%. Such massive price increases impacted more than 55 separate drugs, over a four-year period. Given the intense focus on pricing in the generic drug industry, and the fact that Teva's senior executives, including the Individual Defendants, were asked questions regarding Teva's pricing and pricing trends during every earnings conference call and at many industry meetings, it is implausible that the Individual Defendants—the most senior executives of the Company—were not aware of price increases on this scale in Teva's core business unit.

293.    These massive price increases also contributed billions of dollars to Teva's bottom line. Indeed, from 2013 through mid-2017, Defendants' fraud generated more than $2 billion in additional revenues. Further, given that the costs of implementing price increases are

effectively zero, these massive increases in revenue flowed directly into Teva's profits—which increased by similar amounts.  For example, Teva's profits from Pravastatin, one of Teva's better selling generics, amounted to at least $370 million after instituting price increases of up to 437%. Similarly, Teva increased the price of Propranolol HCL by nearly 300% and obtained nearly $256 million in profits.  Teva also gained over $143 million in such profits from increases of up to 306% in its prices for Baclofen, $110 million from increases of up to 182% in its prices for Fluocinonide; $138 million from increases of up to 579% in its prices for Methotrexate Sodium; and $102 million from increases of up to 1111% in its prices for Ciprofloxacin HCL.

294.    The intense national focus on price increases in the generic drug business from the beginning of the Relevant Period demonstrates that Defendants must have been aware of what was going on with respect to pricing at Teva.   Even assuming that the Individual Defendants—Teva's top executives—were not put on notice by massive and unexplained price spikes in the Company's core generics division, the historic rise in generic drug prices immediately before and during the Relevant Period was well-publicized.  Indeed, the gargantuan prices increases by Teva and other generic manufacturers led Congress to commence an industry-wide investigation beginning in 2014.   On October 2, 2014, Defendant Vigodman received a letter from U.S. Senator Bernie Sanders and U.S. Representative Elijah Cummings, putting Teva on notice of an investigation and requesting pricing data and other information regarding the Company's generics business.  Congress asked Defendants to provide information regarding massive increases in the price of Teva's generic drugs that coincided with similar increases by other generic drug manufacturers.  For example, the letter requested information regarding "the underlying causes of recent increases in the price of [Teva's] drugs" that have increased by "as much as 736 percent for Divalproex Sodium and 573 percent for Pravastatin

Sodium from October 2013 to April 2014.  Over that time period, the average market price went up by as much as $735 for Divalproex Sodium and $426 for Pravastatin Sodium," depending on the formulation.

295.    As noted above, Teva refused to appear to testify or to produce documents in response to the Congressional inquiry.  This Congressional investigation, the subsequent DOJ subpoena to the Company, and the widespread publicity surrounding the price hikes that spawned these investigations, gave rise to a duty to investigate the existence of price increases at Teva and a duty to monitor changes in the Company's generic drug pricing.  At a minimum, Teva's and the Individual Defendants' false and misleading statements were recklessly made, in dereliction of their duty to investigate and monitor changes in the pricing of the Company's core products.

296.    Likewise, in 2016, the Price-Hike Strategy deteriorated as Teva began to experience significant pricing pressure and accelerated price erosion, and was no longer able to implement additional price hikes; as a result Teva's generic drug profits plummeted. Indeed, Teva's deteriorating financial condition in 2017 called into question whether it could service its massive $35 billion debt, forced the Company to take a staggering $6.1 billion impairment charge to its generics business, and reduce its dividend. The stronger inference by far is that the Individual Defendants were aware of the source of this decline, or were reckless in not knowing.

### F.    TEVA'S TURN-AROUND NARRATIVE RELIED ON EXTRAORDINARY PRICE INCREASES.

297.    By the end of 2013, Teva's U.S. generics business suddenly began reporting significant growth.  For example, in 4Q13, its U.S. generics division reported earnings of $1,178 million, as compared to $1,034 million the year before—an increase of approximately $144

million, or nearly 14%.  This was a striking turn around.  Relative to 2012, Teva's net revenues for the nine month period ending September 30, 2013, were down year-over-year.

298.    By April 7, 2014, National Alliance Securities analysts had taken note of Teva's new-found financial success:  although its generics division had "dramatically underperformed in 2013" as compared to its peers, only a few months after the end of 2013, Teva's performance in generics was, remarkably, "the Best YTD" among its peers.

299.    By the end of 2014, Defendants' remarkable "turnaround" story for the Company's generics business had propelled the Company's ADS price from around $37 in late October 2013, to $56 by the end of 2014.

300.    Teva's financial success continued into 2015, and by the end of July 2015, its stock price exceeded $70 per share.

301.    It is implausible that the Individual Defendants, who directly oversaw, and spoke publicly at length about, the "turnaround" in Teva's generics business, were unaware of the true source of the Company's changed fortunes.  The far more compelling inference is that these executives, whose ascension and arrival coincided with massive price increases, and whose departures coincided with expanding governmental probes into those same price increases, were well aware that Teva's newfound success was driven by these price increases.

### G.  THE FRAUD CONCERNS THE CORE OF TEVA'S OPERATIONS.

302.    Teva's production of generic drugs was the Company's core operation during the Relevant Period.  During the Relevant Period, Teva was the largest manufacturer of generic drugs in the world, controlling 13% of the generic drug market by mid-2015.  Generic drug sales accounted for a substantial portion of Teva's revenues and operations during the Relevant Period.  For example, in 2014, Teva's revenues from the segment including generics accounted for 42.13% of the Company's total revenues.  In 2015, the percentage of the Company's

revenues from the segment including generics jumped to roughly 50%.  It is implausible that the Individual Defendants, who were the Company's senior-most executives, were unaware of the historically colossal price increases being implemented by the Company—particularly given the significant positive impact those price increases were having on Teva's financial performance. As the Company's most senior executives, the Individual Defendants had access to information concerning these price increases.  At a minimum, they were reckless in misleadingly telling investors that the Company's improved financial outlook was due to cost-cutting, product mix and other factors without investigating whether changes in prices for the Company's products were not a factor in that turnaround.

### H.   THE COLLUSIVE NATURE OF THE CONCEALED PRICE INCREASES SUPPORTS SCIENTER.

303.     That the fraud involves collusion by Teva with other generic drug manufacturers to fix prices in their industry further supports scienter for several reasons.  In each instance of a collusive price increase, the drug's major manufacturers, including Teva, enacted large price increases at or around the same time, raising prices to exactly, or nearly exactly, the same level. For some, Teva was the first to raise prices, and others followed; other times, Teva followed another manufacturer's lead.

304.     <u>Price Increases Against Self-Interest</u>.   There was no reasonable commercial or economic justification for the price increases in the drugs at issue. No shortage or sudden increase in demand explains Teva's price increases, contrary to the Individual Defendants' explicit statements. Thus, absent a collusive understanding among competitors, a manufacturer that acted alone to enact significant price increases ran a tremendous risk of losing all, or most, of its market share if competitors undercut the suddenly-inflated price. As an empirical fact, each manufacturer was able to substantially increase, and maintain increases on, the prices for the

subject drugs within a short period of time; no competitor sought to seize increased market share by undercutting the other market participants with even a slightly-smaller price increase. Without a deliberate strategy, such price increases would have been against Teva's self-interest.  The fact that Teva was so often willing to expose its market share to predation by other manufacturers whose prices sat many multiples below Teva's plausibly suggests that, in reality, there was no risk at all; Teva had reached a collusive understanding that other market participants would themselves raise prices soon thereafter, and/or that Teva's "fair share" of the market would remain untouched despite its extraordinary price increase.

305.   <u>Motive and Opportunity</u>. Companies and individuals involved in generic drug pricing, sales, and marketing are, as in any other industry, motivated to increase the profit earned on their products. In the generic drug industry specifically, the natural profit motive may bend toward a motive to collude, due to the cold realities of marketing products that are, despite their scientific sophistication, a commodity. Because federal law requires generic drugs to be "readily substitutable," price is the only meaningful mechanism by which generic drug manufacturers may differentiate their products, a circumstance which over time, and absent collusion, drives prices down to a point just above the manufacturers' marginal costs of production. Each of the drugs at issue is a long-established generic in a mature market in which prices had leveled off to a steady equilibrium. The manufacturers of the Collusive Drugs, therefore, had a common motive to increase their profits by conspiring to raise prices in tandem, overriding the natural downward pressure on prices.

306.   In the context of this motive, each Collusive Drug's market is characterized by factors that, as a matter of economics, present the opportunity to collude, including:

- <u>High Concentration</u> The market for each Collusive Drug was an oligopoly by a handful of manufacturers who collectively controlled substantially all of the market.

- <u>High Barriers to Entry</u> Entering a generic pharmaceutical market requires significant lead time for development and regulatory approval. The cost is significant; the process of obtaining regulatory approval alone can cost millions. Further, there is financial risk that the recoupment of any investment could be delayed or never happen. Regulatory approval, known as an "ANDA" approval, could be denied or delayed for months or years due to technical failures or other factors. According to the GAO and others (including Teva), during the Relevant Period the FDA was significantly "backlogged," and thus potential market entrants could have to wait years for approval. It has been reported that in 2015 ANDA approvals often took 40 months or more.

- <u>Demand Inelasticity</u> The Collusive Drugs are all important, and in many cases absolutely critical, to the end-consumer's health and well-being. As a general matter, demand for such drugs is inelastic, *i.e.*, the quantity demanded does not vary significantly as price changes, as the consumer cannot simply walk away as prices rise. Another factor contributing to demand inelasticity is that health insurance plans typically will pay for medications regardless of price, so long as the drug is on the plan's approved list. Counsel undertook statistical analysis of the market for each of the Collusive Drugs, and confirmed inelasticity for each drug and empirically observed that volume did not change as the price increased.

- <u>Lack of Alternative Products</u> Doctors choose to prescribe specific drugs to their patients for reasons related to the specific pharmacological distinctions among the drugs in a particular class and, consequently, they cannot simply substitute one product for another when price varies. This is true of the Collusive Drugs. For instance, Pravastatin is one of several generic statins, but unique for its relatively low level of binding to blood plasma proteins, which may have life-altering implications for certain patients.

- <u>Inherent Fungibility of Generic Drugs</u> Each manufacturer's version of each of the Collusive Drugs is, by nature, interchangeable with any other manufacturers. By law, all generic drugs must be readily substitutable for another generic of the same brand drug.

307. <u>Inter-Firm Communications</u> The State AGs' CAC describes evidence showing Teva, through its directors, officers, and employees—including the Individual Defendants—engaged in extensive direct communication with other manufacturers. For example, the State AGs allege that over 1,500 communications occurred between certain of Teva's "senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs" and employees at 15 other manufacturers between July 1, 2013 and July 30, 2014.

308.    Furthermore, Plaintiff's counsel's investigation identified a multitude of trade shows and conferences that afforded individuals responsible for Teva's generic drug prices an opportunity to interact with their counterparts at other manufacturers during the relevant period, many of which occurred in close proximity to price increases that Teva and/or another manufacturers implemented on generic drugs. A list of such events, indicating attendance by Olafsson, Oberman, Cavanaugh, Kevin Galownia ("Galownia"),[16] and Nisha Patel ("Patel")[17] is attached hereto as Appendix B. In all instances identified in that appendix, representatives of at least one other manufacturer—and typically many more—also attended.

309.    Trade shows and conferences provided opportunities for one-on-one meetings with between Teva personnel, including several of the Individual Defendants, and those of other manufacturers. For instance, at both the 2013 and 2014 annual meetings of the National Association of Chain Drug Stores ("NACDS"), Teva reserved a "strategic exchange" bungalow. NACDS advertised "strategic exchange" bungalows as "opportunities to meet and discuss strategic issues with key trading partners." In essence, Teva paid for a secluded area where its personnel could meet privately with others, including other manufacturers.

## I. GOVERNMENT EVIDENCE SUPPORTS AN INFERENCE OF SCIENTER.

310.    Corroborating the inferences drawn from Plaintiff's counsel's investigation, the State AGs' CAC alleges, based on specifically-described communications, seven drug markets where Teva conspired to fix prices and/or allocate markets, namely the markets for:

---

[16]   Galownia has been Teva's VP of Pricing Operations since January 2018, and formerly was Teva's Senior Director, Marketing from January 2010 to March 2014, and its Senior Director, Marketing Operations from September 2014 to December 2017.

[17]   Patel was Teva's Director of Strategic Customer Marketing from April 2013 to August 2014 and Director of National Accounts from September 2014 to December 2016, and Patel was on maternity leave on or about August to December 2013.

Acetazolamide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Nystatin, and Theophylline.

311.    The State AGs focus many of their drug-specific collusion allegations on the communications of Malek, Heritage's President. In dealing with Teva, Malek coordinated market allocation and price increases with a particular Teva employee, with whom he had a preexisting relationship. This employee joined Teva in April 2013, and was on maternity leave from August through December 2013. On information and belief, this employee is Nisha Patel ("Patel"), Teva's Director of Strategic Customer Marketing from April 2013 to August 2014 and Director of National Accounts from September 2014 to December 2016. Patel's tenure at Teva, based on publicly available social media sites, aligns with that of Malek's Teva contact.  The following is a brief timeline of those interactions, and their anticompetitive outcomes:

- July 2013: After three calls between Malek and Patel spanning more than 43 minutes, Nystatin appeared on an internal Teva list of "potential" price increases, despite a Nystatin price increase having met internal resistance the prior month, when Teva first considered the prospect. Patel went on maternity leave soon afterwards.

- February 7, 2014: After several contacts between Patel and Malek, Nystatin again appeared on an internal Teva spreadsheet as a candidate for a price increase.

- April 4, 2014: Teva increased the Wholesale Acquisition Cost ("WAC"), the list price of a generic manufacturer's drug to a wholesaler or a direct purchaser without discounts, for Nystatin and Theophylline.

- April 15, 2014: Malek and Patel had a 17 minute conversation, during which they discussed price increases and/or market allocation as to at least the seven drugs referenced above. Patel and Malek determined that, as Teva had raised WAC on Nystatin and Theophylline days earlier, Teva would "take the lead" on implementing price increases for those drugs, and other competitors would follow. Heritage would lead on the other five.

- April 16-17, 2014: Multiple Teva employees communicated with Zydus, a competitor in the market for Acetazolamide.

- May 1-6, 19-22, 2014: Patel had at least three calls and exchanged at least 30 text messages with the Actavis pricing manager responsible for Glyburide-Metformin.

- <u>May 9, 2014</u>: A Teva employee responsible for pricing spoke with their counterpart a Mylan, a competitor in the market for Glipizide-Metformin; these employees remained in close communication through 2014.

- <u>July 8, 2014</u>: Teva refused to bid when a large Heritage customer requested a quote on Nystatin from Teva, in response to Heritage's price increase on the drug.

- <u>By July 9, 2014</u>: Teva had increased prices on Nystatin, Theophylline, Glyburide, and Glyburide-Metformin, and Heritage had increased prices on all seven drugs Malek and Patel had discussed on April 15. If Teva did not increase prices, it furthered the agreement by refraining from bidding competitively, lowering prices, or, in the case of Leflunomide, leaving the market entirely.

- <u>July 25, 2014</u>: After a large wholesaler solicited bids from Teva and Aurobindo on Glyburide, Teva spoke with Heritage (and Heritage with Aurobindo) "to ensure uniformity and compliance with the scheme," and resolved that Teva and Aurobindo would decline to provide a bid.

312.    These seven examples of Teva's reaching anticompetitive agreements are drawn just from the limited subset of drugs manufactured by both Teva and Heritage, a relatively small player in the industry. The State AGs have indicated that the common thread of the State AGs' CAC is Heritage, and that they plan to bring separate complaints focused on companies other than Heritage. The States are investigating collusive conduct relating to nearly 200 additional drugs, and filed a significantly expanded complaint in May 2019, as set forth herein.

313.    The DOJ also continues to actively investigate Teva, as evidenced by its motion to stay discovery in the *Propranolol Antitrust* matter on the ground that the plaintiffs' allegations of price-fixing "overlap[] substantially with one aspect of [DOJ's] criminal investigation." The U.S. District Court for the Southern District of New York., in sustaining the *Propranolol Antitrust* allegations over Teva's motion to dismiss, reasoned that "[t]he presence of an ongoing investigation into the same subject matter as alleged in the pleadings here raises an inference of conspiracy." The DOJ intervened similarly in *In re Generic Pharmaceutical Pricing Antitrust Litigation*, Case No. 2:16-md-02724 (E.D. Pa.) (the "*Generics* MDL"), seeking stays and asserting that the drugs at issue—including Baclofen, Fluocinonide, Pravastatin, and

Propranolol—overlap with the DOJ's criminal investigation, further corroborating the existence of illegal price-fixing as to those drugs.

## J. THE INDIVIDUAL DEFENDANTS' HIGH-LEVEL POSITIONS, ACCESS TO INFORMATION, AND CONTROL OF TEVA'S PUBLIC STATEMENTS.

314. As the Company's top executives, the Individual Defendants—including Vigodman, Desheh, Oberman, and Olafsson, respectively the Presidents, CEOs, CFOs, President and CEO of Teva Americas Generics, and President and CEO of Teva's Global Generics Medicines Group (the divisions where the heart of the misconduct alleged herein took place)— controlled the Company's day-to-day operations and were informed of and responsible for monitoring Teva's generics business.  The Individual Defendants had access to various sources of information concerning Teva's U.S. generics business, including pricing.  These sources gave these Defendants access to information that was adverse to their public statements during the Relevant Period.  Because of their high-level positions, each was provided with, or had access to, copies of the documents alleged herein to be false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information concerning the Company, the Individual Defendants knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made to investors were materially false, misleading, and incomplete.  As a result, the Individual Defendants were responsible for the accuracy of Teva's corporate statements, and each is therefore responsible and liable for the representations contained therein or omitted therefrom.

315. Defendant Vigodman served as Teva's President and CEO from February 11, 2014 to February 6, 2017 and as a Teva Director from June 22, 2009 to February 6, 2017.

Vigodman signed and certified certain of Teva's reports on Forms 20-F (including the 2014 and 2015 Form 20-F SOX Certifications) and 6-K, including consolidated balance sheets, filed with the SEC during the Relevant Period, as set forth herein.  Vigodman had a duty to monitor any conduct that threatened to undermine the veracity of these filings, including the conduct alleged herein.  Vigodman had access to pricing data for the Company's generic drugs.  Notwithstanding the certifications signed by Vigodman and his access to pricing data, Vigodman knowingly or recklessly failed to disclose the overwhelming significance of the price increase plan to the financial resurgence of Teva.

316.    Vigodman also, in response to a direct question on pricing practices during an October 29, 2015 investor conference, falsely assured investors that, "[w]e are very responsible . . . in everything that pertains to prices on the generic side and on the specialty side."  He continued, "[a]nd I will even put it another way, all the improvements you see in our – in margins is not driven by price.  It is driven by quantities, and by mix, and by efficiency measures, not by price, 2014, 2015. And that's a very important message."

317.    Defendant Desheh served as Teva's CFO from July 2008 to June 30, 2017, except from October 30, 2013 to February 11, 2014, when he served as Teva's Interim CEO and Interim President.  Desheh also served as Teva's Group EVP from 2012 to June 30, 2017.  Desheh signed and certified certain of Teva's reports on Forms 20-F (including the 2013, 2014, 2015, and 2016 Form 20-F SOX Certifications) and 6-K filed with the SEC during the Relevant Period, including consolidated balance sheets, as set forth herein.  Desheh had a duty to monitor any conduct that threatened to undermine the veracity of these filings, including the conduct alleged herein.  Desheh had access to pricing data for the Company's generic drugs.  Notwithstanding the certifications signed by Desheh and his access to pricing data, Desheh knowingly or

recklessly failed to disclose the overwhelming significance of the price increase plan to the financial resurgence of Teva.

318.    During the Relevant Period, Desheh made additional false and misleading statements regarding the Company's pricing.  For example, during a November 2015 investor conference, Desheh addressed pricing head on: "There is a lot of noise around pricing issues. Some of it is coming from politicians [who are] driving agenda[s]. . . .  Our exposure to all these things is very minimal. . . .  I believe there are many examples for competitive environment, real competition, like we see in generic market in the United States. . . .  So it's a highly competitive environment with players coming from all over the world with a very fierce price competition." Even in the face of this direct question, Desheh never disclosed the price increase plan.

319.    Defendant Olafsson served as President and CEO of Teva's Global Generics Medicines Group from July 1, 2014 to December 5, 2016.  In that role, Olafsson had access to pricing data for the Company's generic drugs.  Olafsson also possessed the power and authority to control the contents of the Company's reports to the SEC concerning Teva's U.S. generics business and was provided with copies of the Company's reports and press releases alleged herein to be misleading before, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Olafsson also would have received reports showing the amount of profit earned from price increases on Teva's generic drugs.

320.    Olafsson assured investors during the Relevant Period that Teva's strong performance in its generics business was not the result of pricing changes: "This is $1 billion improvement in operating profit over 24 months period.  So how did we do this? Not by pricing but by portfolio mix, new products, and efficiency measures."  In response to an analyst request regarding the source of price increases, Olafsson falsely responded as follows: "So first of all, it

doesn't work like we wake up when we are one Company, and we can take price increases. Simply, it doesn't work like that in generics.  When price increases are taken, there's some kind of abnormality in the business. There are shortages.  . . .  So there's always somebody happy to take a little bit lower price.  So it's a very competitive business we're in."  Even in the face of this direct question, Olafsson never disclosed the price increase plan.

### K.  THE SHORT PERIOD OF TIME BETWEEN THE FALSE STATEMENTS AND THE CORRECTIVE DISCLOSURES SUPPORTS SCIENTER.

321.    On August 4, 2016, three days after the Notes Offering, and two days after the Actavis transaction closed, Teva reported second quarter 2016 financial results that reflected a $434 million decline in revenues in its U.S. generics segment compared to the second quarter of 2015. Teva also disclosed for the first time that it was subject to DOJ and State AG price-fixing investigations.  In fact, on July 12, 2016—the day before Teva suddenly decided to rush its bond offering to market—Teva had been served with a subpoena by the Connecticut Attorney General; and three weeks earlier, on June 21, 2016, Teva had been served a subpoena by the DOJ, indicating that Teva was now a focus of the investigations into illegal price collusion.  The timing of these events, with Defendants rushing an offering to market and increasing the Company's guidance immediately after receiving government subpoenas regarding their pricing policies, strongly supports an inference of scienter.

322.    On January 6, 2017, less than six months after raising its guidance on the same day it announced the surprise bond offering, Teva significantly lowered its guidance, admitting that its generics business was underperforming as a result of the pricing pressures it had claimed immunity from.  As Vigodman described in the January 6, 2017 conference call, Teva "ha[s] an EBITDA gap of $1.2 billion emanating from our US generics business."

119

323.    Market reaction to Defendants' disclosures was fast and furious.  Commentators noted: "The larger point here is this: how is it possible that 2017 EPS guidance was cut by as much as 18% within the space of six months with largely the same senior management team in place?"   The temporal proximity of Defendants' disclosures that pricing pressures were impacting Teva's generics business, less than six months after they raised guidance and assured investors that there would be no such effect, further supports an inference of scienter.

### L.  THE INDIVIDUAL DEFENDANTS WERE PERSONALLY MOTIVATED BY COMPENSATION.

324.    The Individual Defendants made millions of dollars in personal compensation from the reported success of the Company's U.S. generics business during the Relevant Period. They received cash bonuses of as much as 158% of their annual salaries based on performance metrics directly impacted by the illicit revenues derived from fixing and maintaining prices, rigging bids, and allocating customers and markets.  Teva also made substantial equity grants to Defendants Vigodman, Desheh, Olafsson, and likely other senior officers, including options to purchase shares, awards of restricted shares, and awards of Performance Share Units ("PSUs").

325.    For 2015, Teva reported paying defendant Desheh more than $1.8 million in cash and $1.7 million in equity compensation.  (His compensation as not disclosed for 2014 or 2016.) For 2015 and 2016, Teva reported paying defendant Olafsson more than $4.8 million in cash and more than $3.5 million in equity compensation.  (His compensation was not disclosed for 2014.) For 2014 to 2016, Teva reported paying defendant Vigodman more than $8.4 million in cash and more than $5 million in equity compensation.

326.    The Individual Defendants' compensation structure incentivized fraud.  The intent of the Company's Compensation Policy for Executive Officers and Directors (the "Compensation Policy") was

[T]o incentivize [Teva's] executive officers by creating a strong link between their performance and compensation.   Therefore, a significant portion of the total compensation package provided to Teva's executive officers is based on measures that reflect both Teva's short- and long-term goals and performance, as well as the executive officer's individual performance and impact on shareholder value.

327.    Teva's Compensation Policy stated that a "significant component" of that policy the Company's annual cash bonus program.  Teva described the bonuses as "strictly pay-for-performance . . . as payout eligibility and levels are determined based on actual financial and operational results, as well as individual performance."  While the Compensation Policy laid out the general parameters of the bonus program, it gave Teva's Board and its Compensation Committee some flexibility to alter the measurements used to award cash bonuses year-to-year.

### 1.  2014 Compensation

328.    In 2014, Defendants Vigodman, Desheh, and Olafsson received cash bonuses and equity compensation based, in significant part, on Teva's achievement of certain financial targets, which were impacted by the revenues generated from the anti-competitive conduct and collusion.

329.    According to the 2014 Form 20-F, more than 70% of Vigodman's cash bonus was tied to such financial targets (specifically, 35.4% for non-GAAP operating profit, 21.2% for non-GAAP net revenue, and 14.2% for cash flow).  He was entitled to a bonus of 140% of salary for achieving 100% of the targets, and a maximum of 200% of salary if 125% of the targets were met.

330.    Vigodman's total reported compensation was nearly $4.5 million; he received a salary of $1,183,888, a bonus of $1,868,477 (approximately 158% of salary), and a one-time bonus of $237,401 for "significant achievements and efforts," including Teva "strengthen[ing] its leading position in generics."  He also was awarded options to purchase 280,702 shares at $41.05; a grant of 15,660 restricted shares; and a grant of 30,869 PSUs based on targets of

cumulative non-GAAP operating profit and cumulative non-GAAP net revenue from 2014 to 2016.

331.    Because Olafsson and Desheh were not among Teva's five highest paid executives in 2014, their salaries and cash bonuses were not disclosed (Olafsson joined Teva in July 2014).  Olafsson was awarded options to purchase 88,238 shares at a price of $54.02; a grant of 18,229 PSUs; and an additional grant of 17,773 PSUs based on Teva's 2014 performance.  Desheh was awarded options to purchase 98,581 shares at a price of $48.76 and a grant of 20,066 PSUs.

## 2.  2015 Compensation

332.    In 2015, defendants Vigodman, Desheh, and Olafsson received cash bonuses and equity compensation based, in significant part, on Teva's achievement of certain financial targets, which were impacted by the revenue generated from the anti-competitive conduct and collusion.

333.    According to the 2015 Form 20-F, more than 70% of Vigodman's cash bonus was tied to such financial targets (specifically, 35.4% for non-GAAP operating profit, 21.2% for non-GAAP net revenue, and 14.2% for free cash flow).  He was entitled to a bonus of up to 200% of salary if 125% of the targets were met.

334.    Vigodman's total reported compensation was approximately $5.7 million; he received a salary of $1,363,682 and a bonus of $2,253,581 (approximately 165% of salary).  He also was awarded options to purchase 163,859 shares at a price of $57.35 and a grant of 30,869 PSUs based on Teva's 2014 to 2015 cumulative performance.

335.    According to the 2015 Form 20-F, Desheh and Olafsson also were entitled to bonuses based on such financial targets (specifically, 25% for non-GAAP operating profit, 15%

for net revenue, and 10% for free cash flow), in amounts of up to 200% of salary if 120% of the targets were met.

336.    Desheh's total reported compensation was approximately $4.3 million; he received a salary of $733,863 and a bonus of $1,110,824 (approximately 151% of salary).  He also was awarded options to purchase 89,376 shares at a price of $57.35 and a grant of 16,838 PSUs.

337.    Olafsson's total reported compensation was approximately $3.9 million; he received a salary of $954,955 and a bonus of $1,449,375 (approximately 151% of salary).  He also was awarded options to purchase 94,343 shares at a price of $57.35; options to purchase an additional 160,114 shares at a price of $59.19 "[i]n light of the increase in . . . scope of work and responsibilities as head of . . . Global Generics Medicines Group in connection with the Actavis acquisition"; and a grant of 17,773 PSUs based on Teva's 2014 to 2015 cumulative performance.

338.    Teva's ADS price reached a high of $72 on July 27, 2015, making the potential value of the Individual Defendants' 2014 and 2015 options quite significant at the height of the alleged fraudulent scheme.  However, because Teva was a "foreign private issuer" during the Relevant Period, it was not required to report insider sales and, therefore, it is unknown whether these Individual Defendants, or any other insider, engaged in suspicious trading activity. Evidence of insider trading, if any, could be obtained in discovery.

### M. CONTEMPORANEOUS RED FLAGS INDICATED THAT DEFENDANTS' STATEMENTS WERE FALSE OR MISLEADING.

339.    Contemporaneous red flags alerted the Individual Defendants to the possibility that their statements were false and misleading. At a minimum, the Individual Defendants recklessly failed to review or check information that they had a duty to monitor under these circumstances.

340.   <u>Congressional Inquiry</u>: On October 2, 2014, Congress sent Vigodman a personal letter seeking answers to "the underlying causes of recent increases in the price of [Teva's] drugs." This should have placed the Individual Defendants on alert to discover whether Teva had taken price increases and to what extent. Despite this, on October 30, 2014, Vigodman, when faced with an analyst question on the subject, denied that Teva derived revenues from price increases. Similarly, Congress invited Teva to testify at a November 20, 2014 hearing on whether "there was a rational economic reason as to . . . huge price increases." Again, this should have sparked an internal inquiry from Teva's executives. Yet, on December 11, 2014, when faced with the assertion from an analyst that wholesalers were seeing large price increases, Olafsson flatly denied that Teva was involved in those practices.

341.   <u>The State AG and DOJ Investigations</u>: The fact that the DOJ and the State AGs began investigations into Teva's competitors related to their pricing practices also supports a strong inference of scienter.

342.   In particular, the Individual Defendants failed to disclose the DOJ and State AG subpoenas in SEC disclosures filed in conjunction with the Notes Offering and Notes Offering materials, but then disclosed them approximately two weeks after completing the Offering (and only two days after the Actavis deal—which the Notes Offering funded—closed).  The failure to disclose receipt of the subpoenas until the Notes Offering was completed supports scienter, as does the fact that many of Teva's competitors disclosed their receipt of a subpoena immediately, in the very next SEC disclosure.  Moreover, those subpoenas triggered a legally mandatory duty to inquire into Teva's pricing practices, including the price increases made in tandem with competitors.  Yet, the Individual Defendants thereafter made materially false and misleading

statements about their exposure to price erosion, including during Teva's September 9, 2016, Generics Day.

343.    These government investigations have uncovered direct evidence of collusion. Connecticut's AG, George Jepsen, who initiated and led the State AGs' investigation, has publicly emphasized that the State AGs' CAC's allegations have a strong basis in direct evidence. In an October 31, 2017 interview with CNBC, held after the filing of the proposed State AGs' CAC, Jepsen emphasized that the State AGs' CAC's now-expanded allegations rested on compelling evidence: "We've uncovered – through emails, text messages, and telephone patterns, plus cooperating witnesses – a very compelling case of systematic and pervasive price fixing within the industry."

344.    GAO Report: On September 12, 2016, the GAO, which Congress had commissioned over two years earlier, publicly released the August 2016 GAO Report," documenting its audit of Medicare Part D data from June 2015 to August 2016. The GAO found hundreds of unexplained "extraordinary price increases," defined as the price of a particular drug increasing over 100% within a 12-month period, and that some drug prices increased more than 1,000%. Teva had numerous drugs that showed extraordinary price increases in the GAO report. The facts of the GAO report support the inference that the Individual Defendants spoke the alleged false statements with scienter.

345.    November 3, 2016 *Bloomberg* Article.   On November 3, 2016, Bloomberg reported that Teva was the subject of the DOJ criminal inquiry, and that the DOJ and State AGs could likely bring charges later in the year. Despite this, Vigodman, almost two weeks later, on November 15, 2016, claimed that he was "not aware of any fact that would give rise to an exposure to Teva with respect to the investigation." The State AGs suit and the DOJ charges

against Glazer and Malek soon followed, and, subsequently, those investigations have expanded massively. Indeed, Teva has produced over one million documents to the DOJ.  The close proximity of Vigodman's statement to the announcement of the charges diminishes the plausibility of innocent explanations or denials put forth by the Individual Defendants.

346.    Teva's Further Denials of Liability Despite Its Purported Investigation of the Facts.  As set forth above, Teva repeatedly denied any involvement in collusive conduct during the Class Period, and continues to do so. For example, on November 7, 2019, Defendant Schultz stated during an investor earnings conference call: "We have, of course, shared more than 1 million documents with [the DOJ]. We have not found any evidence that we were in any way part of any structured collusion or price fixing." Such statements underscore that the 34 Act Defendants knew Teva was a central actor in collusive conduct, or at a minimum, recklessly failed to review or check information they had a duty to monitor that would have revealed that fact.

### N.  THE ABRUPT DEPARTURES OF TOP EXECUTIVES.

347.    That three of the Individual Defendants—Olafsson, Vigodman, and Desheh—unexpectedly resigned from Teva or had their employment with Teva terminated at a critical time, as the Company's Price-Hike Strategy was deteriorating and Teva was in regulators' crosshairs, further supports scienter.

348.    There is a strong inference that the termination of Olafsson was connected to his fraudulent cover-up of the Price-Hike Strategy and the subsequent decline in Teva's profits as the strategy collapsed. The explanation for his termination as "retirement" was false (Olafsson was only 48 years old at the time, and he found a job elsewhere not long afterward), and the first charges from the DOJ and State AGs regarding their pricing investigations were released only days later.

349.    There is a similarly strong inference regarding Vigodman's termination. He was fired without a replacement just two months after Olafsson was terminated, just one month after Teva significantly revised its 2017 guidance downwards, resulting in part from increased price erosion and dwindling generic profits, and only one week before Teva reported disappointing financial results for Q4 2016.

350.    Finally, less than two months after Desheh left Teva, and in the very first reporting period after all Defendants were gone, Teva took a staggering $6.1 billion charge against its U.S. generics business, and announced a radical 75% reduction in dividend payments to shareholders. This supports an inference that it was these Individual Defendants who were blocking the true financial state of the Company from coming to light.

### O.  CORPORATE SCIENTER

351.    Teva possessed scienter by virtue of the fact that the Individual Defendants, who acted with scienter as set forth above, had binding authority over the Company. In addition, certain allegations herein establish Teva's corporate scienter based on (i) the state of mind of employees whose intent can be imputed to the Company, and/or on (ii) the knowledge of employees who approved the statements alleged herein despite knowing the statements' false and misleading nature.

352.    It can be inferred that senior corporate executives at Teva possessed scienter such that their intent can be imputed to the Company. Given the nature of the Price-Hike strategy, which required the involvement of numerous divisions within Teva to implement and had a material impact on Teva's financial statements, additional unknown executives sufficiently senior to impute their scienter to Teva were also aware of the Price-Hike Strategy.

353.    As yet unidentified employees also approved the false statements despite knowing of their false and misleading nature. As discussed, Teva had in place extensive processes to track

its financial performance on a daily, quarterly, and yearly basis. From this, it can be inferred that someone at Teva approved of the false and misleading statements in Teva's financial statements concerning the source of its generics profits, while knowing that the true source of the profits was the Price-Hike Strategy.  It can also be inferred that someone approved the false and misleading statements that Teva was competing intensely on price, someone who knew of the Price-Hike Strategy, and that it was largely dependent on a lack of competition.

## VII.    LOSS CAUSATION

354.    In addition to the allegations herein, Defendants' fraudulent conduct directly and proximately caused Plaintiff to suffer substantial losses as a result of purchasing Teva Securities at artificially inflated prices during the Relevant Period.

355.    Defendants, through each category of false and misleading statements and omissions, concealed the truth about Teva's core business strategy that materially contributed to Teva's financial and operational success during the Relevant Period, as well as collusive conduct. By concealing, among other things, the Price-Hike Strategy, that Teva was not competing on price, that the strategy was driving known material trends, that as the strategy failed and pricing competition increased Teva's financial condition was deteriorating, that Teva in fact was engaged in collusion and was the central actor in an industry wide conspiracy, and that the negative impact of the Actavis acquisition and integration of the acquired business on Teva's financial results and business prospects, Defendants also concealed the numerous and related risks associated with their false statements and omissions, including but not limited to, the risks that:

- the strategy was highly risky and not sustainable, and as the strategy failed, Teva's profits would collapse;

- by their nature, especially when done in tandem with competitors, price hikes might appear to arise from anti-competitive and/or collusive

conduct and, thus, draw the attention of government investigators and law enforcement agencies, precipitating possible legal actions, civil liabilities, and criminal sanctions;

- should the Price-Hike Strategy come under public, legislative, or law enforcement scrutiny, the viability of sustaining the resulting higher revenues and/or implementing new price hikes would be severely undermined, and would thereby undercut a major driver of the generic segment's profit;

- if pricing pressure or competition increased, Teva would be far more susceptible to a rapid and material decline in price-hike-related profits, resulting in poor financial results and undercutting reported and forecasted profits;

- upon the failure of the Price-Hike Strategy, the Company could be further disrupted by the termination of the senior managers who were responsible for the strategy, and by any increased difficulty in hiring qualified replacements; and

- as the Price-Hike Strategy in fact failed over time, the resulting revenue and profit declined, and Teva was prevented from making additional price increases, those trends would continue.

356.    The concealed risks bear directly on Teva's ability to generate and sustain its profits and its ability to service the over $30 billion in debt payable to Plaintiff and other investors.

357.    Beginning in August 2016, the concealed risks began to materialize through a series of negative events and disclosures that revealed, on a piecemeal basis, the false and misleading nature of Defendants' Relevant Period statements and omissions. Despite these partially corrective events and disclosures, Teva Securities' prices remained artificially inflated and were prevented from declining to their true value by Defendants continuing to make materially false and misleading statements that had the effect of, at least temporarily, concealing their fraud. As the relevant truth leaked out into the market from August 2016 to May 2019, Plaintiff suffered losses, which were foreseeable and caused by the materialization of the risks that Defendants' fraudulent conduct concealed from investors, as set forth below.

A. AUGUST 4-5, 2016

358.     After the close of trading on August 4, 2016—just two days after the Actavis transaction closed—Teva filed its Q2 2016 6-K, reporting 2Q 2016 results, including a $434 million decline in revenue in the U.S. generics segment compared to the second quarter of 2015.

359.     Moreover, the Q2 2016 6-K disclosed for the first time that (i) "[o]n June 21, 2015 [sic], Teva USA received a subpoena from the Antitrust Division of the United States Department of Justice seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products;" and (ii) "[o]n July 12, 2016, Teva USA received a subpoena from the Connecticut Attorney General seeking documents and other information relating to potential state antitrust law violations."   These disclosures were the first indication to the market that Defendants were implicated in the DOJ's and State AGs' antitrust investigations.

360.     The Q2 2016 6-K falsely and misleadingly stated that Teva had received its DOJ subpoena on June 21, **2015** (around the time other generic drug companies received and disclosed similar subpoenas, *e.g.*, Actavis received a DOJ subpoena on June 25, 2015), when Teva actually had received its DOJ subpoena on June 21, **2016** (as revealed in the 3Q2016 Form 6-K filed with the SEC on November 15, 2016, without any explanation for the correction).

361.     On this news, the prices of Teva Securities declined. Between the close of trading on August 4, 2016 and on August 5, 2016, the price of Teva's ADS fell $1.24 or 2.24% to close at $54.21, and the Preferred Share price fell $12 or 1.32% to close at $895. Teva's market capitalized was reduced by approximately $1.13 billion.

362.     This marked the beginning of the relevant truth leaking out, as Teva's collusive pricing strategy began to collapse. The disclosure of the subpoenas was a materialization of the

risk that, after nearly two years of ongoing investigations, the DOJ and State AGs would seek evidence from Teva in connection with Teva's pricing practices.

### B.  NOVEMBER 3, 2016, DECEMBER 13-16, 2016

363.     On November 3, 2016, during the trading day on the NYSE, *Bloomberg* published an article titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year End," describing the DOJ's "sweeping" two-year investigation related to the soaring prices of generic drugs and how executives from more than a dozen generic pharmaceutical manufacturers, including Teva, were suspected of colluding to raise the prices of generic drugs. The article broke the news that the first criminal charges against executives of those companies could emerge by the end of the year, and that State AGs were seeking to bring claims against generic manufacturers.

364.     On this news, the prices of Teva Securities declined once again. Between the close of trading on November 2, 2016 and the close of trading on November 3, 2016, Teva's ADS price fell $4.13 or 9.53% to close at $39.20, and the Preferred Share price fell $56.70 or 7.36% to close at $711.  Teva's market capitalized declined by approximately $4 billion.

365.     The next trading day on the TASE, Teva's ordinary shares, priced in Israeli New Shekels ("ILS"), fell ILS 7.10, or 4.43%, from a close of ILS 160.40 on November 3, 2016 to a close of ILS 153.30 on November 6, 2016.

366.     In a November 3, 2016 article titled "News of Charges in Price-Fixing Inquiry Sends Pharmaceuticals Tumbling," *The New York Times* reported that the news that the DOJ and State AGs' investigations found serious evidence of criminal conduct caused significant declines in the price of Teva Securities. On November 4, 2016, S&P Capital IQ lowered its rating of Teva ADS from "buy" to "hold" and its 12-month price target by $34 to $50 per share, noting that "[w]e think this could pose yet another challenge to an industry that has been hit hard by charges of high drug prices and will be an overhang on the shares." HSBC in its November 4, 2016

analyst report, downgraded Teva from "buy" to "hold" and lowered its price target from $66 per share to $44 per share, noting "US DOJ investigation into alleged US generic drug price collusion creates significant uncertainty" for Teva and for investors. In a November 10, 2016 article titled "DOJ's price-fixing investigation could lead to sizable liabilities, analyst says," *Fierce Pharma* reported that analysts tracking the generic drug industry believed that liability from the investigations could have a sizable financial impact on Teva, estimated at $700 million.

367.    Within weeks the expected governmental actions materialized. On December 13, 2016, the DOJ, by means of an Information, charged Malek and Glazer, the top two executives at Heritage, with two felony counts of violating Section 1 of the Sherman Act for fixing the price of Glyburide (as early as April 2014 until at least December 2015), a drug for which Teva held 75% of the market, and of Doxycycline (as early as April 2013 until at least December 2015), for which Teva was a major market participant as a result of the Actavis acquisition.

368.    The DOJ announced these charges in a press release the following day, stating that the charges resulted from an ongoing federal antitrust investigation into price fixing, bid ridding, and other anti-competitive conduct relating to generic drugs.  The charges against Glazer and Malek were also unsealed that day, alleging, inter alia, that various corporations and individuals co-conspired with Glazer and Malek.

369.    That same day, December 14, 2016, the State AGs, led by the Connecticut Attorney General, filed their lawsuit against Teva and several of its peers for civil violations of the antitrust laws, accusing Teva of conspiring to allocate the markets for and fix the prices of generic drugs, including for Glyburide, and of participating in a larger market-wide collusive conspiracy. *Forbes* reported the next day, in an article titled "State Attorneys General Accuse Six Generic Companies Of Fixing Drug Prices," that the State AGs' complaint revealed new

information regarding Teva's potential exposure, made "clear which companies could be implicated in the antitrust investigation federal prosecutors are pursuing," and also noted that Glazer and Malek were cooperating.

370.    As *Forbes* reported the following day, the State AGs complaint revealed new information regarding Teva's potential exposure relating to two generic drugs, in that it "makes clear which companies could be implicated in the antitrust investigation federal prosecutors are pursuing" and that Glazer and Malek were cooperating; according to the publicly available complaint, Malek had a direct relationship with an unnamed Teva employee and the two agreed to raise the prices of Glyburide

371.    On the news of the DOJ charges and the filing of the State AGs' complaint, the prices of Teva Securities continued to decline. Between the close of trading on December 13, and December 16, 2016, the ADS price fell $1.15, or 3%, to close at $36.51, and the Preferred Share price fell $28 or 4% to close at $645.  On the TASE, the price of Teva's ordinary shares declined ILS 1.90, or 1.33%, from a close of ILS 142.90 on December 13, 2016 to a close of ILS 141.00 on December 18, 2016.

## C.  NOVEMBER 15, 2016

372.    On November 15, 2016, before trading opened on the NYSE, Teva filed a press release with the SEC reporting Q3 2016 financial results that were well below consensus expectations, largely due to poor sales in Teva's generics divisions, including a $277 million YOY decline in revenue in Teva's "legacy" U.S. generics segment (*i.e.*, in the pre-Actavis-transaction portion of Teva's U.S. generics business). In the Company's November 15, 2016 earnings call, the Company also revised downward its 2016 guidance, and disclosed for the first time that the rate of price erosion for its generic drugs has increased from 5% to 7%, although Olafsson falsely claimed that the increase was the result of divestitures from the Actavis

transaction, and thus was limited to one quarter, thus continuing to conceal Teva's collusive pricing conduct.

373.     In addition, Vigodman directly addressed the ongoing DOJ investigation of anti-competitive conduct in the generic drug industry, emphasizing that "based on all of our efforts to date, internal and external … we are not aware of any fact that would give rise to an exposure to Teva with respect to the investigation."

374.     These denials softened the blow of Teva's negative financial results and guidance. Nevertheless, the prices of Teva Securities continued to decline.  Between the close of trading on November 14 and 15, 2016, the ADS price fell $3.43 or 8.36%, on high trading volume, to close at $37.60, and the Preferred Share price fell $38.01 or 5.22% to close at $689.99.  The price of Teva's ordinary shares declined ILS 7.20, or 4.6%, from a close of ILS 157.10 on November 14, 2016 to a close of ILS 149.90 on November 15, 2016.

375.     Analysts responded negatively to the new information concerning the Company's disappointing financial results. That day, in a report titled, "Are The Wheels Coming Off? Sure Feels That Way," Piper Jaffray lowered its price target from $57 per share to $43 per share, noting that "it appears to us that Teva painted an overly sanguine picture of its generics business at its investor event in September [during the Generics Day]," and describing Q3 2016 as a "credibility-damaging quarter," because, in the face of Olafsson's explanation that the price erosion would be limited, it was "difficult for us to take that assertion at face value." Also that day, Deutsche Bank wrote "TEVA reported 3Q revenue that was below our estimate on lower generic sales . . . the company saw higher than expected price erosion in 3Q" and, as a result, lowered its price target for the Company from $68 per share to $54 per share on "lower growth assumptions for generics." Likewise, in a November 16, 2016 report, Morgan Stanley lowered its

price target for the Company from $63 per share to $42 per share, as a result of the lower than expected generics growth and worse than expected price erosion.

### D. DECEMBER 5-6, 2016

376.   After the close of trading on December 5, 2016, Teva filed a Form 6-K announcing that Olafsson would be stepping down as President and CEO of the Company's Global Generic Medicines Group and that, effective immediately, he would be replaced by Bhattacharjee. Teva offered no explanation for Olafsson's departure, instead claiming he was "retiring" even though he was only in his late 40s and quickly obtained other employment.

377.   Analysts tied Olafsson's abrupt termination to the disappointing results in Teva's generics segment and concerns over pricing pressure. On December 6, Morningstar reported: "Teva's announcement [that it] will replace Siggi Olafsson as CEO of the generics segment does not inspire confidence. ***Recent pricing pressure*** in the generic drug market . . . remain[s] significant near-term challenge[] for Teva, which makes the abrupt leadership change a ***concerning development at a critical time*** for the company." A December 5 BTIG report noted "[w]ithout Siggi Olafsson at the helm of Teva's global generic segment, we think investor sentiment could worsen as the market has remained ***focused on price erosion for the [company's] base generic business***" and that "the departure of Mr. Olaffson [sic] creates more uncertainty as we head into 2017."

378.   On this news, on December 6, 2016, the prices of Teva Securities continued to decline. Between the close of trading on December 5 and on December 6, 2016, the ADS price fell $2.01, or 5.43%, to close at $35.03, and the Preferred Share price fell $26.26 or 4% to close at $630.75.  Teva's ordinary share price declined ILS 6.90, or 4.91%, from a close of ILS 140.50 on December 5, 2016 to a close of ILS 133.60 on December 6, 2016.

E. **JANUARY 6, 2017**

379.    On January 6, 2017, before the beginning of the trading day on the NYSE, Teva filed a press release on Form 6-K announcing a significant reduction in the 2017 guidance previously released on July 13, 2016. In the investor conference call that day, Vigodman claimed that the "significantly" reduced guidance resulted from "significant headwinds" faced by "[t]he entire healthcare sector" to which Teva "ha[d] not been immune," and "some issues specific to Teva" resulting in "an EBITDA gap of $1.2 billion emanating from our US generics business." In addition to the materialization of the concealed risks described herein, this was the materialization of the risk of Defendants using an "assumption" for price erosion in the July 13, 2016 guidance that was empirically false at the time; specifically, Defendants assumed a pricing environment that was "stable"— *i.e.*, 4%-5% erosion rate disclosed in prior years and quarters— when, in fact, pricing pressure was causing a more rapid decline.

380.    As a result of this new negative information, the prices of Teva Securities continued to decline. Between the close of trading on January 5 and January 6, 2017, the ADS price fell $2.86, or 7.53%, to close at $35.10, and the Preferred Share price fell $47 or 6.91% to close at $633. On the TASE, between the close of trading on January 5, 2017, and the close of the next trading day (January 8, 2017), the price of Teva's ordinary shares declined ILS 7.90, or 5.49%, from a close of ILS 143.90 to a close of ILS 136.

381.    Analysts tied this disclosure to the fact that the prior guidance was "inflated" as a result of understating generic drug price erosion. In a report dated January 6, 2017, Evercore ISI conducted its own price erosion analysis for the Company and noted that, as a result of its lower than expected revenues and EPS, "I think it's ***pretty clear that mgmt's prior expectation for 2017 were very inflated***." Similarly, the same day, Maxim Group downgraded its rating of the Company from "buy" to "hold" and its price target for the Company from $49 per share to $41

per share and noted "challenges in the near term to the core generic . . . business are becoming bigger issues." In a January 8, 2017 report, Piper Jaffray stated that "Teva once again provided disappointing guidance, further eroding what in our view was already *limited management credibility*."

### F.   FEBRUARY 6-7, 2017

382.    On February 6, 2017, after the close of trading on the NYSE, in a Form 6-K filed with the SEC, Teva announced the termination of Vigodman as CEO, effective immediately and without a permanent replacement, and the conclusion of his service on the Board of Directors.

383.    Analysts tied Vigodman's abrupt departure to the Company's poor financial performance in its generics business since no later than Q2 2016, as well as sustained difficulties for the generics business ahead. For example, in a February 6, 2017 report titled "CEO Transition Adds Further Uncertainty to Story," J.P. Morgan reported "we view today's update as a disappointment, with arguably the two most important executives at Teva stepping down (Erez and Siggi Olafsson, CEO of generics) within the last several months at a time of significant fundamental challenges. With Teva facing headwinds across both its generics (incremental competition, pricing headwinds) and branded business . . . we continue to believe a near-term recovery in the company's business is unlikely." Similarly, that day, Wells Fargo concluded that "more investors will be uneasy with the uncertainty of an unexpected and abrupt CEO departure."

384.    As a result of this news, the prices of Teva Securities continued to decline. Between the close of trading on February 6 and on February 7, 2017, the ADS price fell $2.16, or 6.29%, to close at $32.19, and the Preferred Share price fell $29 or 4.57% to close at $605. The price of Teva's ordinary shares declined ILS 4.10, or 3.2%, from a close of ILS 128.10 on February 6 to a close of ILS 124.00 on February 7, 2017.

### G. AUGUST 3-7, 2017

385.    On August 3, 2017, before the NYSE opened, Teva filed a press release on a Form 6-K announcing lower-than-expected Q2 2017 financial results. The Company (i) attributed its poor financial results to poor performance in its U.S. generics business (with reported profits of only $691 million, far below analyst expectations) and "accelerated price erosion"; (ii) was required to take a $6.1 billion accounting charge permanently writing-down the value of the generics business; and (iii) imposed a 75% reduction in the Company's longstanding dividend. The Company also significantly lowered its guidance for 2017, revising downward its earlier-reported guidance from January 2017 for the Company's net revenues, operating income, EBITDA, EPS, and cash flow. On the Company's earnings conference call held that day, Defendant McClellan, Teva's interim CFO, explained that the poor results and reduced guidance were partly the result of increased price erosion and price pressure. Importantly, Bhattacharjee further noted the "impact of the shelf stock adjustments that [Teva has] done," as a "key element" of the revised outlook. Shelf stock adjustments are contractual provisions that require charge backs to customers when prices decline. It was highly foreseeable that prices would decline on at least the 60 drugs subject to the Price-Hike Strategy, drugs for which Teva had increased price by at least 50%, and as much as 1543% over the Relevant Period. Teva's $6.1 billion permanent impairment charge directly reduced Teva's bottom line dollar-for-dollar. During the August 3, 2017 earnings call, Defendant Peterburg stated that the $6.1 billion charge was "to reduce goodwill associated with out U.S. Generics business unit, which include both the Teva legacy business and the Actavis Generics business."

386.    Analysts reacted harshly. That day, J.P. Morgan wrote, "Teva reported weaker-than-expected results but more importantly lowered in 2017 sales and EPS guidance . . . and cut its dividend by 75%. . . . U.S. *generic weakness appears to be at the heart of these reductions*."

Morgan Stanley downgraded Teva ADS to "Underweight," commenting that they had "underappreciated the risk of genetics pricing pressure to Teva's earnings and dividend."

387.    Jefferies wrote, "Mgt Had Effectively No Choice but to Cut the Dividend; Maintaining Debt Covenants a Key Concern." Oppenheimer noted, "it may be difficult for Teva's board to attract top talent (meaningful pharma CEO experience) given the company's ongoing challenges," as the CEO and CFO positions remained unfilled. Analysts were further concerned about Teva's ability to sustain its debt and debt rating. Jefferies wrote: "Can It Get Any Worse?," noting that "[a]t present, Teva has a debt covenant that requires a minimum leverage of 4.25 x (net debt/EBITDA) by YE17 . . . . If mgt's ever-shrinking EBITDA guidance . . . erodes much further, *it is possible Teva may not meet the [debt] obligation*." The reality was that Teva's poor results, guidance reduction, and the risk that it could not satisfy its debt obligations were the materialization of the risks associated with the Price-Hike Strategy and its ultimate demise. There was no realistic prospect that the strategy could be revived, or that it could again generate the same profits. The result was the write down of the generics business by $6.1 billion, and Teva cutting its dividend by 75%.

388.    With the true financial condition of the Company more evident, credit rating agencies immediately issued rating downgrades. On August 3, 2017, Moody's downgraded Teva's debt rating to Baa3 (one step above "junk"), with a negative outlook, reflecting slower-than-anticipated deleveraging "as Teva contends with weakness in its US generics business." Likewise, on August 4, Fitch Ratings also downgraded Teva to BBB- (one step above "junk"), with a negative outlook.

389.    As investors digested the news, the prices of Teva Securities dropped. Between the close of trading on August 2, 2017, and the close of trading on Monday, August 7, 2017, the

price of Teva's ADS fell $12.66, or 40.51%, to close at $18.59, and the Preferred Share price fell $184.50 or 32.92% to close at $376. The price of Teva's ordinary shares declined ILS 40.02, or 35.96%, from a closing price of ILS 111.30 on August 2 to a closing price of ILS 71.28 on Sunday, August 6, 2017.

### H.  NOVEMBER 2, 2017

390.    On November 2, 2017, Teva filed a press release on a Form 6-K announcing lower-than-expected Q3 2017 financial results, including a 9% decline in U.S. generic quarterly revenues compared to Q3 2016. The Company attributed the decrease to "pricing declines resulting from customer consolidation and accelerated FDA approvals for additional generic versions of competing off-patent medicines as well as volume decline of methylphenidate extended-release tablets (Concerta® authorized generic) due to the launch of a competing product."

391.    As a result of this new negative information, the prices of Teva Securities continued to decline. Between the close of trading on November 1 and on November 2, 2017, the ADS price fell $2.79 or 19.90% to close at $11.23, the Preferred Share price fell $48.44 or 16.82% to close at $239.57, and the price of Teva's ordinary shares fell ILS 6.7 to close at ILS 42.38.

392.    Analysts reacted negatively. For example, RBC Capital Markets stated that the results were even "below our cautious expectations," and that the "magnitude of weakness in the US generics business in both revenue and margins was surprising." Wells Fargo found Teva's results "especially disappointing."

### I.  FEBRUARY 8, 2018

393.    On February 8, 2018, Teva filed a press release on a Form 8-K announcing Q4 2017 and FY 2017 financial results, including a staggering $17.1 billion goodwill impairment, of

which $10.4 billion related to Teva's U.S. generics business. Teva stated that the $10.4 billion writedown was based in part on "further deterioration in the U.S. generics market"—including "[p]ricing challenges due to government regulation"—and Teva's resulting expectation of "larger pricing declines" than previously anticipated.

394.    As a result of this new negative information, the prices of Teva Securities continued to decline. Between the close of trading on February 7, 2018 and the close of trading on February 8, 2018, the price of Teva's ADS fell $2.21 or 10.6% to close at $18.64; the Preferred Share price fell $8.25 or 2.29% to close at $352.00; and the price of Teva's ordinary shares fell ILS 5.00 to close at ILS 67.00.

395.    Analysts reacted negatively. Wells Fargo noted that Teva had missed consensus expectations "by a significant margin," pointed to "commentary about generic pricing worsening in 4Q," and concluded that investors "should see [Teva's $17.1 billion impairment] as reflective of how challenging the situation is." IBI Brokerage noted that the impairment charge was "almost entirely for the generics business in the US," and that Teva's 2018 guidance was "way below market expectations."

### J.   DECEMBER 7-10, 2018

396.    On December 9, 2018, an article in *The Washington Post* quoted statements from Connecticut Assistant AG Joseph Nielsen that the State AG investigation had expanded to at least 16 companies and 300 drugs, and exposed "the largest cartel in the history of the United States." While the article noted Teva's continued denial of engaging in any anticompetitive conduct, and its statement in a court filing that allegations of a price-fixing conspiracy "are entirely conclusory and devoid of any facts," the price of Teva Securities dropped substantially with the disclosure of the State AGs' expanded investigation.

397.    Between the close of trading on December 7, 2018 (the last trading day before the announcement) and the close of trading on December 10, 2018, the price of Teva's ADS fell $0.97 or 5% to close at $18.44; the Preferred Share price fell $16.40 or 4.43% to close at $353.40.  Between the close of trading on December 6, 2018 (the last trading day on the TASE before the announcement), and the close of trading on December 10, 2018, the price of Teva's ordinary shares fell ILS 8.90 to close at ILS 69.10.

### K.  MAY 10-13, 2019

398.    On May 10, 2019, after the market closed, the State AGs filed a 524-page antitrust complaint revealing previously undisclosed facts regarding Teva's participation in the generic drug price-fixing conspiracy. The May 2019 complaint details Teva's price-fixing with regards to at least 86 different generic drugs, compared to just 7 drugs in the previously filed action. The complaint further asserts that the Company implemented significant price increases for approximately 112 generic drugs, including extraordinary price hikes of over 1,000%, and details Teva's role as a "consistent participant" and a central player in the conspiracy. Further, the May 2019 complaint names four Teva employees personally as defendants: Cavanaugh, Patel, Kevin Green (Teva's former Director of National Accounts), and David Rekenthaler (Teva's former Vice President, Sales U.S. Generics).

399.    On this news, the price of Teva's ADS declined by 14.83%, from a closing price of $14.36 on May 10, 2019, to a closing price of $12.23 on May 13, 2019 (the following trading day).  On the TASE, the price of Teva's ordinary shares fell ILS 7.14, from a closing price of ILS 52.25 on May 7, 2019 (the last trading day before the news) to a closing price of ILS 45.11 on May 13, 2019.

400.    Analysts were surprised by the revelations in the State AGs' May 10, 2019 complaint. For example, Bernstein warned that "the price-fixing lawsuit is worse than we

expected" and "there seem to be specific cases in the lawsuit that are going to be hard to explain away." J.P. Morgan stated that "[w]e were open to the majority of price spikes being 'explainable' by way of shortages, limited competition (only two or three competitors), and price 'signaling,' a grey area of antitrust law. So we were sorely disappointed by the nature of the direct quotes attributed to Teva employees in the expanded complaint."

## VIII.    PLAINTIFF IS ENTITLED TO A PRESUMPTION OF RELIANCE

401.    Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine. At all relevant times, the markets for Teva ADS, Preferred Shares, and ordinary shares were open and efficient for the following reasons, among others:

> (a) Teva's ADS met the requirements for listing on, and were listed and actively traded on, the NYSE, a highly efficient and automated market;

> (b) Teva's ordinary shares met the requirements for listing on, and were listed and actively traded on, the TASE, a highly efficient and automated market;

> (c) The average weekly trading volume of Teva Securities, including Teva ADS, Preferred Shares, and ordinary shares, was significant;

> (d) As a registered and regulated issuer, Teva filed public reports with the SEC and the NYSE;

> (e) Teva was "dual-listed" in the U.S. and Israel, and reported to Israeli securities regulators accordingly;

> (f) Teva was eligible to file simplified SEC filings;

> (g) Teva regularly communicated with the public through established market communication channels, including through the regular dissemination of news releases on major newswire services, communications with the financial press, and other wide-ranging public disclosures; and

> (h) Teva was followed by numerous securities and credit analysts employed by major brokerage firms, such as Bank of America Merrill Lynch, Barclays Capital, BMO Capital, Citigroup, Goldman Sachs, J.P. Morgan, Needham & Company, Susquehanna Financial Group, UBS, and Wells Fargo, who wrote reports that were published, distributed, and entered the public domain.

(i)   The material misrepresentations and omissions alleged herein would induce a reasonable investor to misjudge the value of Teva Securities; and

(j)   Without knowledge of the misrepresented or omitted facts, Plaintiff purchased or otherwise acquired Teva Securities between the time that Defendants made the material misrepresentations and omissions and the time that the truth was revealed, during which period the price of Teva Securities was artificially inflated by Defendants' misrepresentations and omissions.

402.   Accordingly, the markets for Teva Securities promptly digested current information regarding Teva from all publicly available sources and the price of Teva Securities reflected such information.  As a result of the materially false or misleading statements or omissions of material fact alleged herein, Teva Securities thus traded at artificially inflated prices during the Relevant Period.  Plaintiff purchased or otherwise acquired Teva Securities at such inflated prices in reliance upon the integrity of the market price and other market information relating to Teva.  Under these circumstances, a presumption of reliance under the fraud-on-the-market doctrine applies.

403.   Further, Plaintiff relied upon Defendants to disclose material information as required by law.  Plaintiff would not have purchased or otherwise acquired Teva Securities at artificially inflated prices if Defendants had disclosed all material information as required.  Thus, to the extent Defendants concealed or improperly failed to disclose material facts with regard to Teva, Plaintiff is entitled to a presumption of reliance pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and its progeny.

## IX.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY.

404.   Neither the statutory safe harbor of the Private Securities Litigation Reform Act of 1995, nor the "bespeaks caution" doctrine applicable to forward-looking statements under certain circumstances, applies to the materially false or misleading statements alleged herein.

405.     The statements complained of herein were not forward-looking.  Rather, each was a statement concerning then-present or historical facts, or purported facts, as of the time the statement was made.

406.     To the extent any of the materially false or misleading statements alleged herein, or any portion thereof, can be construed as forward-looking, such statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Teva or other Defendants were insufficient to insulate Defendants from liability for their materially false or misleading statements or omissions.

407.     To the extent the statutory safe harbor otherwise may apply to any of Defendants' materially false or misleading statements alleged herein, or any portion thereof, Defendants are liable under the Exchange Act for any such false or misleading forward-looking statement because at the time such statement was made, the speaker knew that the statement was untrue or misleading, or the statement was approved by an executive officer of Teva who knew that the statement was untrue or misleading.

## X.    CLAIMS FOR RELIEF

### COUNT I
### For Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### in Connection with Plaintiff's Domestic Acquisitions of
### Teva ADS and Preferred Shares
### (Against All Defendants)

408.     Plaintiff incorporates the allegations above by reference as if fully set forth herein.

409.     During the Relevant Period, Defendants made, disseminated or approved the false and misleading statements specified above, which they knew or recklessly disregarded were false

and misleading in that the statements contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

410.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

> (a) Employed devices, schemed, and artifices to defraud;
>
> (b) Made untrue statements of material fact or omitted to state materials facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or
>
> (c) Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff in connection with their purchases of Teva Securities during the Relevant Period.

411.    Plaintiff has suffered damages in that, in reliance on the integrity of the market, it paid artificially inflated prices for Teva Securities. Plaintiff would not have purchased Teva Securities at the prices it paid, or at all, if it had been aware that the market prices of those securities had been artificially and falsely inflated by Defendants' misleading statements.

412.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchases of Teva Securities during the Relevant Period.

### COUNT II
#### For Violation of Section 20(a) of The Exchange Act in Connection with Plaintiff's Domestic Acquisitions of Teva ADS and Preferred Shares (Against The Individual Defendants)

413.    Plaintiff incorporates the allegations above by reference as if fully set forth herein.

414.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against each of the Individual Defendants.

415.    As alleged above, Teva violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.   During their tenures as officers and/or directors of Teva, the Individual Defendants acted as controlling persons of Teva within the meaning of Section 20(a) of the Exchange Act, and were culpable participants in the alleged wrongful conduct that is the basis of Count I.  The Individual Defendants held senior executive positions with the Company and were directly involved in the Company's day-to-day operations; they had the power to, and did, control or influence the policies and practices underlying the securities violations alleged herein.  This included the power, which they exercised, to influence and control Teva's public statements with respect to its operations, corporate governance, and regulatory compliance.

416.    By reason of the foregoing, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act as controlling persons of Teva.

**COUNT III**
**For Violation of The Israel Securities Law, 1968**
**in Connection with Plaintiff's Acquisitions of Teva Ordinary Shares**
**(Against All Defendants)**

417.    Plaintiff incorporates the allegations above by reference as if fully set forth herein.

418.    This Count is asserted pursuant to the Israel Securities Law, 1968.

419.    Throughout the Relevant Period, Teva's ADS and ordinary shares were "dual listed" on both the NYSE and the TASE under Israeli law.[18]  Section 1 of the Israel Securities Law defines a "foreign corporation" as "a corporation incorporated in Israel whose securities are listed for trade on a foreign stock exchange."  The NYSE is a "foreign stock exchange" under the Israel Securities Law.  Because Teva is incorporated in Israel and has its securities, such as the

---

[18]    *See* http://www.tase.co.il/eng/marketdata/stocks/marketdata/pages/marketdata.aspx (last visited Jan. 18, 2019).

ADSs, listed for trading on the NYSE, it is a "foreign corporation" under the Israel Securities Law.  Therefore, the TASE correctly recognizes Teva as a dual-listed company.

420.   For dual-listed "foreign corporations," Israeli law applies the reporting requirements (including the anti-fraud requirements) of the country of primary listing.  *See* Israel Securities Law, §§ 1, 35T, 35DD, 35EE.  Thus, Israeli law applies the reporting requirements (including the anti-fraud requirements) of the United States to "foreign corporations" that are dual-listed in Israeli and the United States.  *See* Israel Securities Law, §§ 1, 35T, 35DD, 35EE.

421.   Section 1 of the Israel Securities Law defines "the foreign law" as "the law applying to a foreign corporation because its securities are listed for trade on a foreign stock exchange, including the rules of that foreign stock exchange."  A "foreign corporation" must agree to comply with the foreign law as a matter of Israeli law. *See* Securities Law § 35T(a)(1).  Indeed, a foreign corporation listed in the U.S., like Teva, generally only needs to file its U.S. SEC filings in Israel (without further alteration or translation) in order to comply with Israeli reporting requirements.  As a matter of Israeli securities law, Teva agreed to comply with the U.S. securities laws and the rules of the NYSE to fulfill its obligations under Israeli law.

422.   Thus, in the case of Teva, Israeli law adopts and applies U.S. statutes, regulations, and rules, including the anti-fraud provisions of the United States securities laws, to enforce Teva's disclosure obligations.  *See* Israel Securities Law, §§ 35T, 35DD, 35EE; *Verifone Holdings, Inc. v. Stern*, Class Action 3912-01-08, decision rendered Nov. 16, 2008; *Stern v. Verifone Holdings, Inc.*, Class Action 3912-01-08, decision rendered Aug. 25, 2011 (subsequent to and in light of *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010)); Letter from Israel Securities Authority to the SEC (Feb. 18, 2011), https://www.sec.gov/comments/4-617/4617-45.pdf (last visited Jan. 18, 2019).

423.     In a motion to dismiss filed on December 1, 2017, in the Class Action, defendants

Teva, Vigodman, Desheh, Olafsson, and others

> agree[d] that Israeli law mirrors U.S. law here.  The Israeli dual-listing regime
> was purposefully created in 2000 to make the Tel Aviv Stock Exchange more
> attractive to Israeli companies (like Teva) who otherwise might list their securities
> only on exchanges outside of Israel.  *See generally, e.g.*, Marcus Best & Jean-Luc
> Soulier, Israel §21.1, *International Securities Law Handbook* (4th ed. 2014).
> Because issuers find it unattractive to be subject to multiple and diverging
> regulatory regimes, Israel simply adopts the securities law requirements of the
> foreign jurisdiction – in this case, the United States – instead of enforcing
> "requirements that apply to Israeli companies listed solely on the TASE." *Id.*  As
> Plaintiffs acknowledge, both Israeli case law and the Israel Securities Authority's
> public statements support the view that, as a matter of Israeli law, Israel
> voluntarily applies U.S. liability standards to dual-listed companies like Teva.
> Compl., ¶1084; *see In re VeriFone Holdings, Inc. Sec. Litig.*, No. 07-cv-06140
> EMC, 2014 WL 12646027, at *1 (N.D. Cal. Feb. 18, 2014) (noting, in case
> involving securities fraud claims under Israeli law and a dual-listed company, that
> "the Israeli district court ruled twice that U.S. law, and not Israeli law, applies").

424.     Accordingly, liability under Israeli law is pursuant to Section 10(b) of the

Exchange Act and Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act,

applies to the claims arising from trades made on the TASE.

425.     This Count incorporates Counts I and II by reference.

## XI.   JURY DEMAND

426.     Plaintiff hereby demands a trial by jury.

## XII.   PRAYER FOR RELIEF

427.     WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a) Awarding Plaintiff damages, including interest;

(b) Awarding Plaintiff its reasonable costs and expenses incurred in this
action, including attorneys' fees and experts' fees; and

(c) Granting such other and further relief as the Court may deem just and
proper.

Dated:  January 16, 2020                    Respectfully submitted,

                                            By:   /s/ Nathan Zezula
                                            Nathan C. Zezula ct27936
                                            **LUEKER MOTT ZEZULA LLC**
                                            750 East Main Street
                                            6th Floor
                                            Stamford, CT 06902
                                            (203) 408-6500 (tel.)

                                            **GRANT & EISENHOFER P.A.**
                                            Jay W. Eisenhofer
                                            Daniel L. Berger*
                                            Jonathan D. Park*
                                            485 Lexington Avenue
                                            New York, New York  10017
                                            Telephone: (646) 722-8500
                                            *Counsel for Plaintiff*

*pro hac vice* application forthcoming

# APPENDIX A

| Drug | Form | Strength | Teva Pre-Increase Month | Teva Maximum Price Month | Percentage Price Increase by Manufacturer | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Anagrelide HCL** | | | | | **TEVA** | | | | |
| | AAA CAPS REGULAR ORDINARY | 0.5MG | Mar-2014 | Dec-2015 | 243% | | | | |
| | AAA CAPS REGULAR ORDINARY | 1MG | Mar-2014 | Dec-2016 | 242% | | | | |
| | | | | | | | | | |
| **Baclofen** | | | | | **TEVA** | **NORTHSTAR RX** | **UPSHER-SMITH** | | |
| | ABA TABS UNCOAT REGULAR ORD | 10MG | Mar-2014 | Feb-2015 | 306% | 779% | 694% | | |
| | ABA TABS UNCOAT REGULAR ORD | 20MG | Mar-2014 | Dec-2014 | 411% | 654% | 736% | | |
| | | | | | | | | | |
| **Bumetanide** | | | | | **TEVA** | **SANDOZ** | | | |
| | ABA TABS UNCOAT REGULAR ORD | 0.5MG | Mar-2014 | Feb-2015 | 566% | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 1MG | Mar-2014 | Jul-2016 | 417% | 296% | | | |
| | ABA TABS UNCOAT REGULAR ORD | 2MG | Mar-2014 | Jul-2016 | 652% | 220% | | | |
| | | | | | | | | | |
| **Cabidopa-Levodopa** | | | | | **TEVA** | **MAYNE PHARMA** | **MYLAN** | | |
| | ABA TABS UNCOAT REGULAR ORD | 10-100MG | Jun-2016 | Dec-2016 | 51% | 86% | 73% | | |
| | | | | | | | | | |
| **Carpamazepine** | | | | | **TEVA** | **MYLAN INSTITUTION** | **TORRENT PHARM** | | |
| | ABA TABS UNCOAT REGULAR ORD | 200MG | Aug-2014 | Dec-2016 | 909% | 423% | 1508% | | |
| | ABC TABS UNCOAT REGULAR CHE | 100MG | Aug-2014 | Jun-2015 | 497% | | 444% | | |
| | | | | | | | | | |
| **Cephalexin** | | | | | **TEVA** | **RANBAXY PHARM** | | | |
| | DEA PWD/GRAN SOL/SUSP REG | 125MG/5ML | Mar-2014 | Jan-2015 | 189% | | | | |
| | DEA PWD/GRAN SOL/SUSP REG | 250MG/5ML | Mar-2014 | Jul-2014 | 171% | 320% | | | |
| | | | | | | | | | |
| **Cimetidine** | | | | | **TEVA** | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 300MG | Jun-2013 | Feb-2016 | 296% | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 400MG | Jun-2013 | Jun-2018 | 869% | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 800MG | Oct-2015 | Jun-2018 | 1072% | | | | |
| | | | | | | | | | |
| **Ciprofloxacin HCL** | | | | | **TEVA** | | | | |
| | ACA TABS COATED REGULAR ORD | 250MG | May-2016 | Jan-2017 | 353% | | | | |
| | ACA TABS COATED REGULAR ORD | 500MG | Apr-2016 | Oct-2016 | 417% | | | | |
| | ACA TABS COATED REGULAR ORD | 750MG | Dec-2014 | Jan-2017 | 1111% | | | | |
| | NBA OPHTHALMIC LIQUID EYE | 0.3% | Dec-2015 | Nov-2016 | 506% | | | | |
| | | | | | | | | | |
| **Clemastin Fum** | | | | | **TEVA** | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 2.68MG | Jul-2013 | Dec-2016 | 223% | | | | |
| | DAA SYRUP REGULAR | 0.67MG/5ML | Jul-2012 | Apr-2015 | 296% | | | | |
| | | | | | | | | | |
| **Clotrimazole** | | | | | **TEVA** | | | | |
| | MC- DERM LIQD EMULSION ETC | 1% | Aug-2014 | Dec-2017 | 500% | | | | |
| | | | | | | | | | |
| **Cromolyn Sodium** | | | | | **TEVA** | | | | |
| | KA- INHALANT SOLUTON SYSTMC | 20MG/2ML | Jul-2014 | Jun-2018 | 392% | | | | |
| | NBA OPHTHALMIC LIQUID EYE | 4% | Feb-2016 | May-2016 | 339% | | | | |
| | | | | | | | | | |
| **Cyrpoheptadine HCL** | | | | | **TEVA** | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 4MG | Mar-2014 | Nov-2017 | 110% | | | | |
| | DAA SYRUP REGULAR | 2MG/5ML | Jun-2017 | May-2018 | 99% | | | | |
| | | | | | | | | | |

| Drug | Form | Strength | Teva Pre-Increase Month | Teva Maximum Price Month | Percentage Price Increase by Manufacturer | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Danazol** | | | | | TEVA | LANNETT | | | | |
| | AAA CAPS REGULAR ORDINARY | 100MG | Jan-2015 | Apr-2017 | 90% | 69% | | | | |
| | AAA CAPS REGULAR ORDINARY | 200MG | Jan-2015 | Mar-2016 | 169% | 60% | | | | |
| | AAA CAPS REGULAR ORDINARY | 50MG | Jan-2015 | Jul-2017 | 60% | 97% | | | | |
| | | | | | | | | | | |
| **Diclofenac** | | | | | TEVA | | | | | |
| | ACA TABS COATED REGULAR ORD | 50MG | Jan-2013 | Aug-2015 | 310% | | | | | |
| | | | | | | | | | | |
| **Dicloxacillin Sodium** | | | | | TEVA | | | | | |
| | AAA CAPS REGULAR ORDINARY | 250MG | Mar-2014 | May-2017 | 147% | | | | | |
| | AAA CAPS REGULAR ORDINARY | 500MG | Mar-2014 | Aug-2017 | 98% | | | | | |
| | | | | | | | | | | |
| **Diltiazem HCL** | | | | | TEVA | | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 120MG | Jul-2013 | Jan-2016 | 205% | | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 30MG | Jul-2013 | Jul-2016 | 247% | | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 60MG | Jul-2013 | Jul-2016 | 238% | | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 90MG | Jul-2013 | Jan-2016 | 221% | | | | | |
| | | | | | | | | | | |
| **Dipyridamole** | | | | | TEVA | IMPAX GENERICS | WEST WARD | ZYDUS PHARM | | |
| | ABA TABS UNCOAT REGULAR ORD | 25MG | Jun-2015 | Apr-2018 | 291% | 127% | 396% | 221% | | |
| | ABA TABS UNCOAT REGULAR ORD | 50MG | Jun-2015 | Dec-2017 | 413% | | | 252% | | |
| | ABA TABS UNCOAT REGULAR ORD | 75MG | Jul-2015 | Feb-2018 | 238% | | | 231% | | |
| | | | | | | | | | | |
| **Divalproex Sodium** | | | | | TEVA | NORTHSTAR RX | SUN PHARMACEUTICAL | DR REDDY'S LAB | | |
| | ACA TABS COATED REGULAR ORD | 125MG | Feb-2014 | Jun-2018 | 366% | | | | | |
| | ACA TABS COATED REGULAR ORD | 250MG | Mar-2013 | Jun-2018 | 444% | 311% | 116% | | | |
| | ACA TABS COATED REGULAR ORD | 500MG | Mar-2013 | May-2018 | 179% | | | 70% | | |
| | | | | | | | | | | |
| **Doxazosin Mesy** | | | | | TEVA | APOTEX CORP | MYLAN | PAR PHARM | | |
| | ABA TABS UNCOAT REGULAR ORD | 1MG | Jul-2013 | Jan-2015 | 862% | 1427% | 708% | 770% | | |
| | ABA TABS UNCOAT REGULAR ORD | 2MG | Jul-2013 | Oct-2015 | 743% | 1605% | 1185% | 691% | | |
| | ABA TABS UNCOAT REGULAR ORD | 4MG | Jul-2013 | Oct-2015 | 666% | 1254% | 1404% | 535% | | |
| | ABA TABS UNCOAT REGULAR ORD | 8MG | Jul-2013 | Mar-2014 | 817% | 589% | 247% | 480% | | |
| | | | | | | | | | | |
| **Enalapril** | | | | | TEVA | MYLAN | MYLAN INSTITUTION | WOCKHARDT AMERICA | | |
| | ABA TABS UNCOAT REGULAR ORD | 10MG | Jun-2013 | Aug-2015 | 1470% | 1978% | 379% | 1270% | | |
| | ABA TABS UNCOAT REGULAR ORD | 2.5MG | Jun-2013 | Aug-2015 | 2216% | 1651% | 486% | 1045% | | |
| | ABA TABS UNCOAT REGULAR ORD | 20MG | Jun-2013 | Dec-2016 | 1728% | 1962% | 644% | 1327% | | |
| | ABA TABS UNCOAT REGULAR ORD | 5MG | Jun-2013 | Nov-2017 | 864% | 2329% | 381% | 1212% | | |
| | | | | | | | | | | |
| **Estazolam** | | | | | TEVA | MAYNE PHARMA | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 1MG | Mar-2014 | May-2017 | 135% | 290% | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 2MG | Mar-2014 | Jun-2018 | 132% | 263% | | | | |
| | | | | | | | | | | |
| **Estradiol** | | | | | TEVA | MAYNE PHARMA | MYLAN | | | |
| | ABA TABS UNCOAT REGULAR ORD | 0.5MG | Jul-2012 | Apr-2013 | 159% | 408% | 132% | | | |
| | ABA TABS UNCOAT REGULAR ORD | 1MG | Jul-2012 | Jan-2016 | 198% | 335% | 230% | | | |
| | ABA TABS UNCOAT REGULAR ORD | 2MG | Jul-2012 | Dec-2016 | 237% | 375% | 158% | | | |
| | | | | | | | | | | |
| **Etotolac** | | | | | TEVA | SANDOZ | | | | |
| | ACA TABS COATED REGULAR ORD | 400MG | Mar-2013 | Dec-2015 | 501% | | | | | |

2

| Drug | Form | Strength | Teva Pre-Increase Month | Teva Maximum Price Month | Percentage Price Increase by Manufacturer | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | ACA TABS COATED REGULAR ORD | 500MG | Mar-2013 | May-2015 | 425% | 333% | | | |
| | | | | | | | | | |
| **Etodolac SR** | | | | | **TEVA** | | | | |
| | BCA TABS COATED LG/ACT ORD | 400MG | Jul-2013 | Jan-2014 | 200% | | | | |
| | BCA TABS COATED LG/ACT ORD | 500MG | Jul-2013 | Nov-2013 | 210% | | | | |
| | BCA TABS COATED LG/ACT ORD | 600MG | Jul-2013 | Jul-2016 | 90% | | | | |
| | | | | | | | | | |
| **Fluconazole** | | | | | **TEVA** | **GLENMARK PHARMA** | **GREENSTONE LTD** | | |
| | ABA TABS UNCOAT REGULAR ORD | 100MG | Jun-2013 | Aug-2013 | 574% | 929% | 679% | | |
| | ABA TABS UNCOAT REGULAR ORD | 150MG | May-2013 | Aug-2013 | 487% | 704% | 276% | | |
| | ABA TABS UNCOAT REGULAR ORD | 200MG | Jun-2013 | Nov-2015 | 523% | 769% | 478% | | |
| | ABA TABS UNCOAT REGULAR ORD | 50MG | Jun-2013 | Nov-2015 | 536% | 663% | | | |
| | DEA PWD/GRAN SOL/SUSP REG | 40MG/ML | Oct-2013 | Oct-2014 | 332% | | | | |
| | | | | | | | | | |
| **Fluocinonide** | | | | | **TEVA** | **TARO PHARM** | **MAYNE PHARMA** | | |
| | MA- DERMATOLOGICAL OINTMENT | 0.05% | May-2014 | Dec-2014 | 182% | 376% | | | |
| | MB- DERMATOLOGICAL CREAMS | 0.05% | May-2014 | Feb-2015 | 290% | 233% | 464% | | |
| | ME- DERMATOLOGICAL JELLY | 0.05% | Jul-2012 | Jul-2015 | 2345% | | | | |
| | MB- DERMATOLOGICAL CREAMS | 0.05% | Oct-2012 | Dec-2014 | 1072% | | | | |
| | | | | | | | | | |
| **Fluoxetine HCL** | | | | | **TEVA** | | | | |
| | AAA CAPS REGULAR ORDINARY | 40MG | May-2015 | Nov-2015 | 227% | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 10MG | Jan-2015 | Jun-2018 | 769% | | | | |
| | DJA NONSPECIFIC LIQ, REGULA | 20MG/5ML | Jul-2015 | Oct-2016 | 1264% | | | | |
| | | | | | | | | | |
| **Flutamide** | | | | | **TEVA** | | | | |
| | AAA CAPS REGULAR ORDINARY | 125MG | Nov-2015 | Jul-2016 | 55% | | | | |
| | | | | | | | | | |
| **Fosinipril Sodium** | | | | | **TEVA** | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 10MG | Feb-2015 | Oct-2015 | 53% | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 20MG | Feb-2015 | Sep-2015 | 60% | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 40MG | Feb-2015 | Apr-2016 | 51% | | | | |
| | | | | | | | | | |
| **Glimepiride** | | | | | **TEVA** | **DR REDDY'S LAB** | **MYLAN** | **PAR PHARM** | **PERRIGO** |
| | ABA TABS UNCOAT REGULAR ORD | 1MG | Jan-2015 | Feb-2015 | 304% | 110% | 147% | 311% | 297% |
| | ABA TABS UNCOAT REGULAR ORD | 2MG | Jan-2015 | Jul-2015 | 181% | 96% | 146% | 327% | |
| | ABA TABS UNCOAT REGULAR ORD | 4MG | Jan-2015 | Aug-2015 | 199% | | 173% | 336% | 196% |
| | | | | | | | | | |
| **Glipizide Metform** | | | | | **TEVA** | | | | |
| | ACA TABS COATED REGULAR ORD | 2.5-250MG | Dec-2012 | Dec-2015 | 56% | | | | |
| | ACA TABS COATED REGULAR ORD | 2.5-500MG | Oct-2012 | Aug-2015 | 106% | | | | |
| | ACA TABS COATED REGULAR ORD | 5-500MG | Feb-2013 | Feb-2016 | 142% | | | | |
| | | | | | | | | | |
| **Griseofulvin** | | | | | **TEVA** | | | | |
| | DGA REDY-MDE SUSPENSION, RE | 125MG/5ML | Feb-2015 | Mar-2016 | 276% | | | | |
| | | | | | | | | | |
| **Hydroxyzine Pam** | | | | | **TEVA** | | | | |
| | AAA CAPS REGULAR ORDINARY | 100MG | Mar-2014 | Nov-2016 | 78% | | | | |
| | AAA CAPS REGULAR ORDINARY | 25MG | Mar-2014 | Jan-2018 | 173% | | | | |
| | AAA CAPS REGULAR ORDINARY | 50MG | Mar-2014 | May-2018 | 134% | | | | |

| Drug | Form | Strength | Teva Pre-Increase Month | Teva Maximum Price Month | Percentage Price Increase by Manufacturer | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Ketoconazole | | | | | TEVA | TARO PHARM | | | |
| | ABA TABS UNCOAT REGULAR ORD | 200MG | Mar-2014 | Jan-2017 | 1156% | 700% | | | |
| | MB- DERMATOLOGICAL CREAMS | 2% | Mar-2014 | Sep-2016 | 590% | 1191% | | | |
| | | | | | | | | | |
| Ketoprofen | | | | | TEVA | | | | |
| | AAA CAPS REGULAR ORDINARY | 50MG | Jul-2013 | Apr-2018 | 1246% | | | | |
| | AAA CAPS REGULAR ORDINARY | 75MG | Jul-2013 | May-2018 | 746% | | | | |
| | | | | | | | | | |
| Ketorolac Trometh | | | | | TEVA | | | | |
| | ACA TABS COATED REGULAR ORD | 10MG | Jul-2013 | May-2016 | 409% | | | | |
| | | | | | | | | | |
| Loperamide HCL | | | | | TEVA | | | | |
| | AAA CAPS REGULAR ORDINARY | 2MG | Aug-2014 | Feb-2016 | 119% | | | | |
| | | | | | | | | | |
| Megestrol Ace | | | | | TEVA | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 20MG | Feb-2015 | Jun-2015 | 37% | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 40MG | Feb-2015 | Jun-2015 | 35% | | | | |
| | | | | | | | | | |
| Meperdine HCL | | | | | TEVA | EPIC PHARMA | PAR PHARM | WEST WARD | |
| | ABA TABS UNCOAT REGULAR ORD | 100MG | Aug-2014 | Dec-2017 | 433% | 460% | 577% | 322% | |
| | ABA TABS UNCOAT REGULAR ORD | 50MG | Jul-2014 | May-2016 | 439% | 259% | 460% | 256% | |
| | | | | | | | | | |
| Methotrexate Sodium | | | | | TEVA | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 2.5MG | Jun-2013 | Jan-2015 | 579% | | | | |
| | | | | | | | | | |
| Methydolpa | | | | | TEVA | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 250MG | Jan-2015 | Jan-2017 | 280% | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 500MG | Jan-2015 | Feb-2017 | 216% | | | | |
| | | | | | | | | | |
| Mexiletine HCL | | | | | TEVA | | | | |
| | AAA CAPS REGULAR ORDINARY | 150MG | Aug-2014 | Apr-2017 | 124% | | | | |
| | AAA CAPS REGULAR ORDINARY | 200MG | Aug-2014 | Aug-2015 | 73% | | | | |
| | AAA CAPS REGULAR ORDINARY | 250MG | Aug-2014 | May-2015 | 107% | | | | |
| | | | | | | | | | |
| Nadolol | | | | | TEVA | MYLAN | | | |
| | ABA TABS UNCOAT REGULAR ORD | 20MG | Jun-2013 | Nov-2014 | 722% | 126% | | | |
| | ABA TABS UNCOAT REGULAR ORD | 40MG | Jun-2013 | Oct-2016 | 1143% | 147% | | | |
| | ABA TABS UNCOAT REGULAR ORD | 80MG | Jun-2013 | Jan-2017 | 595% | 121% | | | |
| | | | | | | | | | |
| Nefazodone HCL | | | | | TEVA | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 100MG | Aug-2014 | Nov-2016 | 126% | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 150MG | Aug-2014 | Aug-2017 | 122% | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 200MG | Aug-2014 | Nov-2016 | 120% | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 250MG | Aug-2014 | Nov-2016 | 125% | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 50MG | Aug-2014 | Sep-2017 | 120% | | | | |
| | | | | | | | | | |
| Nortriptyline HCL | | | | | TEVA | | | | |
| | AAA CAPS REGULAR ORDINARY | 10MG | Jan-2015 | Sep-2016 | 158% | | | | |
| | AAA CAPS REGULAR ORDINARY | 25MG | Jan-2015 | Oct-2016 | 127% | | | | |
| | AAA CAPS REGULAR ORDINARY | 50MG | Jan-2015 | Aug-2016 | 111% | | | | |
| | AAA CAPS REGULAR ORDINARY | 75MG | Jan-2015 | Aug-2016 | 111% | | | | |

| Drug | Form | Strength | Teva Pre-Increase Month | Teva Maximum Price Month | Percentage Price Increase by Manufacturer | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Nystatin** | | | | | TEVA | | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 500MU | Mar-2014 | Nov-2015 | 52% | | | | | |
| | | | | | | | | | | |
| **Oxybutynin CL** | | | | | TEVA | PAR PHARM | UPSHER-SMITH | | | |
| | ABA TABS UNCOAT REGULAR ORD | 5MG | May-2013 | Jan-2016 | 869% | 479% | 592% | | | |
| | | | | | | | | | | |
| **Penicillin V Potassium** | | | | | TEVA | CITRON PHARMA, LLC | SANDOZ | PAR PHARM | | |
| | ABA TABS UNCOAT REGULAR ORD | 250MG | Aug-2014 | Jun-2017 | 235% | 257% | 242% | | | |
| | ABA TABS UNCOAT REGULAR ORD | 500MG | Oct-2016 | Mar-2017 | 440% | | | 737% | | |
| | DEA PWD/GRAN SOL/SUSP REG | 125MG/5ML | Jan-2015 | Dec-2016 | 106% | | | | | |
| | DEA PWD/GRAN SOL/SUSP REG | 250MG/5ML | Jan-2015 | Jul-2017 | 120% | | | | | |
| | | | | | | | | | | |
| **Pravastatin Sod** | | | | | TEVA | APOTEX CORP | LUPIN PHARMA | ZYDUS PHARM | MYLAN INSTITUTION | GLENMARK |
| | ABA TABS UNCOAT REGULAR ORD | 10MG | Jul-2013 | Feb-2014 | 417% | 460% | 570% | 489% | | |
| | ABA TABS UNCOAT REGULAR ORD | 20MG | Jul-2013 | Nov-2013 | 373% | 446% | 450% | | | |
| | ABA TABS UNCOAT REGULAR ORD | 40MG | Jul-2013 | Nov-2013 | 437% | 413% | 574% | 517% | 173% | |
| | ABA TABS UNCOAT REGULAR ORD | 80MG | Jul-2013 | May-2014 | 191% | 249% | 229% | | | 159% |
| | | | | | | | | | | |
| **Prazosin HCL** | | | | | TEVA | | | | | |
| | AAA CAPS REGULAR ORDINARY | 1MG | Nov-2012 | Jan-2016 | 635% | | | | | |
| | AAA CAPS REGULAR ORDINARY | 2MG | Nov-2012 | Nov-2015 | 243% | | | | | |
| | AAA CAPS REGULAR ORDINARY | 5MG | Nov-2012 | Jan-2016 | 345% | | | | | |
| | | | | | | | | | | |
| **Propranolol HCL** | | | | | TEVA | HERITAGE PHARMA | IMPAX GENERICS | MYLAN | NORTHSTAR RX | PAR PHARM |
| | ABA TABS UNCOAT REGULAR ORD | 10MG | Dec-2014 | Jan-2016 | 1347% | 1193% | 894% | 796% | | |
| | ABA TABS UNCOAT REGULAR ORD | 20MG | Dec-2014 | Jan-2016 | 1542% | 1227% | 967% | | 56% | |
| | ABA TABS UNCOAT REGULAR ORD | 40MG | Dec-2014 | Jan-2016 | 1694% | 1282% | 1446% | | 95% | 851% |
| | ABA TABS UNCOAT REGULAR ORD | 80MG | Dec-2014 | Nov-2015 | 1730% | 985% | 1005% | | | |
| | BAA CAPS LG/ACT ORDINARY | 120MG | May-2013 | Jun-2014 | 276% | | | | | |
| | BAA CAPS LG/ACT ORDINARY | 160MG | May-2013 | Oct-2014 | 199% | | | | | |
| | BAA CAPS LG/ACT ORDINARY | 60MG | May-2013 | Jun-2014 | 252% | | | | | |
| | BAA CAPS LG/ACT ORDINARY | 80MG | May-2013 | May-2014 | 298% | | | | | |
| | | | | | | | | | | |
| **Ranitidine HCL** | | | | | TEVA | | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 150MG | Jun-2013 | Jan-2017 | 611% | | | | | |
| | ABA TABS UNCOAT REGULAR ORD | 300MG | Jun-2013 | Oct-2016 | 509% | | | | | |
| | | | | | | | | | | |
| **Theophylline** | | | | | TEVA | | | | | |
| | BBA TABS UNCOAT LG/ACT ORD | 100MG | Mar-2014 | Jul-2014 | 187% | | | | | |
| | BBA TABS UNCOAT LG/ACT ORD | 200MG | Mar-2014 | Jul-2014 | 172% | | | | | |
| | BBA TABS UNCOAT LG/ACT ORD | 300MG | Mar-2014 | Apr-2017 | 613% | | | | | |
| | BBA TABS UNCOAT LG/ACT ORD | 450MG | Mar-2014 | Jul-2016 | 21% | | | | | |
| | | | | | | | | | | |
| **Tolmetin Sodium** | | | | | TEVA | | | | | |
| | AAA CAPS REGULAR ORDINARY | 400MG | Jul-2013 | Jun-2017 | 265% | | | | | |
| | | | | | | | | | | |
| **Trazodone HCL** | | | | | TEVA | MUTUAL PHARM | PAR PHARM | APOTEX CORP | | |
| | ABA TABS UNCOAT REGULAR ORD | 100MG | Jun-2015 | Feb-2016 | 112% | 98% | 120% | | | |
| | ABA TABS UNCOAT REGULAR ORD | 150MG | Jun-2015 | Jul-2016 | 134% | 234% | 137% | | | |
| | ABA TABS UNCOAT REGULAR ORD | 50MG | Jun-2015 | Feb-2016 | 119% | 107% | 86% | | | |

| Drug | Form | Strength | Teva Pre-Increase Month | Teva Maximum Price Month | Percentage Price Increase by Manufacturer | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| Source: IQVIA National Sales Perspective® data. | | | | | | | | | | |

# APPENDIX B

| February 20-22, 2013 Generic Pharmaceutical Association ("GPhA") (n/k/a Association for Accessible Medicines) Annual Meeting in Orlando, Florida | |
|---|---|
| Teva attendees | Allan Oberman (President & CEO, Teva Americas Generics) and Siggi Olafsson (President, Actavis Pharma) |
| Co-conspirator Attendees | **Aurobindo:** unidentified representatives |
| | **Heritage:** unidentified representatives |
| | **Mylan:** Tony Mauro (President Mylan North America) |
| | **Zydus:** unidentified representatives |
| **June 4-5, 2013 GPhA CMC Workshop in Bethesda, Maryland** | |
| Teva attendees | Unidentified representatives |
| Co-conspirator Attendees | **Aurobindo:** unidentified representatives |
| | **Heritage:** unidentified representatives |
| | **Mylan:** unidentified representatives |
| | **Sun:** unidentified representatives |
| | **Zydus:** unidentified representatives |
| **October 28-30, 2013 GPhA Fall Technical Conference in Bethesda, Maryland** | |
| Teva attendees | Unidentified representatives |
| Co-conspirator attendees | **Aurobindo:** unidentified representatives |
| | **Heritage:** unidentified representatives |
| | **Mylan:** Dan Snider (Vice President Morgantown RD, Mylan Inc.), Carmen Shepard (Senior VP, Global Policy and Regulatory, Mylan Pharmaceuticals Inc.), Marcie McClintic (Vice President and Chief of Staff, Mylan Inc.) |
| | **Sun:** unidentified representatives |
| | **Zydus:** unidentified representatives |
| **February 19-21, 2014 GPhA An** | |
| Teva attendees | Allan Oberman (President and CEO, Teva Americas Generics) and other representatives from Teva Pharmaceuticals USA, Inc. |
| Co-conspirator attendees | **Aurobindo:** unidentified representatives |
| | **Heritage:** unidentified representatives |
| | **Mylan:** Tony Mauro (President, Mylan North America), Marcie McClintic Coates (VP and Head of Global Regulatory Affairs, Mylan Inc.), Andrew Miller (Senior Vice President, Head, Global Complex Products Operations, Mylan, Inc.) |
| | **Sun:** unidentified representatives |
| | **Zydus:** unidentified representatives |

| June 3-4, 2014 GPhA CMC Workshop in Bethesda, Maryland | |
|---|---|
| Teva attendees | Unidentified representatives |
| Co-conspirator attendees | **Heritage:** unidentified representatives |
| | **Mylan:** unidentified representatives |
| | **Sun:** unidentified representatives |
| | **Zydus:** unidentified representatives |
| **October 27-29, 2014 GPhA Fall Technical Conference in Bethesda, MD** | |
| Teva attendees | Scott Tomsky (Vice President, Generic Regulatory Affairs, North America, Teva Pharmaceuticals) |
| Co-conspirator attendees | **Aurobindo:** unidentified representatives |
| | **Citron:** unidentified representatives |
| | **Heritage:** unidentified representatives |
| | **Mylan:** Marcie McClintic Coates (Vice President and Head of Global Regulatory Affairs, Mylan Inc.) |
| | **Sun:** unidentified representatives |
| | **Zydus:** unidentified representatives |
| **November 19-21 2014, Annual IGPA Conference in Miami, FL** | |
| Teva attendees | Yehudah Livneh (Vice President, Global Policy, Asia and EMIA, Teva Pharmaceuticals), Allan Oberman (President and CEO, Teva Americas Generics) |
| Co-conspirator attendees | **Mylan:** Rajiv Malik (President, Mylan Inc.), Nawel Bailey Rojkjaer (Senior Director, International Affairs Office of Global Policy, Mylan GmbH) |
| **February 9-11, 2015 GPhA Annual Meeting in Miami Beach, FL** | |
| Teva attendees | Brian Rubenstein (Executive Counsel, Teva Pharmaceuticals) |
| Co-conspirator attendees | **Aurobindo:** unidentified representatives |
| | **Heritage:** unidentified representatives |
| | **Mylan:** Deborah Autor (Senior Vice President, Strategic Global Quality & Regulatory Policy, Mylan, Inc.), Rajiv Malik (President, Mylan, Inc.) |
| | **Zydus:** unidentified representatives |
| **June 9-10, 2015 GPhA CMC Workshop in Bethesda, MD** | |
| Teva attendees | Scott Tomsky (Vice President, Generic Regulatory Affairs, North America, Teva Pharmaceuticals), Siva Vaithiyalingam (Director of Regulatory Affairs, Teva Pharmaceuticals) |
| | **Aurobindo** (through its affiliate AuroMedics): unidentified representatives |
| | **Citron:** unidentified representatives |

| Conspirator attendees | **Heritage:** unidentified representatives |
| | **Mylan:** Timothy Ames (Vice President, Global Strategic Regulatory Affairs, Mylan Inc.), Dawn Culp (Vice President, Global Regulatory Affairs Policy, Mylan, Inc.), Dan Snider (Vice President, Morgantown RD, Mylan Pharmaceuticals Inc.), Bryan Winship (Senior Director, Quality Management, Strategic Global Quality and Regulatory Policy, Mylan, Inc.) |
| | **Sun:** unidentified representatives |
| | **Zydus:** unidentified representatives |

| **June 1-4, 2014 Healthcare Distribution Alliance BLC Meeting (Phoenix, AZ)** | |
|---|---|
| Teva Attendees | Theresa Coward (Sr. Director, Sales and Trade Relations); Jessica Peters (Director, Trade Relations) |
| Co-Conspirator Attendees | **Mylan:** Richard Isaac (Sr. Manager, Strategic Accounts); Lance Wyatt (Director, National Accounts) |
| | **Heritage:** Neal O'Mara (Sr. Director, National Accounts); Anne Sather (Sr. Director, National Accounts) |

| **June 7-10, 2015 Healthcare Distribution Alli.5ance BLC Meeting (San Antonio, TX)** | |
|---|---|
| Teva Attendees | Theresa Coward (Senior Director of National Sales); Nick Gerebi (Director of National Accounts); Jessica Peters (Director, National Accounts); Nisha Patel (Director, National Accounts); Gary Skalske (Sr. Director of Sales, Impax Laboratories, Inc.), Christine Baeder (Vice President Commercial Operations, Teva Pharmaceuticals USA), Brad Bradford (Director National Accounts, Teva Pharmaceuticals USA), Christopher Doerr (Senior Director, Trade Operations, Teva Pharmaceuticals USA), Cassie Dunrud (Associate Director, Teva Pharmaceuticals USA), Jeff Herberholt (Senior Manager, Regional Accounts), Jeff McLard (Senior Director, National Accounts), Jason Nagel (Associate Director, Trade Relations), Michelle Osmian (Director, Customer Operations) |
| | **Aurobindo:** Julie Faria (Senior Manager, Sales Operations & Contract Administration, AuroMedics Pharma LLC), Charles Rath (National Trade Relations Manager, AuroMedics PharmaLLC) |
| | **Citron:** Susan Knoblauch (Director, National Accounts), Laura Short (Vice President of Sales), Karen Strelau (Executive Vice President of Sales and Marketing) |
| | **Heritage:** Jeffrey (Jeff) Glazer (CEO and Vice Chairman); Jason Malek (Senior Vice President Commercial Operations); Neal O'Mara (Director, National Accounts); Anne Sather (Director, National Accounts); Matthew (Matt) Edelson (Associate Director, National Accounts) |

| | |
|---|---|
| Conspirator Attendees | **Mylan:** John Baranick (Director, Trade Relations, Mylan Specialty, L.P.), Todd Bebout (Vice President – NA Supply Chain Management, Mylan Inc.); Janet Bell (Director, National Accounts, Mylan, Inc.); Richard Isaac (Senior Manager, Strategic Accounts, Mylan Inc.); Stephen Krinke (National Account Manager, Mylan Inc.); Robert O'Neill (Head of Sales Generic, NA, Mylan Inc.); Sean Reilly (National Account Manager, Mylan Inc.); John Shane (Director, Trade Relations, Mylan Specialty L.P.); Erik Williams (VP NA Pricing & Contracts, Mylan Inc.); Lance Wyatt (Director, National Accounts, Mylan Inc.) |
| | **Sun:** Daniel Schober (Vice President, Trade Sales), Steven Smith (Sr. Director of Sales) |
| | **Zydus:** Maria Bianco-Falcone (Director of Offer Development and Trade Operations), Scott Goldy (Sales Director), Kevin Green (Sr. Director of Sales), Maria McManus (Corporate Account Manager), Louis Pastor (Sr. Director, Trade Operations), Kristy Ronco (Vice President, Sales), Jodi Weber (Corporate Account Manager) |

| April 20-2013, 2013 National Association of Chain Drug Stores ("NACDS") Annual Meeting (Palm Beach, FL) | |
|---|---|
| Teva Attendees | Jeremy Levin (President and CEO); Allan Oberman (President and CEO of Teva Americas Generics); Maureen Cavanaugh (SVP and COO of North America Generics); Theresa Coward (Sr. Director Sales and Trade Relations); Michael Sine (Director, Corporate Account Group); Jonathan Kafer (EVP, Sales and Marketing); David Marshall (VP of Operations); David Rekenthaler (VP of Sales) |
| Co-Conspirator Attendees | **Mylan:** Joe Duda (President); Tony Mauro (Chief Commercial Officer); Robert Potter (SVP of North America National Accounts and Channel Development); Jeffrey May (VP of North America Product Strategy); Jim Nesta (VP of Sales) |

| August 10-13, 2013 NACDS Total Store Expo (Las Vegas, Nevada) | |
|---|---|
| Teva Attendees | Allan Oberman (President and CEO of Teva Americas Generics); Maureen Cavanaugh (SVP and COO of North America Generics); Theresa Coward (Sr. Director Sales and Trade Relations); David Rekenthaler (VP of Sales); Kevin Galowina (Head of Marketing Operations); Jessica Peters (Manager of Corporate Accounts) |
| Co- | **Mylan:** Mike Aigner (Director National Accounts); Kevin McElfresh (Executive Director National Accounts) Joe Duda (President); Robert Potter (SVP North America National Accounts and Channel Development); Rob O'Neill (Head of Sales); Lance Wyatt (Director National Accounts) |

| Conspirator Attendees | **Heritage:** Jeffrey Glazer (CEO and Chairman); Matthew Edelson (Sr. Director of Sales); Jason Malek (SVP, Commercial Operations); Gina Gramuglia (Commercial Operations); Neal O'Mara (Sr. Director, National Accounts); Anne Sather (Sr. Director, National Accounts) |
|---|---|

### December 3, 2013 NACDS 2013 NYC Week and Annual Foundation Dinner (NYC)

| Teva Attendees | Maureen Cavanaugh (SVP and COO of North America Generics); Theresa Coward (Sr. Director Sales); David Rekenthaler (VP of Sales) |
|---|---|
| Co-Conspirator Attendees | **Mylan:** Joe Duda (President); Tony Mauro (COO); Robert Potter (SVP of North America National Accounts and Channel Development); Rob O'Neill (Head of Sales) |

### August 23-26, 2014 NACDS Total Store Expo (Boston, MA)

| Teva Attendees | Maureen Cavanaugh (SVP and COO of North America Generics); David Rekenthaler (VP of Sales); Kevin Galowina (Head of Marketing Operations); Jessica Peters (Manager of Corporate Accounts); Nisha Patel (Director of National Accounts) |
|---|---|
| Co-Conspirator Attendees | **Mylan:** Joe Duda (President); Tony Mauro (President); Robert Potter (SVP of North America National Accounts); Mike Aigner (Director, National Accounts); Kevin McElfresh (Executive Director, National Accounts); Gary Tighe (Director, National Accounts); Lance Wyatt (Director, National Accounts) |
| | **Heritage:** Jeffrey Glazer (CEO and Chairman); Jason Malek (SVP, Commercial Operations); Heather Beem (National Account Manager, Institutional); Katie Brodowski (Associate Director Institutional Sales); Matthew Edelson (Senior Director of Sales); Gina Gramuglia (Commercial Operations); Neal O'Mara (Sr. Director, National Accounts); Anne Sather (Sr. Director, National Accounts) |

### April 26-29, 2014 NACDS 2014 Annual Meeting (Scottsdale, AZ)

| Teva Attendees | Allan Oberman (President and CEO of Teva Americas Generics); Maureen Cavanaugh (SVP and COO of North America Generics); Theresa Coward (Sr. Director Sales and Trade Relations); David Rekenthaler (VP of Sales) |
|---|---|
| Co-Conspirator Attendees | **Mylan:** Joe Duda (President); Tony Mauro (President); Robert Potter (SVP of North America National Accounts and Channel Development); Rob O'Neill (Head of Sales) |
| | **Heritage:** Jeffrey Glazer (CEO and Chairman) |

### December 3, 2014 NACDS 2014 NYC Week and Annual Foundation Dinner (NYC)

| Teva Attendees | Maureen Cavanaugh (SVP and Chief Operating Officer of North America Generics); David Rekenthaler (VP of Sales); Theresa Coward (Sr. Director of Sales); Jessica Peters (Director, National Accounts) |
|---|---|
| Co-Conspirator Attendees | **Mylan:** Tony Mauro (COO); Mike Aigner (Director National Accounts); Robert Potter (SVP of North America National Accounts) |

| | |
|---|---|
| **April 25-28, 2015 NACDS 2015 Annual Meeting (Palm Beach, FL)** | |
| Teva Attendees | Maureen Cavanaugh (SVP and COO of North America Generics); Theresa Coward (Sr. Director of Sales) |
| Co-Conspirator Attendees | **Mylan:** Tony Mauro (President); Robert Potter (SVP of North America National Accounts and Channel Manager); Rob O'Neill (Head of Sales); Gary Tighe (Director National Accounts) |

| | |
|---|---|
| **August 22-25, 2015 NACDS Total Store Expo (Denver, CO)** | |
| Teva Attendees | Theresa Coward (Sr. Director of Sales); Maureen Cavanaugh (SVP and COO of North America Generics); Kevin Galowina (Head of Marketing Operations); Jessica Peters (Manager of Corporate Accounts); Nisha Patel (Director of National Accounts |
| Co-Conspirator Attendees | **Mylan:** Mike Aigner (Director National Accounts); Tony Mauro (President); Robert Potter (SVP of North America National Accounts and Channel Development); Kevin McElfresh (Executive Director, National Accounts); Robert O'Neill (Head of Sales Generic, NA) |
| | **Heritage:** Jeffrey Glazer (CEO and Chairman); Jason Malek (SVP of Commercial Operations); Neal O'Mara (Sr. Director, National Accounts); Anne Sather (Sr. Director, National Accounts); Matthew Edelson (Associate Director, National Accounts); Gina Gramuglia (Commercial Operations) |

| | |
|---|---|
| **February 23-26, 2014 Efficient Collaborative Retail Marketing Retail Pharmacy Efficient Program Planning Session (Amelia Island, FL)** | |
| Teva attendees | Unidentified representatives |
| Co-conspirator attendees | **Heritage:** unidentified representatives |

| | |
|---|---|
| **February 22-25, 2015 Efficient Collaborative Retail Marketing Annual Retail Pharmacy Efficient Program Planning Session (Destin, FL)** | |
| Teva attendees | Unidentified representatives |

| Co-conspirator attendees | **Heritage:** unidentified representatives |
|---|---|

| **May 12-15, 2014 Minnesota Multistate Contracting Alliance for Pharmacy National Member Conference in Bloomington, MN** ||
|---|---|
| Teva attendees | Nick Gerebi (National Account Manager) |
| Co-conspirator attendees | **Heritage:** Anne Sather (Director, National Accounts) |
| | **Mylan:** Jan Bell (Director, National Accounts) |

| **February 16-18, 2015 National Pharmacy Forum (Tampa, FL)** ||
|---|---|
| Teva attendees | Nick Gerebi (Director, National Accounts), Jeff McClard (Senior Director, National Accounts), Cam Bivens (Director, National Accounts), Brad Bradford (Director, National Accounts) |
| Co-conspirator attendees | **Mylan:** Lee Rosencrance (District Manager). Martin Wingerter (Director of National Accounts), Jan Bell (Director of National Accounts), Heather Paton (VP Institutional Sales), Mark Pittinger (Senior Director National Accounts) |